## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Leonid Falberg, as representative of a class of similarly situated persons, and on behalf of The Goldman Sachs 401(k) Plan,<br><br>Plaintiff,<br>v.<br><br>The Goldman Sachs Group, Inc., The Goldman Sachs 401(k) Plan Retirement Committee, and John Does 1–20,<br><br>Defendants. | Case No. 19-CV-9910<br><br>**CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.      Plaintiff Leonid Falberg ("Plaintiff"), as representative of the Class described herein, and on behalf of The Goldman Sachs 401(k) Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants The Goldman Sachs Group, Inc. ("Goldman Sachs"), The Goldman Sachs 401(k) Plan Retirement Committee (the "Retirement Committee"), and John Does 1-20 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties and engaged in unlawful self-dealing with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      As of the first quarter of 2019, Americans had approximately $8.3 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $29.1 Trillion in First Quarter 2019* (June 19, 2019) *available at*, *available at* https://www.ici.org/research/stats/retirement/ret_19_q1.  Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* BANKRATE, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), *available at* https://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx.  By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to avoid unnecessary expenses and remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). While participants have a strong interest in avoiding unnecessary costs and investing only in prudently-vetted options, the employer and plan fiduciaries in charge of those variables do not have the same incentives, as the employees bear the risk of excessive fees and investment underperformance.

4.     For financial services companies like Goldman Sachs, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan by, for example, retaining proprietary investment products that a disinterested fiduciary would avoid or remove under the same circumstances, or structuring proprietary investments to maximize revenue for the firm.

5.     To safeguard against the financial incentives for disloyalty and imprudence in defined contribution plans, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "sweeping," "overlapping," and "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 270-71, 272 n.8 (2d Cir. 1982). Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1), and with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.     Contrary to these fiduciary duties, Defendants failed to administer the Plan in the best interest of participants and failed to employ a prudent process for managing the Plan. Instead, Defendants managed the Plan in a manner that benefited Goldman Sachs at the expense of participants.

7.     The interests of Goldman Sachs interfered with Defendants' management of the Plan in a number of ways.  Among other things, Defendants retained underperforming proprietary mutual funds that an objective fiduciary in Defendants' position would have removed. These funds did not earn their high fees by outperforming their stated benchmark indexes, and their performance only worsened as time passed. While underperforming proprietary funds saw large redemptions from other investors, Defendants retained these funds in the Plan, allowing Goldman Sachs to stem the consequences of further depletion of fund assets. Defendants only removed

3

proprietary mutual funds from the Plan in 2017, after a series of legal rulings against other financial services firms highlighted Defendants' liability risk. This act of self-preservation, however, arrived too late, and Defendants have not reimbursed participants for the underperformance of the improperly retained proprietary funds.

8.      Defendants also failed to obtain lower-cost separate accounts or collective trusts in place of proprietary mutual funds. For example, the Plan remained invested in the Goldman Sachs Mid Cap Value mutual fund, which charged the Plan between 0.73% and 0.76% of the Plan's balance during the statutory period, even though Goldman Sachs offered its institutional clients a separately-managed account utilizing the same investment strategy that would have cost at most 0.55% per year. Indeed, Defendants obtained lower-cost separate account or collective trust pricing for more than fifteen unaffiliated investment options in the Plan, but appear to have made an exception for proprietary investments.

9.      Defendants did worse than overpay for proprietary mutual funds versus separate accounts. Defendants also caused the Plan to pay more for proprietary mutual funds than other plans invested in the same funds. Until the end of 2015 or early 2016, Defendants invested in Institutional shares of proprietary mutual funds in the Plan. The Institutional shares generally provided fee rebates of 0.05% to 0.10%, which other plans re-credited to participant accounts or used to offset administrative expenses.  However, Defendants did not obtain the same rebates for the Plan, and instead allowed Goldman Sachs to retain the extra 0.05% to 0.10% as additional revenue to the firm.

10.      The Plan then continued to overpay when Defendants switched to a new share class of proprietary funds.  Although the stated expense ratios for the new shares were 0.01 to 0.02% less than Institutional shares, the new shares offered no fee rebates. If Defendants were to continue

to invest in proprietary mutual funds over superior alternatives, the best option remained Institutional shares with prudent use of available fee rebates. Instead, Defendants used the Plan to infuse the new share class of proprietary funds with hundreds of millions of dollars of investment, without regard for the net position of the Plan and participants invested in those funds.

11.     Based on this conduct, Plaintiff asserts claims against Defendants under ERISA for breach of their fiduciary duties (Count One), prohibited transactions with a party-in-interest (Count Two), and prohibited transactions with a fiduciary (Count Three).  In addition, Plaintiffs assert a claim against Goldman Sachs for failure to monitor fiduciaries (Count Four).

## JURISDICTION AND VENUE

12.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

13.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFF

15.     Plaintiff Leonid Falberg resides in New Jersey and is a current participant in the Plan. Plaintiff's account in the Plan would be worth more today but for Defendants' violations of ERISA alleged in this Complaint. Plaintiff was invested in one or more non-money market

Goldman Sachs mutual funds in the Plan during the statutory period. Plaintiff has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

## THE PLAN

16.     The Plan was established in 1945 and assumed its current name in 2008.

17.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

18.     The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

19.     The Plan covers eligible employees and former employees of Goldman Sachs and participating affiliates.

20.     Participants may direct a portion of their earnings to their account in the Plan, and participants also may receive contributions from Goldman Sachs or one of its affiliates as their employer.  Participant contributions are held in trust and invested based on the investment options made available to participants by Defendants.

21.     The Plan has held approximately $5.5 billion to $7.5 billion in participant assets during the statutory period, and has consistently ranked as one the largest 100 defined contribution plans in the United States out of more than 650,000 such plans. The Plan also had approximately 30,000 to 35,000 participants with balances at any time during the relevant period.

22.     Defendants require participants to choose between a "target date" fund that holds a mix of assets determined by a professional manager and a menu of "single-strategy" options that allows participants to customize their portfolio. Participants may not invest in the target-date option and the single-strategy menu at the same time. The single-strategy menu offers around 35 pooled investment vehicles that cover major asset classes, like capital preservation, bonds, and

equities, as well as alternative asset classes, like commodities, real estate, and hedge funds. Within major asset classes, Defendants offered multiple sub-asset classes and management styles. Defendants generally offered a single option to represent a sub-asset class and management style.

23.     Around 90% of the Plan's assets were held in the single-strategy menu options during the statutory period.

### DEFENDANTS

#### *The Goldman Sachs Group, Inc.*

24.     Goldman Sachs is the "Plan Sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). Goldman Sachs has authority to appoint and remove members of the Retirement Committee. As a result of this authority, Goldman Sachs exercises discretionary authority or discretionary control respecting management of the Plan, and/or has discretionary authority or responsibility in the administration of the Plan.  Goldman Sachs is therefore a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

#### *The Retirement Committee*

25.     The Retirement Committee is named by the Plan as one of the parties responsible for administering and managing the Plan, and is therefore a named fiduciary pursuant to 29 U.S.C. § 1102(a). Although the identities of Retirement Committee members during the statutory period are not known to Plaintiff, Goldman Sachs has identified them as senior employees of Goldman Sachs or its affiliates. The Retirement Committee's duties include selecting and monitoring the Plan's investment objectives and investment options. As a result of this authority, the Retirement Committee exercises discretionary authority or discretionary control respecting management of the Plan and the disposition of Plan assets.  The Retirement Committee is therefore also a fiduciary under 29 U.S.C. § 1002(21)(A).

***John Does 1-20***

26.     Because Plaintiff does not know the identity of members of the Retirement Committee during the statutory period, they are collectively identified as John Does 1-20. As a result of their positions on the Retirement Committee and the authority granted to the Retirement Committee by the Plan, the Retirement Committee members exercise discretionary authority or discretionary control respecting management of the Plan and the disposition of Plan assets. The Retirement Committee  members are therefore fiduciaries under 29 U.S.C. § 1002(21)(A).

## ERISA FIDUCIARY DUTIES

27.      ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a)(1) states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     For the exclusive purpose of
>
> > (i)     Providing benefits to participants and their beneficiaries; and
> >
> > (ii)     Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

28.     "The fiduciary obligations of the [plan's fiduciaries] to the participants and beneficiaries of an ERISA plan are those of trustees of an express trust—the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan*, 680 F.2d at 272 n.8).

### DUTY OF LOYALTY

29.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most

fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (citation and internal quotation marks omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added); *accord In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)). Corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Donovan*, 680 F.2d at 271.

## DUTY OF PRUDENCE

30.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (citation and internal quotation marks omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that "exists separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 135 S. Ct. at 1828. If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (citation and

internal quotation marks omitted). "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litigation II*, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423 (4th Cir. 2007)).

## SOURCE AND CONSTRUCTION OF DUTIES

31.     The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (citation and internal quotation marks omitted). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.; accord La Scala*, 479 F.3d at 219 (explaining that the duty of prudence "is measured according to the objective prudent person standard developed in the common law of trusts") (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)). In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

32.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule.  This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets.  In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs.  The duty

> to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs ... that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies ... entail investigation and analysis expenses and tend to increase general transaction costs .... [T]hese added costs ... must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

## CO-FIDUCIARY LIABILITY

33.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  29 U.S.C. § 1105(a) states, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

34.     In a defined contribution plan, fiduciaries are obligated to assemble a diversified menu of investment options from which participants may choose.  *See* 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii).

35.     Each investment option within a defined-contribution plan is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class.

36.     Every pooled investment product charges certain fees and expenses that are deducted from the pool of assets on a periodic basis. For example, for the Goldman Sachs mutual funds in the Plan, management fees and other fees and expenses are paid on a monthly basis to Goldman Sachs subsidiaries.

37.     Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential typically is not realized).

### MINIMIZATION OF PLAN EXPENSES

38.     At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account. According to the Department of Labor, a difference of 1% per year in net returns can reduce an

employee's accumulated savings at retirement by 28% or more.

39.     Investment management expenses are the largest expense paid by a defined contribution plan. Investment management expenses are the fees and expenses charged by investment managers and withdrawn from each fund on a periodic basis. A plan's remaining expenses concern administrative tasks such as recordkeeping, trustee and custodial services, advisory and consulting services, and accounting.

40.     Fiduciaries can minimize investment management expenses by selecting a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Larger plans can lower investment management fees by selecting mutual funds only available to institutional investors, or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors through a separate account or collective trust.

41.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of investment management expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character") (emphasis added).

### SELECTION OF APPROPRIATE INVESTMENT OPTIONS

42.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when determining the investments to be offered within a plan. The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments.

43.     Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds. Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, and fail to reassess their investment decisions even when presented with evidence suggesting that they should.

44.     For all of these reasons, prudent fiduciaries will limit their investment menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

45.     The second critical insight provided by academic and financial industry literature is that in evaluating prudent investments, the most important consideration is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873, 883 (2009) ("Price and quality thus seem to be inversely related in the market for actively managed funds.").

46.     Consistent with these insights, a prudent investor should choose only funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after the fund's stated fees. *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## **DEFENDANTS' VIOLATIONS OF ERISA**

**I.      DEFENDANTS RETAINED HIGH COST AND POORLY PERFORMING MUTUAL FUNDS IN THE PLAN IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PLAN PARTICIPANTS.**

47.      Defendants displayed self-interest and disregard for participants by retaining high-cost, poorly performing proprietary mutual funds in the Plan.  An objective fiduciary in the same position would have removed these funds promptly at the start of the class period, and certainly before 2017. Yet Defendants retained these proprietary funds despite persistent underperformance and steep asset declines, adversely affecting participant balances while allowing Goldman Sachs to continue to draw fees and stem the consequences of losing one of the of the largest investors in the funds—the Plan. It was only reluctantly and belatedly that Defendants removed these funds from the Plan in 2017, after other self-dealing firms were successfully brought to court over similar practices. The circumstances of Defendants' retention and belated removal of these proprietary funds demonstrates that Defendants' process for managing the Plan and monitoring Plan investments was deeply flawed and improperly influenced by the interests of Goldman Sachs, in breach of Defendants' fiduciary duties.

48.      The Goldman Sachs mutual funds in the Plan were actively managed. Other than money markets, there were five proprietary mutual funds in the Plan's single-strategy menu at the end of 2013: the Goldman Sachs Large Cap Value Fund, the Goldman Sachs Mid Cap Value Fund, the Goldman Sachs High Yield Fund, the Goldman Sachs Core Fixed Income Fund, and the Goldman Sachs Short-Duration Government Fund.

49.      The Goldman Sachs mutual funds charged high fees relative to the average mutual funds held by similarly-sized plans. Among plans with more than $1 billion in assets that held mutual funds in 2013, the average expense ratio for domestic equity funds was 0.44%, but the Goldman Sachs Large Value Fund and Goldman Sachs Mid Cap Value Fund, both domestic equity

funds, cost 0.79% and 0.75%, respectively. Moreover, index mutual funds similar to the Goldman Sachs domestic equity funds were available for less than 0.10%, and actively managed funds for between 0.31% and 0.68%.

50.     For domestic bond mutual funds in 2013, plans with more than $1 billion paid 0.34% in expenses on average. Yet the proprietary domestic bond funds in the Plan—the Goldman Sachs High Yield Fund, the Goldman Sachs Core Fixed Income Fund, and the Goldman Sachs Short Duration Government Fund—charged 0.71%, 0.47%, and 0.50%, respectively. Moreover, index mutual funds similar to the Goldman Sachs domestic bond funds were available for between 0.05% and 0.15% or less, and other actively managed funds for between 0.19% and 0.40%.

51.     A prudent fiduciary offering high fee options like the Goldman Sachs mutual funds would continuously monitor whether the extra fees were justified by a reasonable expectation of increased returns. Indeed, for non-proprietary actively managed options in the Plan, which charged more than comparable index funds, Defendants appear to have monitored the options to ensure that the extra fees paid by participants were justified. As of the start of the fourth quarter of 2013, 14 out of 18 non-proprietary actively managed options in the Plan outperformed stated benchmarks net of fees over 3-, 5-, and 10-year periods, or since inception for options with shorter histories. However, among the five proprietary equity and bond funds then in Plan, only the Goldman Sachs Short Duration Government Fund passed the same test. Plan participants had more than $650 million invested in the four proprietary funds that failed the test.

52.     Moreover, the differences were not small. Multiple non-proprietary actively managed options generated sustained outperformance of 1.00% or more per year net of fees over 3-, 5- and 10-year periods as of the start of the fourth quarter of 2013. For options with shorter histories, Defendants appear to have identified outstanding managers and hired them to manage

new accounts for the Plan, as several such options outperformed their benchmarks by more than 1.00% per year net of fees since inception.  The Goldman Sachs funds were a sharp contrast. The Goldman Sachs equity funds had underperformed stated benchmarks net of fees over 3-, 5-, and 10-year periods as of the start of the fourth quarter of 2013, including net underperformance of more than 1.00% per year over the prior 3 years. The Goldman Sachs High Yield Fund also underperformed net of fees over the prior 3-, 5-, and 10-year periods, including net underperformance of more than 2.00% per year over the prior 5-year period.

53.     The performance disparity between non-proprietary and proprietary actively managed funds shows that Defendants had a different standard for proprietary funds. While Defendants appear to have demonstrated an ability to investigate and identify unaffiliated managers likely to deliver significant value to participants through superior investment performance, Defendants permitted the Goldman Sachs funds to languish for long periods without earning their fees.

54.     As time passed, the situation only worsened. The Goldman Sachs mutual funds that had failed to exceed their benchmarks for long periods continued to underperform. This underperformance would have been foreseeable to a prudent and objective fiduciary at the time, based on the long periods of prior underperformance and persistently high fees. Yet Defendants did not remove any proprietary funds, even as underperformance continued for years.

55.     For example, the Goldman Sachs Mid Cap Value Fund continued to trail its benchmark net of fees over 3-, 5-, and 10-year periods as of the end of 2014 and 2015. The Goldman Sachs Large Cap Value Fund, which was managed by the same team, also continued to trail its benchmark net of fees over 5- and 10-year periods as of the end of 2014, and trailed net of fees over 3-, 5, and 10-year periods as of the end of 2015. There were cycles that showed significant

17

poor performance, including the 5-year periods through the end of 2014 and 2015, in which both funds trailed their benchmark net of fees by more than 1.00%.

56.     The Goldman Sachs High Yield Fund and Goldman Sachs Core Fixed Income Fund also continued to underperform.  The High Yield Fund trailed its benchmark net of fees over the 5- and 10-year periods through the end of 2014, and the 3-, 5-, and 10-year periods that ended at the end of 2015. At the end of 2015, the High Yield Fund's underperformance exceeded 1.00% per year over the prior 10 years. The Core Fixed Income Fund also trailed net of fees over the 10-year periods that ended at the end of 2014 and 2015, in addition to the 3- and 5-year period that ended at the end of 2015.  And the Goldman Sachs Short Duration Government Fund also posted trailing performance net of fees over 3- and 5-year periods as of the end of 2015.

57.     There were multiple superior alternatives to these proprietary funds in the marketplace (within the same sub-asst classes and with comparable management styles), which Defendants could have readily identified had they conducted a prudent investigation. The following tables illustrate examples of superior marketplace alternatives to Goldman Sachs funds readily available to Defendants at the start of the class period:

**Plan Option: Goldman Sachs Large Cap Value Fund**

|  | 3-Year Ann. Ret. (As of 9/30/13) | 5-Year Ann. Ret. (As of 9/30/13) | 2013 Ann. Rep. Net Expense |
|---|---|---|---|
| Goldman Sachs Fund | 14.37% | 8.38% | 0.79% |
| JPMorgan Equity Income Fund | 17.81% | 11.11% | 0.53% |
| DFA US Large Cap Value | 18.58% | 10.76% | 0.27% |

**Plan Option: Goldman Sachs Mid Cap Value Fund**

|  | 3-Year Ann. Ret. (As of 9/30/13) | 5-Year Ann. Ret. (As of 9/30/13) | 2013 Ann. Rep. Net Expense |
|---|---|---|---|
| Goldman Sachs Fund | 15.62% | 11.69% | 0.75% |
| Victory Sycamore Established Value | 15.99% | 12.92% | 0.67% |
| JPMorgan Mid Cap Value | 18.85% | 12.93% | 0.74% |

**Plan Option: Goldman Sachs High Yield Fund**

|  | 3-Year Ann. Ret. (As of 9/30/13) | 5-Year Ann. Ret. (As of 9/30/13) | 2013 Ann. Rep. Net Expense |
|---|---|---|---|
| Goldman Sachs Fund | 8.50% | 11.46% | 0.71% |
| Federated Institutional High Yield | 9.34% | 12.38% | 0.49% |
| BlackRock High Yield Bond | 10.17% | 12.89% | 0.56% |

**Plan Option: Goldman Sachs Short Duration Government Fund**

|  | 3-Year Ann. Ret. (As of 9/30/13) | 5-Year Ann. Ret. (As of 9/30/13) | 2013 Ann. Rep. Net Expense |
|---|---|---|---|
| Goldman Sachs Fund | 0.79% | 2.45% | 0.50% |
| DFA Short-Term Government | 1.36% | 3.39% | 0.19% |
| Wells Fargo Short Duration Gov Bond | 1.53% | 3.29% | 0.37% |

**Plan Option: Goldman Sachs Core Fixed Income Fund**

|  | 3-Year Annual Return (As of 9/30/13) | 5-Year Annual Return (As of 9/30/13) | 2013 Ann. Rep. Net Expense |
|---|---|---|---|
| Goldman Sachs Fund | 3.60% | 6.34% | 0.47% |
| Western Asset Core Bond | 4.03% | 8.68% | 0.44% |
| Baird Aggregate Bond | 4.28% | 6.69% | 0.30% |

58.    These superior marketplace alternatives also outperformed Goldman Sachs's proprietary funds during the class period, until the Goldman Sachs funds were belatedly removed:

---

[1] Indeed, when Defendants belatedly decided to replace the long underperforming Goldman Sachs Mid Cap Value Fund, Defendants selected Sycamore to manage a mid cap value separate account for the Plan. *See infra*, at ¶ 71.

| | Total Return<br>10/31/13-<br>Removal of Goldman Sachs Fund[2] |
|---|---|
| **Goldman Sachs Large Cap Value Fund** | **8.77%** |
| JPMorgan Equity Income Fund | 10.34% |
| DFA US Large Cap Value | 10.30% |
| **Goldman Sachs Mid Cap Value Fund** | **7.36%** |
| Victory Sycamore Mid-Cap Value | 13.15% |
| JPMorgan Mid Cap Value | 10.44% |
| **Goldman Sachs High Yield Fund** | **4.43%** |
| Federated Institutional High Yield Bond | 5.85% |
| BlackRock High Yield Bond | 5.29% |
| **Goldman Sachs Short Duration Government Fund** | **0.78%** |
| Wells Fargo Short Duration Government Bond | 1.01% |
| DFA Short-Term Government | 0.98% |
| **Goldman Sachs Core Fixed Income Fund** | **2.78%** |
| Western Asset Core Bond | 3.87% |
| Baird Aggregate Bond | 3.22% |

59.     Similarly, low-cost index funds in these asset or sub-asset classes would have offered superior performance at a lower cost.

60.     Based on the marketplace of competitive non-proprietary options, a prudent and objective fiduciary would have acted sooner to address the struggling Goldman Sachs funds. By retaining Goldman Sachs funds despite persistent underperformance and in the face of superior alternatives, Defendants were improperly influenced by the interests of Goldman Sachs.

61.     The Plan's largest holding in Goldman Sachs funds, the Mid Cap Value fund, is illustrative.  The Plan consistently held more than $300 million in this fund.  The Plan's investment appears to have represented the largest single investment by any retirement plan in the fund. Between August 2013 and February 2017, the total assets in the fund dropped by 50% due to

---

[2] Through month-end prior to removal. The Goldman Sachs Large Cap Value, Goldman Sachs Mid Cap Value, Goldman Sachs Core Fixed Income Fund, and Goldman Sachs Short Duration Government Fund were removed on April 4, 2017. The Goldman Sachs High Yield Fund was removed on June 6, 2017.

investor redemptions. As investors left the fund, the Plan's stake became more important to Goldman Sachs, and eventually represented around 7% or more of the entire fund.

62.     Retaining the Goldman Sachs Mid Cap Value Fund in the Plan allowed Goldman Sachs to delay the consequence of otherwise declining assets in this fund. Typically, declining assets under management will make a manager appear less appealing to prospective and current investors, will reduce the fund's profitability, and may require the fund manager to raise fees to generate sufficient revenue. These effects can exacerbate the redemption problem, especially in the market environment over the last 10 years, in which mutual fund fees have seen fierce competition and steep decreases across the industry. Indeed, after Defendants belatedly removed the Goldman Sachs Mid Cap Value Fund from the Plan in April 2017, the fund's assets continued to decline, Goldman Sachs raised the fund's fees, and asset loss reached more than 85%. Holding on to the fund through persistent underperformance and significant redemptions helped Goldman Sachs stem these consequences, but caused substantial losses to the Plan.

63.     Similar factors appear to have motivated Defendants to retain other Goldman Sachs funds. The Goldman Sachs Large Cap Value Fund suffered significant redemptions each year since 2010, with the Plan serving as the fund's largest investor and eventually representing 10% of the entire fund. When the fund was belatedly removed from the Plan in April 2017, assets further dwindled, declining 65% since August 2013, causing Goldman Sachs to raise fees. The Goldman Sachs High Yield Fund also experienced significant redemptions in the years before it was belatedly removed from the Plan in June 2017. Although Goldman Sachs avoided raising fees while the Plan maintained its substantial $155 million stake, the fund suffered further subsequent redemptions and was forced to raise fees after the Plan belatedly exited the fund. The Goldman Sachs Core Fixed Income Fund and Goldman Sachs Short Duration Government Fund also

suffered asset declines between 2013 and 2017, with the Plan holding 5% or more of each fund prior to removal. Though Goldman Sachs may have benefited as the Plan's investments helped delay further adverse consequences for the firm, the Plan suffered mounting losses as each fund continued to underperform.

64.     When Defendants belatedly removed these funds from the Plan in 2017, it was not because circumstances changed for Plan participants. The interest of Plan participants had long demanded removal of these funds. The risk and reward of self-dealing for Goldman Sachs, however, had changed. In October of 2016, a Southern District of New York court upheld allegations that another large financial services firm competitor of the Goldman Sachs violated ERISA by retaining high-cost, poorly performing proprietary mutual funds in its employees' plan.[3] The decision also cited another federal decision from August 2016 entering a similar ruling. After these adverse court rulings, the risk that Defendants would be held liable likely exceeded the benefit to Defendants of retaining the funds, and Defendants removed all proprietary mutual funds from the Plan in 2017.[4]  Defendants should have been looking out for the interests of participants all along, not just their own interests. Defendants have not reimbursed the Plan for tens of millions

---

[3] *See Moreno v. Deutsche Bank Americas Holding Corp.*, 15-cv 9936 (LGS), 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) (denying motion to dismiss in substantial part); *see also Urakhchin v. Allianz Asset Mgt. of Am., L.P.*, 15-SACV-1614 (JLS-JCGx), 2016 WL 4507117 (C.D. Cal. Aug. 5, 2016) (same). Lead counsel for Plaintiff and the putative class in this matter also represented the plaintiff classes in *Deutsche Bank* and *Allianz*.

[4] It is "clearly improper" for a fiduciary's actions to rise and fall based on assessments of their own liability risk. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 359-61 (4th Cir. 2014). Yet all signs point to Defendants' removal of Goldman Sachs mutual funds as an abrupt shift in Defendants' perceived liability risk after *Deutsche Bank* and *Allianz*. At the same that Defendants removed proprietary funds that had long underperformed in the Plan, Defendants also removed two proprietary mutual funds that had only just been added to the Plan, the Goldman Sachs Emerging Markets Equity Fund and Goldman Sachs Strategic Income Fund. These newly-added funds, added to the Plan in 2016 and 2014, respectively, had positive 5-year performance records when Defendants removed them. Therefore, removal of all proprietary mutual funds in 2017 appears to have been a defensive response to litigation risk, not the conclusion of a routine, prudent, and objective fiduciary monitoring process.

of dollars in losses sustained during the period that these funds were imprudently and disloyally retained in the Plan.

II.    **DEFENDANTS FAILED TO CONSIDER LOWER-COST INSTITUTIONAL INVESTMENT VEHICLES FOR PROPRIETARY INVESTMENTS.**

65.    The deficient net returns of the Plan's propriety mutual funds was compounded by Defendants' failure to adequately investigate lower-cost institutional investment vehicles, such as separately managed accounts and collective trusts, for these options.

66.    Separate accounts and collective investment trusts offer a number of advantages over mutual funds for large institutional investors, including the ability to negotiate fees. Due in part to this negotiability, for investors with over $25 million to invest in a particular strategy, fees within these institutional vehicles are typically much lower than even the lowest-cost share class of a particular mutual fund.

67.    Defendants were fully aware of these advantages, as they elected to utilize separate accounts and collective trusts for many of the non-proprietary investments offered in the Plan, especially in widely-covered asset classes. Indeed, out of the 12 domestic equity options in the Plan as the of the end of 2013, the only 2 that were mutual funds were Goldman Sachs funds, the Goldman Sachs Large Cap Value Fund and Goldman Sachs Mid Cap Value Fund.

68.    There was no shortage of successful investment managers willing to offer a multi-billion dollar plan like the Plan lower pricing for substantially similar investment strategies as those represented by the Goldman Sachs mutual funds.

69.    The Plan's participants were entitled to a prudent and objective investigation of investment managers in each asset class to determine the best fit for the Plan and negotiate the best pricing and investment vehicle. Had Defendants performed this duty, the Plan would have paid 0.10% to 0.30% less during the relevant period for each strategy served by a Goldman Sachs

mutual fund, based on an annual consultant's survey of large institutional investment sponsors and managers.[5]  For example, whereas the Plan paid 0.73% to 0.79% for proprietary domestic equity mutual funds during the statutory period, the same style of investments in separate account form were available to the Plan with median fees of around 0.50%. Similarly, the Plan's holding in Goldman Sachs's proprietary high yield bond mutual fund could have been placed with an unaffiliated manager for around 0.45%, significantly less than the 0.71% paid the Plan.  For the Goldman Sachs Core Fixed Income Fund, the median separate account fee for an investment the size of the Plan's stake was less than 0.30%, much less than the 0.47% paid by the Plan.

70.     Defendants did not even have to look outside their own firm. Goldman Sachs's asset management subsidiary GSAM offers institutional clients separately managed accounts in the same investment styles as the proprietary mutual funds (which are also managed by GSAM) that Defendants held on behalf of the Plan. Defendants could have hired GSAM to manage separate accounts on behalf of the Plan and saved fees.[6] GSAM offers separate account rates well below the fees charged by corresponding mutual funds in the Plan, and the Plan would have saved 0.10% to 0.30% in fees by switching to GSAM separate accounts. For example, even after adding extra custody and administrative costs of maintaining separate accounts for the Plan, Goldman Sachs would have charged no more than 0.55% for the domestic equity options and the high yield option (as compared to more than 0.70% for the mutual fund versions of these investments in the Plan). Likewise, Goldman Sachs would have charged no more than 0.35% for the core fixed income and short duration government options (as compared to 0.47% and 0.50% for the mutual fund versions

---

[5] CALLAN INVESTMENTS INSTITUTE, *Investment Management Fee Survey: U.S. Institutional Fund Sponsors and Investment Managers* (2014), available at https://www.callan.com/wp-content/uploads/2017/01/Callan-2014-Investment-Manager-Fee-Survey.pdf.
[6] Indeed, other plan sponsors with asset manager subsidiaries have engaged such subsidiaries to manage investments for their employee plans.

of these investments in the Plan). Defendants' decision to retain mutual fund versions of these investments was a benefit to Goldman Sachs, but a loss to the Plan and its participants.

71.     When Defendants belatedly removed underperforming Goldman Sachs funds, Defendants confirmed that separate accounts and collective trusts were the best option for participants as a result of their lower fees. Defendants selected a mid cap value separate account managed by Sycamore to replace the Goldman Sachs Mid Cap Value Fund, lowering the cost of this strategy from 0.76% to 0.55%. Defendants also now offer US large cap value and core fixed income strategies in collective trust form, after removal of the Goldman Sachs mutual funds.

## III.   DEFENDANTS CAUSED THE PLAN TO PAY MORE FOR PROPRIETARY MUTUAL FUNDS THAN OTHER INVESTORS IN THE SAME FUNDS.

72.     Unfortunately for Plan participants, investing in mutual funds in place of other institutional investment vehicles was not the only way that Defendants skimmed extra fees from the Plan for the benefit of Goldman Sachs.

73.     Until sometime between September 2015 and February 2016, the Plan held Institutional shares of Goldman Sachs funds. The Institutional share class provided fee rebates to retirement plans of 0.10% for equity funds and 0.05% for bond funds. The fiduciaries of each plan could then decide how to use the fee rebates for the benefit of their participants.  Fiduciaries could offset other costs billed to their plans, or refund the fees directly to the participants invested in the rebate-paying funds.[7]

74.     However, Defendants failed to claim these available fees rebates on behalf of the Plan. Plaintiff was charged the full amount of administrative fees billable to Plan participants for

---

[7] Because Plan participants were responsible for paying the Plan's auditing, consulting, and recordkeeping expenses, the Plan's participants would have benefited financially from either potential use of fee rebates, had Defendants secured them.

years, despite holding at least one Goldman Sachs fund that paid fee rebates to other plans. Moreover, Plaintiff's account was not credited with any fee rebates.

75.     Instead of claiming these fee rebates, Defendants allowed Goldman Sachs to retain the rebate portion of the fees charged against the Plan's shares of each fund, causing the Plan to pay more for Goldman Sachs mutual funds on a net basis than other shareholders in the same funds. This cost the Plan and its participants more than $1 million in extra fees during the statutory period, which instead accrued to the benefit of Goldman Sachs.

76.     Sometime between September 2015 and February 2016, Defendants redeemed the Plan's investments in Institutional shares of Goldman Sachs funds for R6 shares. The new R6 share class did not offer fee rebates. Although the R6 shares had stated expense ratios that were 0.01% to 0.02% less than Institutional shares, for a plan that prudently claimed and distributed available fee rebates, the new shares were actually more expensive net of fee rebates.

77.     The Plan paid the R6 share fees after the change, yet the Plan would have paid less had Defendants remained in Institutional shares and claimed and distributed available fee rebates. Therefore, even after the change to R6 shares, the Plan still paid more for proprietary mutual funds than other plans invested in the same funds as a result of Defendants' mismanagement.

## IV.   PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES.

78.     Plaintiff did not have knowledge of all material facts (including, among other things, the Plan's investment fees and investment performance versus similar non-proprietary alternatives in the marketplace; the importance of the Plan to Goldman Sachs's declining mutual funds; the institutional separate account or collective trust fees charged by Goldman Sachs and unaffiliated managers to manage investment strategies substantially similar to the Plan's options; the available fee rebates from the Goldman Sachs funds in the Plan and Defendants' failure to

claim them on behalf of the Plan; and industry-wide trends regarding lower fees). Further, Plaintiff does not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments and Defendants' processes for selecting, monitoring, and removing members of the Retirement Committee, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

79. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

80. Plaintiff asserts his claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:[8]

> All participants and beneficiaries of The Goldman Sachs 401k Plan whose Plan account held any Goldman Sachs mutual fund (other than money market funds) any time on or after October 25, 2013, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plan's investment or administrative functions.

81. Numerosity:  The Class is so numerous that joinder of all Class members is impracticable. The Plan has had between 29,000 and 35,000 participants with account balances during the applicable period, and a significant portion of Plan was invested in Goldman Sachs mutual funds during the statutory period.

---

[8] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

82.   <u>Typicality</u>:      Plaintiff's claims are typical of the Class members' claims. Like

other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of

Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class

members with regard to the Plan. Defendants managed the Plan as a single entity, and therefore

Defendants' imprudent decisions affected all Plan participants similarly.

83.   <u>Adequacy</u>:      Plaintiff will fairly and adequately protect the interests of the Class.

Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel

experienced in complex class action litigation, including ERISA class action litigation. Plaintiff

does not have any conflicts of interest with any Class members that would impair or impede his

ability to represent such Class members.

84.   <u>Commonality</u>:  Common questions of law and fact exist as to all Class members,

and predominate over any questions solely affecting individual Class members, including but not

limited to:

      a.   Whether Defendants are fiduciaries of the Plan;

      b.   Whether the Plan's fiduciaries breached their fiduciary duties by engaging
in the conduct described herein;

      c.   Whether the Plan's fiduciaries are additionally or alternatively liable, as co-
fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C.
§ 1105;

      d.   Whether Goldman Sachs breached its fiduciary duty to monitor the Plan's
fiduciaries to ensure the Plan was being managed in compliance with
ERISA;

      e.   The proper form of equitable relief; and

      f.   The proper measure of monetary relief.

85.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because

prosecuting separate actions against Defendants would create a risk of inconsistent or varying

adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

86.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

87.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

88.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

89.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

90.     The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA. Further, Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

91.     As described throughout the Complaint, Defendants failed to prudently and objectively monitor the Plan's proprietary investments to ensure that each of the Plan's proprietary investments were and remained appropriate for the Plan, and failed to remove those proprietary investments that were no longer appropriate. Defendants retained proprietary funds as Plan investments despite the availability of superior alternative investments from other firms, or even from Goldman Sachs itself, that would have cost Plan participants significantly less. A prudent and objective fiduciary would have removed the disputed Goldman Sachs mutual funds by the end of 2013.

92.     Each of the above-mentioned imprudent actions and failures to act in a prudent and objective manner illustrate Defendants' failure to monitor the Plan and make Plan investment decisions based solely on the merits of each investment and what was in the interest of Plan participants. Instead, Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to Goldman Sachs. Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

93.     Through the actions and omissions described in this Complaint, Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

94.     Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

95.     Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy

the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Prohibited Transactions with a Party-in-Interest
### 29 U.S.C. § 1106(a)(1)

96.   As alleged throughout this Complaint, Defendants are fiduciaries of the Plan.

97.   The Goldman Sachs mutual funds that were offered in the Plan were serviced by various Goldman Sachs subsidiaries, including GSAM. These services included advising, promoting, and distributing the Goldman Sachs mutual funds. These subsidiaries qualify as parties-in-interest to the Plan pursuant to 29 U.S.C. § 1002(14)(E) and (G) because their employees are covered by the Plan, and because Goldman Sachs, a fiduciary of the Plan and a Plan employer, owns more than 50 percent of such subsidiaries, directly or indirectly.

98.   As described throughout the Complaint, Defendants have caused the Plan to make indirect transfers of Plan assets to GSAM and other parties-in-interest to the Plan in the form of fees and expenses deducted from shares of Goldman Sachs mutual funds held by the Plan, in violation of 29 U.S.C. § 1106(a)(1)(D). Defendants also caused the Plan to engage in transactions that constituted the sale and exchange of mutual fund shares between the Plan and GSAM and other parties-in interest, in violation of 29 U.S.C. § 1106(a)(1)(A). These transactions occurred on a daily basis throughout the class period as the Plan acquired and sold shares of Goldman Sachs mutual funds, and on a monthly basis as GSAM and other parties-in-interest deducted fees and expenses from the Goldman Sachs mutual funds.

99.   Defendants stated in every annual report to the Department of Labor that covered any portion of the class period that the Plan did not engage in any non-exempt prohibited transactions with parties-in-interest during the reporting period.  However, this is not true, as

Defendants did not satisfy all elements for an exemption.  Unbeknownst to Plaintiff until recently, Defendants did not obtain terms for investment in Goldman Sachs mutual funds that were equally favorable to the Plan as other plans invested in the same funds. In fact, Defendants caused the Plan to pay more than other investors by failing to collect available fee rebates, instead allowing GSAM and other parties-in-interest to retain more in fees from the Plan than from other plans.

100.    As a direct and proximate result of Defendants' actions and omissions, the Plan engaged in transactions that were prohibited under ERISA and not exempt. These transactions caused losses to the Plan in the form of improper and excessive fees paid to parties-in-interest, and corresponding depletion of shares of Goldman Sachs mutual funds. Defendants are liable to make good to the Plans all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with their unlawful conduct.

### COUNT III
### Prohibited Transactions with a Fiduciary
### 29  U.S.C. § 1106(b)

101.    As alleged throughout this Complaint, Defendants are fiduciaries of the Plan.

102.    Goldman Sachs received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.  These transactions took place on a monthly basis when fees and expenses were deducted from shares of Goldman Sachs mutual funds being held for the Plan in exchange for services performed by GSAM and other Goldman Sachs subsidiaries, whose profits accrued, in whole or in part, to the benefit of Goldman Sachs. Each of these payments constituted a prohibited transaction in violation of 29 U.S.C. § 1106(b)(3).

103.    Based on the foregoing facts and other facts set forth in this Complaint, Defendants knowingly caused Goldman Sachs to engage in these prohibited transactions, and made no efforts

to prevent these transactions, and are liable for these prohibited transactions under 29 U.S.C. § 1106(b)(3).

104.    These prohibited transactions were not permitted by an exemption because, among other reasons, the Plan was treated less favorably than other shareholders of Goldman Sachs funds. As noted above, fee rebates were not provided in connection with funds held by the Plan, despite the fact that fee rebates were provided in connection with the same funds held by other plans.

105.    As a direct and proximate result of Defendants' actions and omissions, the Plan engaged in transactions that were prohibited under ERISA and were not exempt. These transactions caused losses to the Plan in the form of improper and excessive fees, and corresponding depletion of shares of Goldman Sachs mutual funds. Defendants are liable to make good to the Plans all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with their unlawful conduct.

## COUNT IV
### Failure to Monitor Fiduciaries

106.    As alleged throughout the Complaint, Defendants are fiduciaries of the Plan. Goldman Sachs had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to appoint and remove members of the Retirement Committee, which includes senior Goldman Sachs employees, and the authority to hire and fire the employees who were ultimately appointed as members of the Retirement Committee. Goldman Sachs therefore had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Retirement Committee.

107.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan

assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

108.    To the extent that Goldman Sachs's fiduciary monitoring responsibilities were delegated, its monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

109.    Goldman Sachs breached its fiduciary monitoring duties by, among other things:

   a)   Failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of Defendants' imprudent actions and omissions;

   b)   failing to monitor the processes by which Plan investments were evaluated, which would have alerted a prudent fiduciary to the preferential treatment the Plan's fiduciaries were giving to Goldman Sachs proprietary investments in their process of selecting and monitoring the Plan's investments; and.

   c)   failing to remove fiduciaries whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings;

110.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to excessive fees and investment underperformance.

111.    Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), Goldman Sachs is liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor the Plan's fiduciaries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, as representative of the Class defined herein, and on behalf of

The Goldman Sachs 401k Plan, prays for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties under ERISA;

D.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.    An accounting for profits earned by Goldman Sachs in connection with the Plan, and a subsequent order requiring Goldman Sachs to disgorge all profits received from, or in respect of, the Plan;

F.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all Plan assets transferred to Goldman Sachs as a result of Defendants' unlawful conduct in violation of ERISA or a surcharge against Goldman Sachs to prevent unjust enrichment and to compensate the class for Defendants' violations of ERISA;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

K.    An award of such other and further relief as the Court deems equitable and just.

Dated: October 25, 2019

**NICHOLS KASTER, PLLP**

/s/ Michele Fisher
Michele R. Fisher, NY#4505822
Paul J. Lukas, MN#22084X*
Kai H. Richter, MN#0296545*
Brock J. Specht, MN#0388343*
Carl F. Engstrom, MN Bar No. 0396298*
Brandon T. McDonough, MN#0393259*
Ben J. Bauer, MN# 0398853*
* *pro hac vice* application forthcoming
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
fisher@nka.com
lukas@nka.com
krichter@nka.com
bspecht@nka.com
cengstrom@nka.com
bmcdonough@nka.com
bbauer@nka.com

*-and-*

**MKLLC LAW**

Major Khan, NY#2643625
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
Telephone: 646-546-5664
Facsimile: 646-546-5755
mk@mk-llc.com

ATTORNEYS FOR PLAINTIFF