UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Leonid Falberg, as representative of a class of
similarly situated persons, and on behalf of the
Goldman Sachs 401(k) Plan,

                        Plaintiff,

                        v.

The Goldman Sachs Group, Inc., The Goldman
Sachs 401(k) Plan Retirement Committee, and John
Does 1-20,

                        Defendants.

---

**OPINION AND ORDER**

19 Civ. 9910 (ER)

Ramos, D.J.:

        Leonid Falberg ("Plaintiff" or "Falberg"), a participant in the Goldman Sachs

401(k) Plan (the "Plan"), brings this class action lawsuit on behalf of the Plan and those

similarly situated.  Falberg alleges violations of the Employment Retirement Income

Security Act of 1974 ("ERISA") by the Plan's sponsor, The Goldman Sachs Group, Inc.,

and the Plan's managers, The Goldman Sachs 401(k) Retirement Committee and its

members John Does 1-20 (collectively "Defendants").  Before this Court is Defendants'

motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  Doc. 30.  For the reasons set forth below, Defendants' motion is DENIED.

I.      **Factual Background and Procedural History**

        A.      **The Plan's General Structure**

        The Plan is an employee pension benefit plan for eligible employees and former

employees of Goldman Sachs Group, Inc. ("Goldman Sachs") and its affiliates.  Doc. 1 at

¶¶ 17-19.  As a defined contribution plan, the Plan is organized so that participants have

separate accounts into which they can transfer portions of their earnings and through which employers can make contributions to employees' accounts.  *Id.* at ¶¶ 17, 20.

Defendants are fiduciaries of the Plan and its participants under ERISA.  29 U.S.C. § 1002(21)(A).  *Id.* at ¶¶ 24-26.  Goldman Sachs sponsors the Plan and can appoint or remove members of the Goldman Sachs 401(k) Retirement Committee ("Retirement Committee"), which controls the Plan.  *Id.* at ¶¶ 24-25.  The Retirement Committee is composed of John Does 1-20, each of whom are senior employees of Goldman Sachs or its affiliates.  *Id.* at ¶¶ 25-26.

The Plan's terms established a procedure for pursuing any claims under the Plan. Doc. 32-1 at 10.6.  The Plan provided that "a claim or action . . .  that relates to the Plan and seeks a remedy, ruling or judgment of any kind against the Plan or a Plan fiduciary or party in interest . . . , may not be commenced in any court or forum until after the claimant has exhausted the Plan's claims and appeals procedures[.]"  *Id.*  The Plan also set a 24-month limitations period for all judicial claims.  *Id.*

**B.     The Organization of Participant Accounts and the Offering of Proprietary Mutual Funds**

Plan participants can set up their own accounts in one of two ways.  *Id.* at ¶ 22. The first option is to have a "target date fund" which holds a mixture of assets selected by a professional manager and is calibrated to become more conservative as it approaches the target date, which is the employee's retirement date.[1]  *Id.*; Doc. 32-8 at 4.  The second option allows participants to select funds from a menu of 35 single-strategy investment

---

[1] Target-Date Fund, https://www.investopedia.com/terms/t/target_date_fund.asp (last visited July 7, 2020).

options to create their own portfolios.  Doc. 1 at ¶ 22.  Participants must choose between

using a target date fund or the single-strategy menu.[2]  *Id.*

      At the start of the class period in 2013, the menu included several investment

categories:  money market, bank deposit, bonds, domestic equity, real estate, international

equity, commodities, employer stock, and monthly valued hedge fund strategies.  Doc.

32-8.  Across these categories, Defendants offered several different investment vehicles,

including 15 separate accounts[3], 12 mutual funds[4], 7 collective trusts[5], and 1 bank

deposit.[6]  *Id.*

      From 2013 until their removal from the menu in 2017, the Plan offered five

proprietary actively managed[7] mutual funds:  the Goldman Sachs Large Cap Value Fund

("Large Cap Fund"), the Goldman Sachs Mid Cap Value Fund ("Mid Cap Fund"), the

---

[2]  During the relevant period, the Plan held approximately $5.5 to 7.5 billion in participant assets, 90% of which were invested in the single-strategy options.  *Id.* at ¶¶ 21, 23.

[3]  "A separate account is a portfolio of assets managed by a professional investment firm."  Separate Account, https://www.investopedia.com/terms/s/separateaccount.asp (last visited July 7, 2020).  One advantage of a separate account is that the investment strategy is more customized.  *Id.*  They also tend to be cheaper than most mutual funds.  What is a Managed Separate Account?, https://www.nasdaq.com/articles/what-is-a-managed-separate-account-2010-07-21 (last visited July 7, 2020).

[4]  Mutual funds pool the money collected from many investors to invest in different securities, usually stocks and bonds.  Mutual Fund, https://www.investopedia.com/terms/m/mutualfund.asp (last visited July 7, 2020).  Mutual funds charge annual fees called expense ratios.  *Id.*

[5]  Collective trusts are pooled investment vehicles managed by banks or trust companies and offered to 401(k) and certain types of government retirement plans.  What is a Collective Investment Trust?, https://admainnew.morningstar.com/webhelp/FAQs/CIT_FAQ.htm (last visited July 7, 2020).  They are generally less expensive for investors because they have lower marketing, overhead and compliance costs.  *Id.*

[6]  Bank deposits are money placed in the care of banking institutions and can be set up as an investment vehicle for consumers.  Bank Deposits, https://www.investopedia.com/terms/b/bank-deposits.asp (last visited July 7, 2020).

[7]  Passively managed funds, also called index funds, try to replicate the market index by purchasing securities matching the composition of the market.  *Id.* at ¶ 37.  Index funds are thus predictable, have diverse exposure, and have lower expenses.  *Id.*  Actively managed funds, on the other hand, pick securities to try to beat the market through superior investment strategies.  *Id.*  They are more expensive than index funds, but also have the potential to outperform the market.  *Id.*

Goldman Sachs High Yield Fund ("High Yield Fund"), the Goldman Sachs Core Fixed Income Fund ("Fixed Income Fund"), and the Goldman Sachs Short-Duration Government Fund ("Government Fund") (together, the "GS Funds").  Doc. 1 at ¶¶ 47-48.

### C.   The GS Funds' Fees and Rebates

The GS Funds charged monthly management and administrative fees for services rendered by various Goldman Sachs subsidiaries, including Goldman Sachs Asset Management ("GSAM").  Doc. 1 at ¶¶ 36, 74, 97, 102.  According to the complaint, the GS Funds cost more to administer than their peer funds.  *Id.* at ¶¶ 49-50.  For example, in 2013, the domestic equity Large Cap and Mid Cap Funds had expense ratios of .79% and .75% respectively.  *Id.* at ¶ 49.  By comparison, the average expense ratio for similar domestic equity funds was .44%.[8]  *Id.*  The domestic bond mutual funds—the High Yield, Fixed Income, and Government Funds—cost .71%, .47%, and .50%, respectively.  *Id.* at ¶ 50.  Meanwhile, the average expense ratio for domestic bond mutual funds is .34%.[9]  *Id.*

The Plan held institutional shares[10] of the GS Funds until sometime between September 2015 and February 2016.  *Id.* at ¶ 73.  The institutional shares offered fee rebates to retirement plans, which plan fiduciaries could use to offset the costs billed to the plans or to refund participants directly.  *Id.*  Because Plan participants paid the Plan's

---

[8]  Similar index funds cost .10%, and similar actively managed funds cost between .31% and .68%.  *Id.*

[9] Similar index funds cost from .05% to .15%, and similar actively managed funds cost from .19% and .40%.  *Id.*

[10]  Mutual funds offer several classes of shares that fit into two categories:  institutional shares and retail shares.  Institutional Shares, https://www.investopedia.com/terms/i/institutionalshares.asp (last visited July 7, 2020).  Institutional shares are available to institutional investors whose investments are of a certain size and have lower expense ratios.  *Id.*  Retail shares are stratified into levels A, B, C, and R, each of which have different fee structures.  *Id.*

administrative costs for auditing, consulting and recordkeeping, participants could have used fee rebates to defray those costs. *Id.* at ¶ 73 n.7. However, Defendants chose not to apply fee rebates to the Plan, charged the Plan the full amount of administrative fees, and never credited participant accounts with any fee rebates. *Id.* at ¶ 74. When Defendants then redeemed the Plan's institutional shares for retail shares in the R6 share class at some point between September 2015 and February 2016, the R6 shares did not have fee rebates and were more expensive than the institutional shares net of rebates. *Id.* at ¶ 76.

   **D.      The GS Funds' Underperformance**

   According to the complaint, the GS Funds not only had higher fees than peer funds, but also underperformed as compared to peer funds over 3, 5, and 10-year periods ("benchmarks"). At the fourth quarter of 2013, many of the non-proprietary actively managed menu options exceeded their benchmarks net of fees, with several outperforming by more than 1.00%. *Id.* at ¶¶ 51-52. The GS Funds, however, fell below almost all of their benchmarks. *Id.* at ¶ 51. Of particular note, the Large and Mid Cap Funds underperformed by more than 1.00% [11] as compared to their 3-year benchmarks, and the High Yield Fund trailed its 5-year benchmark by over 2.00%. *Id.* at ¶ 52.

   By the end of 2015, all but one of the GS Funds had underperformed over the prior 10-year period. Docs. 32-10 at 9-11. The Large and Mid Cap Funds had trailed most of their benchmarks and had each underperformed by more than 1.00% in the prior five years. *Id.* at ¶ 55. The High Yield Fund had missed most of its benchmarks and had underperformed by more than 1.00% over the prior ten years. *Id.* at ¶ 56. The Fixed Income and Government Funds had also trailed most of their benchmarks. *Id.*

---

[11] Even a 1% difference in net returns each year can reduce an employee's accumulated savings by 28% by the time of retirement. *Id.* at ¶ 38.

### E.     Superior Investment Options were Available

According to Plaintiff, Defendants should have removed the GS Funds from the menu because of their high fees and underperformance during the class period. *Id.* at ¶ 54. Plaintiff alleges that there were several non-proprietary actively managed mutual funds in the marketplace that performed better and could have replaced the GS Funds on the menu. *Id.* at ¶¶ 57-58. Defendants also could have offered index funds, which would have performed better at a lower cost. *Id.* at ¶ 59. Plaintiff also alleges that collective trusts and separate accounts were preferable menu options because their fees are negotiable.[12] *Id.* at ¶¶ 65-66.

### F.     Defendants' Incentives to Maintain the GS Funds in the Plan

Plaintiff asserts that Defendants were incentivized to offer the GS Funds in the Plan and that the Plan was the largest single investor in the Mid and Large Cap Funds. *Id.* at ¶¶ 61, 63. As other investors left the Mid Cap Fund and the fund's assets dropped by 50% between August 2013 and February 2017, the Plan's investment in the fund became even more important and eventually represented 7% or more of the fund. *Id*. at 61. Similarly, with the Large Cap Fund suffering significant redemptions, the Plan ultimately represented 10% of that fund. *Id.* at ¶ 63. The High Yield, Fixed Income, and Government Funds also endured significant redemptions throughout the class period. *Id.*

Plaintiff alleges that Defendants finally removed the GS Funds from the Plan's menu only after two district courts ruled that financial services firms had breached their

---

[12] When Defendants finally removed the GS Funds in 2017, they replaced the Mid Cap Fund with a separate account managed by Sycamore and replaced the Large Cap and Fixed Income Funds with collective trusts. *Id.* at ¶ 71.

fiduciary duties under ERISA by offering expensive proprietary mutual funds.[13] *Id.* at ¶ 64 & n.3.

During the class period, Plaintiff was unaware of Defendants' investment selection process, or of the superior options that Defendants could have selected for the Plan but did not. *Id.* at ¶ 78. Plaintiff was equally unaware of how large a percentage of the GS Funds' assets were due to the Plan's investment. *Id.*

### G.    Procedural History

On October 25, 2019, Plaintiff filed the instant complaint under 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3) alleging that Defendants breached their duties of loyalty and prudence, engaged in prohibited transactions, and failed to monitor the Plan's fiduciaries in violation of 29 U.S.C. §§ 1104 and 1106. Doc. 1. On January 27, 2020, Defendants moved to dismiss the complaint and attached three declarations from Goldman Sachs employees including regulatory disclosures, and documents provided to participants including mandatory disclosures and Plan terms and conditions. Docs. 30-34.

## II.    Standard

When ruling on a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in plaintiff's favor. *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681, 686 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To satisfy the pleading standard under

---

[13] *Moreno v. Deutsche Bank Americas. Holding Corp.*, No. 15 Civ. 9936 (LGS), 2016 WL 5957307, at *6-7 (S.D.N.Y. Oct. 13, 2016) ("*Moreno I*") (declining to dismiss breach of fiduciary duty and prohibited transaction claims); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 15 Civ. 1614, 2016 WL 4507117 at *6-7 (C.D. Cal. Aug. 5, 2016) (denying dismissal of disloyalty and monitoring claims).

Fed. R. Civ. Pro. 8, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Thus, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

On a Rule 12(b)(6) motion, in addition to the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted); 5B Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure*, § 1357 (3d. ed. 2020).

Defendants submitted three declarations with their motion. The declaration of Peter Fortner ("Fortner") attaches excerpts from several mandatory shareholder reports for the GS Funds that Goldman Sachs filed with the Securities and Exchange Commission ("SEC"). Doc. 33. The declaration of Kenneth Topping ("Topping") affixes mandatory annual prospectuses for the GS Funds also filed by Goldman Sachs with the SEC. Doc. 34. The declaration of Christopher Ceder ("Ceder") includes the 2016 Plan document explaining its terms, a summary of the Plan's terms from that same year, the Plan's Annual Return/Report of Employee Benefit Plan ("Form 5500") filed with the Department of Labor ("DOL"), and Plan Performance, Risk Measures and Fees disclosures issued to Plan participants under 29 C.F.R. § 2550.404a-5. Doc. 32.

The Court takes judicial notice of the excerpts of SEC and DOL filings attached to the Fortner, Topping, and Ceder declarations. Docs. 32-3 to 32-7, 33-1 to 33-4, 34-1

to 34-3.  *Cunningham v. Cornell Univ.*, No. 16 Civ. 6525 (PKC), 2017 WL 4358769, at

*3-4 (S.D.N.Y. Sept. 29, 2017) ("*Cunningham I*") ("Courts regularly take notice of

publicly available documents including regulatory filings" like SEC filings and DOL

Form 5500 "for the fact that they contain a statement therein but not to prove the truth of

the statement.") (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d

Cir. 2008)).  The Court also considers the Plan Performance, Risk Measures, and Fees

disclosures Goldman Sachs issued to participants and attached to Ceder's declaration,

which include the benchmarks upon which Plaintiff clearly relied in asserting his claims.

Docs. 32-8 to 32-11.  *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17 Civ. 6685

(ALC), 2019 WL 4466714, at *9 (S.D.N.Y. Sept. 18, 2019) ("Plaintiffs allegations

concern fund performance, and therefore, the Court may factor in the fund performance

data integral to the allegation to decide this motion.").  In addition, because the 2016 Plan

document is relevant and integral to the complaint, and Plaintiff does not contest its

authenticity, the Court will also consider it in evaluating Plaintiff's claims.  Doc. 32-1.

*Savides v. United Healthcare Servs., Inc.*, No. 18 Civ. 4621 (LGS), 2019 WL 1173008, at

*2 (S.D.N.Y. Mar. 13, 2019) (rejecting consideration of Plan document because, although

relevant and integral, Plaintiff objected to its consideration); *Ambris v. Bank of New York*,

No. 96 Civ. 61 (LAP), 1997 WL 107632, at *2 (S.D.N.Y. Mar. 10, 1997) ("Because the

Plans are integral to the [ERISA] complaint, I will consider them in ruling on defendants'

motion to dismiss.").  However, because it is not clear that Plaintiff relied on the 2016

Plan summary, or that it was integral to the complaint, the Court declines to consider it.

Doc. 32-2.  *Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 522 (S.D.N.Y. 2015)

(declining to consider plan summary because not relied on or referenced in complaint).

III.    **Discussion**

A.    **Threshold Questions**

Defendants raise three threshold arguments to bar Plaintiff's claims:  that his

claims are untimely, that he has failed to exhaust them, and that he lacks standing.  Doc.

31 at 27-29.  As discussed below, none have merit.

i.    **Time Bar**

Plaintiff's claims are not time-barred.  Under 29 U.S.C. § 1113, plaintiffs must

bring ERISA breach of fiduciary duty claims "after the earlier of"

> (1) six years after (A) the date of the last action which constituted a part of
> the breach or violation, or (B) in the case of an omission the latest date on
> which the fiduciary could have cured the breach or violation, or
> (2) three years after the earliest date on which the plaintiff had actual
> knowledge of the breach or violation;
> except that in the case of fraud or concealment, such action may be
> commenced not later than six years after the date of discovery of such
> breach or violation.

Defendants argue that, despite § 1113, the Plan's two-year limitations period controls.

Docs. 31 at 29, 38 at 15.

Defendants cite *Heimeshoff v. Hartford Life Ins. & Accident Ins. Co.* for the

proposition that parties may "contract around a default statute of limitations" unless

prohibited by statute.  571 U.S. 99, 107 (2013); Doc. 38 at 15.  However, *Heimeshoff*

involved claims brought under § 1132(a)(1)(B), for which ERISA does not provide a

statute of limitations, and the Court expressly limited its holding to circumstances where

there was no controlling statutory authority.  *Id.* at 105-06 ("*Absent a controlling statute

to the contrary*, a participant and a plan may agree by contract to a particular limitations

period, even one that starts to run before the cause of action accrues, as long as the period

is reasonable.") (emphasis added).  In dicta, the Court noted that statutes may or may not

10

allow parties to contract to shorter limitation periods, concluding that "[i]f parties are permitted to contract around a default statute of limitations, it follows that the same rule applies where the statute creating the cause of action is silent regarding a limitations period." *Id.* at 107.  The Court said nothing about whether ERISA allows parties to agree to a shorter statutory period for those claims covered by § 1113; indeed, the Court later suggests § 1113 *could* qualify as a controlling statute.  *Id.* at 110.  *See also Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 774 (2020) (applying § 1113 to claim under § 1132(a)(2)); *Winburn v. Progress Energy Carolinas, Inc.*, No. 11 Civ. 3527, 2015 WL 505551, at *11 (D.S.C. Feb. 6, 2015) (citing same passage from *Heimeshoff* and noting that "the Supreme Court specifically distinguished Section 1113 (the breach of fiduciary duty statute of limitations) from its holding"); *Chelf v. Prudential Ins. Co. of Am.*, No. 17 Civ. 736, 2018 WL 4219424, at *7 (W.D. Ky. Sept. 5, 2018) (rejecting Plan limitations period and applying § 1113); *Gedek v. Perez*, 66 F. Supp. 3d 368, 380 (W.D.N.Y. Dec. 17, 2014) ("While it is true that fiduciaries are generally obligated to follow plan documents, that is so only insofar as the terms of those documents are consistent with ERISA.  The requirements of the statute control.").

In the absence of controlling authority that the parties can agree to set a shorter statute of limitations period than ERISA provides for his claims, the Court declines to bar Plaintiff's claims on this basis.  Thus, Defendants' motion to dismiss Plaintiff's claims as untimely is denied.

### ii.   Exhaustion

Nor is Plaintiff's claim barred for want of exhaustion.  Defendants argue that Plaintiff failed to follow the exhaustion procedure enumerated in the Plan document and

that exhaustion applies to statutory claims under ERISA.  Docs. 31 at 29, 38 at 15.

However, as with the limitations period, Defendants cite no authority suggesting that

parties can contract to create an exhaustion requirement when ERISA already provides

one under § 1133(2).  *See supra* Part III.A.i.

Moreover, Defendants' argument that ERISA's exhaustion requirement applies to

Plaintiff's statutory claims is unpersuasive.  Plaintiff brings suit under § 1132(a)(2) and

1132(a)(3) for violation of ERISA itself, not the terms of the Plan.  Doc. 1 at ¶ 12.  While

ERISA's exhaustion requirement applies to claims raised under § 1132(a)(1)(B) to

recover benefits under a plan, *Heimeshoff*, 571 U.S. at 105, its applicability is

questionable for statutory ERISA claims, which do not require analysis of the operative

plan's terms.  The Second Circuit has yet to decide the question, and its sister Circuits are

split.  *McCulloch v. Bd. of Trustees of SEIU Affiliates Officers & Emps. Pension Plan*,

686 F. App'x 68, 69 (2d Cir. 2017) (summary order acknowledging that the Second

Circuit has not decided this question); *Diamond v. Local 807 Labor Mgmt. Pension Fund*,

595 F. App'x 22, 24-25 (2d Cir. 2014) (summary order) (collecting cases from Circuits

agreeing exhaustion not required for statutory violations); *Nechis v. Oxford Health Plans,

Inc.*, 421 F.3d 96, 101-02 & n.3 (2d. Cir. 2005) (collecting cases showing Circuit split).

*See also LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 259 n.* (2008)

(Roberts, C.J. concurring) ("Sensibly, the Court leaves open the question whether

exhaustion may be required of a claimant who seeks recovery for a breach of fiduciary

duty under § 502(a)(2).").

In the absence of controlling authority, courts in this Circuit have repeatedly

dispensed with any exhaustion requirement for statutory ERISA claims because "while

plan fiduciaries have expertise in interpreting plan documents, the Court has expertise in interpreting the statute." *Stolarz v. Rosen*, No. 03 Civ. 3083 (JGK), 2005 WL 2124545, at *4 (S.D.N.Y. Aug. 26, 2005); *see also Fernandez v. Wells Fargo Bank, N.A.*, Nos. 12 Civ. 7193, 7194 (PKC), 2013 WL 3465856, at *6 (S.D.N.Y. July 9, 2013); *Campanella v. Mason Tenders' Dist. Council Pension Plan*, 299 F. Supp. 2d 274, 281 (S.D.N.Y. 2004); *De Pace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 558-60 (E.D.N.Y. 2003).

In addition, Plaintiff argues that first raising his claims to the very fiduciaries he accuses of disloyalty would have been futile.  Doc. 35 at 30 n.40.  Several courts in this district have upheld this argument.  *De Pace*, 257 F. Supp. 2d at 560*; Gray v. Briggs*, No. 97 Civ. 6252 (DLC), 1998 WL 386177, at *7 (S.D.N.Y. July 7, 1998); *Ludwig v. NYNEX Serv. Co.*, 838 F. Supp. 769, 781-82 (S.D.N.Y. 1993) (collecting cases).

Accordingly, Defendants' motion to dismiss for lack of exhaustion is denied.

### iii.   Standing

To establish standing under Article III of the Constitution, a plaintiff must show "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In a putative class action, the named plaintiff must allege he was personally injured by defendants' conduct.  *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care*, 433 F.3d 181, 199 (2d Cir 2005).  The named plaintiff "may also have 'class standing' to assert 'other claims, unrelated to those injuries,' on behalf of unnamed class members." *Leber v. Citigroup 401(k) Plan Inv.*

*Comm.*, 323 F.R.D. 145, 154 (S.D.N.Y. 2017) ("*Leber IV*") (citing *Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 160-61 (2d Cir. 2014)).  A named plaintiff in a putative class action has class standing if he alleges personal injury caused by the defendant and "that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  *Leber IV*, 323 F.R.D. at 154 (citing *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012)).

Defendants argue that because Plaintiff has only invested in three of the five proprietary funds at issue, he cannot establish any injury with regards to the two remaining funds.  Doc. 31 at 27.  Defendants further contend that Plaintiff lacks class standing because his claims will have to be proven fund by fund, showing that they do not implicate the same concerns.  Doc. 31 at 27-28.  Neither argument prevails.

In *Leber IV*, the named plaintiffs were participants in a defined contribution plan who brought a putative class action under § 1132(a)(2) alleging defendants favored investment options with higher management fees over comparable alternatives.  323 F.R.D. at 149-51.  The Court found the named plaintiffs had asserted an injury because "plaintiffs can establish constitutional standing to bring representative claims by pointing to injuries to Plan assets."  *Id.* at 155 (citing *Carver v. Bank of New York Mellon*, No. 15 Civ. 10180 (JPO), 2017 WL 1208598, at *4 (S.D.N.Y. Mar. 31, 2017)).  The named plaintiffs satisfied the first prong of class standing because they had personally paid excessive fees in connection with their own investments, establishing an injury.  *Id.* at 156.  With respect to the second prong, the Court determined that "a fund-specific inquiry

. . . does not preclude a finding of class standing" because the question is whether *defendant's conduct* implicates the same concerns for all putative class members.  *Id.* at 158.  In holding that the named plaintiffs satisfied the second prong of class standing, the Court reasoned that "despite the variations between the Affiliated Funds, investors in all nine funds have the 'same necessary stake in litigating' whether defendants' conduct amounted to a breach of their fiduciary duties."  *Id.* (citing *NECA-IBEW*, 693 F.3d at 164).  "Proving the existence and quantum of losses incurred by each Affiliated Fund is therefore a secondary inquiry."  *Id.*  The same reasoning applies to Plaintiff's case.

Plaintiff alleges millions in losses to the Plan resulting from Defendants' decision to maintain underperforming, high cost funds, which specifically affected him as a participant invested in several of them.  Doc. 1 at ¶¶ 15, 64, 110.  Moreover, the allegation that Defendants acted in their own interest over that of the Plan in offering proprietary funds with high fees over comparable but cheaper alternatives applies to the entire class of participants who invested in any of the GS Funds.  *Id.* at ¶¶ 7-11, 79-87.

For their position, Defendants rely primarily on *Patterson v. Morgan Stanley*, where the Court concluded that plaintiffs in a putative class action did not have class standing to bring suit for defendants' breach of fiduciary duty under ERISA because they had only invested in six of the thirteen funds at issue and proof would vary by fund.  No. 16 Civ. 6568 (RJS), 2019 WL 4934834, at *4-7 (S.D.N.Y. Oct. 7, 2019).  But *Patterson* is an outlier; the majority of courts considering similar cases both in this district and elsewhere are consistent with *Leber IV*.  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009) ("a plaintiff may seek relief under § 1132(a)(2) that sweeps beyond his own injury."); *Cunningham v. Cornell Univ.*, No. 16 Civ. 6525 (PKC), 2019 WL

275827, at *2-4 (S.D.N.Y. Jan. 22, 2019) ("*Cunningham II*"); *Cassell v. Vanderbilt Univ.*, No. 16 Civ. 2086, 2018 WL 5264640, at *3 (M.D. Tenn. Oct. 23, 2018) ("Courts have recognized that a plaintiff who is injured in his or her own plan assets - and thus has Article III standing - may proceed under Section 1132(a)(2) on behalf of the plan or other participants even if the relief sought sweeps beyond his own injury."); *Moreno v. Deutche Bank Ams. Holding Corp.*, No. 15 Civ. 9936 (LGS), 2017 WL 3868803, *10 (S.D.N.Y. Sept. 5, 2017) ("*Moreno II*"); *Urakhchin*, No. 15 Civ. 1614, 2016 WL 4507117, at *4-5 (C.D. Cal. Aug. 5, 2016); *Krueger v. Ameriprise Fin., Inc.*, 304 F.R.D. 559, 566-68 (D. Minn. 2014); *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 285 F.R.D. 169, 175 (D. Mass. 2012).[14]  In addition, the argument that a named plaintiff only has constitutional standing where he shares an identical injury with the class improperly conflates the separate inquiries of Article III standing and Rule 23 class certification.  *Bais Yaakov of Spring Valley v. Houghton Mifflin Harcourt Publishers, Inc.*, 36 F. Supp. 3d 417, 421 & n.5 (S.D.N.Y. 2014); *see also Johnson v. Fujitsu Tech. and Bus. of Am.*, 250 F. Supp. 3d 460, 465 (N.D. Cal. 2017).

Thus, Defendants' motion to dismiss Plaintiff's claims for lack of standing is denied.

---

[14]  The other cases upon which Defendants rely are readily distinguishable.  *Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015) (holding no standing where plaintiff failed to allege *any* personal injury to her plan account); *Retirement Bd. of Policemen's Annuity & Benefit Fund*, 775 F.3d at 156, 162 (reasoning no class standing because claim that each of 530 trusts were not properly documented and the same mistake was not replicated in each required "very different proof" for each trust); *Caltagirone v. N.Y. Cmty. Bancorp, Inc.*, 257 F. App'x 470, 472-74 (2d Cir. 2007) (finding named defendants lacked standing because they were either never part of the plan or terminated employment before the class period, or had an ESOP account for which "plaintiffs' theory of fiduciary breaches has no application").

**B.      Breach of Fiduciary Duties (Count I)**

    **i.      Duty of Prudence**

As the Supreme Court recently explained, a participant's "benefits can turn on the plan fiduciaries' particular investment decisions." *Thole*, 140 S. Ct. at 1618.  ERISA requires fiduciaries to discharge their investment selections "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use" in the same circumstances.  29 U.S.C. § 1104(a)(1)(B).  Courts "'measure fiduciaries' investment decisions and disposition of assets'" against the prudent person standard.  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (citing *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 143 n.10 (1985)).  Put simply, the central question is whether "a prudent fiduciary in like circumstances would have acted differently."  *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 720 (2d Cir. 2013).  By necessity, the inquiry turns on the circumstances at the time the fiduciary acted and "will necessarily be context specific."  *Fifth Third*, 573 U.S. at 425 (citing § 1104(a)(1)(B)).  The prudence of any given investment is judged against the backdrop of the entire portfolio.  *Pension Benefit*, 712 F.3d at 716-17.  Courts must also be mindful to "judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight."  *Id.* at 716 (citation omitted).  A plaintiff may survive a motion to dismiss, even absent allegations of the defendant's knowledge or inadequate investigation, if the court can infer "based on circumstantial factual allegations . . . 'that the process was flawed.'"  *Id.* at 718 (citing *Braden*, 588 F.3d at 596).

Plaintiff alleges that Defendants acted imprudently by offering the GS Funds despite their underperformance when there were comparable investment options that cost less.  Doc. 1 at ¶¶ 49-60.  Plaintiff also pleads that Defendants acted imprudently in continuing to offer the GS Funds, even though they consistently underperformed, until 2017 when the litigation risk associated with offering them increased.  *Id.* at ¶¶ 54, 64. Plaintiff further asserts that Defendants failed to offer separate accounts or collective trusts, which were offered to other investors, or provide participants fee rebates that were used to defray other investors' costs.  *Id.* at ¶¶ 65, 73-75.  Defendants raise several counter arguments in support of the instant motion but each fail.

**Underperformance and Fees.**  Defendants argue that because Plaintiff alleges a prudent fiduciary would have removed the GS Funds by the end of 2013, the only relevant GS Fund performance data is from that period.  Doc. 31 at 12, 14 & n.14.  Based on the 2013 data, Defendants reason that selection of the GS Funds for inclusion in the menu was not imprudent because all but one had exceeded their benchmarks over the prior year.  Doc. 31 at 14.  Defendants further argue that any shortfalls, even those over 1.00%, were marginal.  *Id.* at 13-14 & n.13.  However, Defendants' argument neglects that the GS Funds missed most of their benchmarks at the end of 2013, and that even a 1% difference in net returns each year can reduce a participant's savings by over a fourth by retirement.  Docs. 1 at ¶¶ 38, 52, 32-8 at 9-11.

Defendants' argument also ignores that fiduciaries must not only exercise care in "selecting investments at the outset" but also have "a continuing duty of some kind to monitor investments and remove imprudent ones."  *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015).  By 2015, the GS Funds had continued to underperform over most

18

of their benchmarks, and all but one had underperformed over the prior 10-year period.

Docs. 35 at 12-13, 32-10 at 9-11. *Sacerdote v. New York Univ.,* No. 16 Civ. 6284 (KBF),

2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017) (finding ten years of

underperformance combined with inaction supported imprudence claim).

Defendants also contend that the fees were within a reasonable range and that the

fees charged for an index fund cannot be meaningfully compared to the fees of an

actively managed fund. Doc. 31 at 15-16. However, Plaintiff pleads the expense ratios

of similar *mutual funds* as well as index funds, showing that the GS Funds' expense ratios

were 1.1 to 3.7 times higher. Doc. 1 at ¶¶ 49-50. *Moreno I*, 2016 WL 5957307, at *1-2

(finding one fund charging more than 11% in fees than comparable investments, and

several others charging two to five times higher fees, sufficient to state a claim of

imprudence). Whether such fees are reasonable is a question of fact not determinable on

a motion to dismiss. *Bekker v. Neuberger Berman Inv. Group Comm.*, No. 16 Civ. 6123

(LTS), 2019 WL 2073953, at *4 (S.D.N.Y. May 9, 2019) ("it would not be appropriate

for the Court to weigh evidence to determine which comparisons are the most probative

in the context of this motion practice."). In addition, courts in other jurisdictions have

rejected any presumption of reasonableness from expense ratios falling within a given

range. *Schapker v. Waddell & Reed Fin., Inc.*, No. 17 Civ. 2165, 2018 WL 1033277, at

*9 (D. Kan. Feb. 22, 2018) (rejecting presumption of prudence around reasonable range

of fees); *Troudt v. Oracle, Corp.*, No. 16 Civ. 175, 2017 WL 1100876, at *2 (D. Colo.

Mar. 22, 2017) (same); *cf. Fifth Third Bancorp*, 573 U.S. at 412 (rejecting presumption of

prudence for employee stock ownership plans).

Defendants are right that they need not pick the cheapest or best-performing funds to offer participants, but that is not the argument upon which Plaintiff rests. Docs. 31 at 15-16, 38 at 5. Taken together, Plaintiff's allegations that the GS Funds underperformed and failed to warrant their elevated expense ratios as compared to similar funds sufficiently states a claim of imprudence. Doc. 1 at ¶¶ 51, 57-58.[15] *Velazquez v. Mass. Fin. Sevs. Co.*, 320 F. Supp. 3d 252, 259 (D. Mass. 2018) ("A claim of breach is sufficiently made out, however, when a plaintiff plausibly alleges that the higher fees were unjustified or otherwise improper."); *Cunningham I*, 2017 WL 4358769, at *8 ("to the extent plaintiffs claim that defendants breached their fiduciary duties by selecting specific retail funds over lower-cost, but otherwise identical, institutional funds . . . , these allegations are sufficient to survive the motions to dismiss."); *Moreno I*, 2016 WL 5957307, at *6; *Leber v. Citigroup 401(k) Plan Inv. Comm.*, No. 07 Civ. 9329 (SHS), 2014 WL 4851816, at *4 (S.D.N.Y. Sept. 30, 2014) ("*Leber II*"). "While it may turn out that defendants had legitimate and prudent reasons for making the challenged investments available to participants—or that the retail and corresponding institutional mutual funds were not truly identical—accepting the Complaint's allegations as true and drawing all reasonable inferences in favor of the plaintiffs, plaintiffs' allegations are sufficient, at this stage, to survive a motion to dismiss." *Cunningham I*, 2017 WL 4358769, at *8.[16]

---

[15] Defendants argue Plaintiff does not plead comparators with specificity but Plaintiff identifies them by name and asserts that they are managed with similar strategies. Docs. 1 at ¶ 57, 38 at 4-5.

[16] Defendants' other arguments, that their selection methods were sound, that there is strategy in maintaining underperforming investments, that the degree of underperformance is not significant, and that above-average fees are not unreasonable are also not resolvable at the pleading stage. Doc. 38 at 2-6 & nn.3, 6.

And, unlike *Patterson*, Plaintiff alleged several other indicia of imprudence.  2019 WL 4934834, at *10-12;[17] *see also Pension Benefit*, 712 F.3d at 719 ("courts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct.") (citation omitted); *Dorman v. Charles Schwab Corp.*, No. 17 Civ. 285, 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019);  *White v. Chevron Corp.*, No. 16 Civ. 793, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("ERISA requires a plaintiff to plead some other objective indicia of imprudence" besides poor performance) (citing *Pension Benefit*, 712 F.3d at 719).  Here, Plaintiff alleges that 14 of the 18 non-proprietary funds offered by the Plan exceeded their benchmarks at the end of 2013.  Doc. 1 at ¶ 51.  Since the GS Funds did not perform as well, there is an inference that Defendants held proprietary funds to a different standard.  *Id.*  That inference is further supported by Plaintiff's assertion that the Plan represented increasingly significant percentages of the GS Funds as other investors increasingly dumped their shares towards the end of the class period.  Doc. 1 at ¶¶ 61-63.  Plaintiff also pleaded that Defendants waited until unrelated litigation challenging the maintenance of expensive, underperforming proprietary funds to remove the GS Funds

---

[17] The other cases Defendants cite to the contrary are from out of Circuit and differ significantly on the facts.  *Renfro v. Unisys Corp.*, 671 F.3d 314, 327-28 (3d Cir. 2011) (affirming dismissal of imprudence claim where plan offered 73 investment options with a variety of profiles and no allegation of "quid pro quo for inclusion of particular unaffiliated mutual funds"); *Loomis v. Exelon Corp.*, 658 F.3d 667, 669-70 (7th Cir. 2011) (upholding dismissal of imprudence claim where plaintiffs challenge retail mutual funds also offered to public at same expense); *Hecker v. Deere & Co.*, 556 F.3d 575, 586-87 (7th Cir. 2009) (affirming dismissal of imprudence claim where plaintiffs singled out 26 investment options out of more than 2,500 investment options offered); *Dorman*, 2019 WL 580785, at *6 ("all ten SMRT Funds outperformed or matched the Index benchmark in the previous five years, and eight out of the ten funds outperformed or matched the Universe Median in the previous five years."); *White*, 2016 WL 4502808, at *17 ("The mere fact that the fund's price dropped is not sufficient to state a claim for breach of fiduciary duty.").  In addition, none involve similar allegations of self-dealing.  Doc. 35 at 12.

from the Plan's menu. *Id.* at ¶ 64 & n.3. These allegations raise the specter that Defendants maintained the GS Funds as menu options for their own benefit.

   **Separate Accounts.** Defendants argue that they are barred from offering proprietary separate accounts under ERISA. Doc. 31 at 17. In addition, Defendants contend, even if proprietary separate accounts were permitted, Defendants are not required to offer them. *Id.* at 18. But Plaintiff's claim is not necessarily limited to proprietary separate accounts: it is that Defendants failed to consider superior, cost-effective pooled investment alternatives to the GS Funds including separate accounts and collective trusts. Doc. 1 at ¶¶ 65-69. This may be true even though Defendants offered separate accounts managed by third parties because, ultimately, Plaintiff's point is that the GS Funds were imprudent and other investment options should have replaced them sooner. Doc. 31 at 18. Tellingly, Defendants make no arguments with respect to collective trusts, having replaced the Large Cap and Fixed Income Funds with collective trusts following their removal from the Plan's menu in 2017, and their affiliate GSAM having offered them prior to July 2015. Docs. 1 at ¶ 71, 32-6 at 49, 35 at 16 n.22. Several courts in this Circuit have upheld similar claims at this stage. *In re M&T Bank Corp. ERISA Litig.*, No. 16 Civ. 375, 2018 WL 4334807, at *8-9 (W.D.N.Y. Sept. 11, 2018); *Velazquez*, 320 F. Supp. 3d at 257, 259; *Moreno I*, 2016 WL 5957307, at *2, 6.

   **Rebates.** Defendants deny the existence of a fee rebate program and explain that, had there been rebates, they would have been used by the fiduciaries to defray administrative costs to recordkeepers to the benefit of Defendants and not the Plan. Doc. 31 at 18-19. The main authority Defendants rely on for this position, however, was decided on motion for summary judgment, where the plaintiff's claim had survived an

earlier dismissal motion.  *Wildman v. AM. Century Servs., LLC*, No. 16 Civ. 737, 2018

WL 2326627, at *8-9 (W.D. Mo. May 22, 2018) ("*Wildman II*"); *Wildman*, 237 F. Supp.

3d 902, 916 (W.D. Mo. Feb.27, 2017) ("*Wildman I*").

Accordingly, Defendants' motion to dismiss Plaintiff's claims of breach of the

duty of prudence is denied.

ii.      **Duty of Loyalty**

Loyalty has been called "the most fundamental duty of a trustee" and the onus it

places on fiduciaries has been described as "stricter than the morals of the marketplace."

*Pegram v. Herdich, 530* U.S. 211, 224-25 (2000) (citations omitted).  Under §

1104(a)(1)(A), fiduciaries must act "solely in the interest of the participants and

beneficiaries for the exclusive purpose of providing benefits to the participants and

beneficiaries; and defraying reasonable expenses of administering the plan[.]"

Fiduciaries must discharge their duties "with an eye single to the interests of participants

and beneficiaries."  *Patterson*, 2019 WL 4934834, at *7 (citation omitted).  To state a

claim of disloyalty, "a plaintiff must allege plausible facts supporting an inference that

the defendant acted *for the purpose of* providing benefits to itself or someone else."

*Ferguson*, 2019 WL 4466714, at *4 (collecting cases) (emphasis in original).

Defendants argue that Plaintiff's disloyalty claim must fail because it overlaps

with his imprudence claim.  Doc. 31 at 19-20.  But, while the Second Circuit has

recognized that plaintiffs must do more than "recast" their imprudence claims as

disloyalty claims, it has also recognized that they are "interrelated and overlapping"

claims that often "rise or fall" together.  *Rosen v. Prudential Retirement Ins. & Annuity

Co.*, 718 F. App'x 3, 7 (2d Cir. 2017) (quoting *Sacerdote*, 2017 WL 3701482, at *5);

*Leber v. Citigroup 401(k) Plan Inv. Comm.*, 129 F. Supp. 3d 4, 13 (S.D.N.Y. 2015)

("*Leber III*") (citing *Pension Benefit*, 712 F.3d at 715).  The complaint styles the two

issues as one count but, while the allegations of disloyalty add plausibility to the claims

sounding in imprudence, the two claims are not entirely coextensive.  Doc. 1 at ¶¶ 88-95;

*see supra* Part III.B.i.

Plaintiff raises several allegations from which one can infer that Defendants were

acting for their own benefit in maintaining the GS Funds.  Plaintiff alleges that most of

the non-proprietary funds offered by the Plan exceeded their benchmarks by the end of

2013.  *Id.* at ¶ 51.  That the GS Funds did not perform as well suggests that Defendants

were less critical of the GS Funds than other investments.  *Id.*  In addition, as other

investors redeemed their shares in the GS Funds, the Plan participants who had invested

in them occupied an increasingly larger share of their assets until their removal from the

menu in 2017, which suggests that Defendants maintained the GS Funds not for the

benefit of the Plan but for the benefit of themselves.  *Id.* at ¶¶ 61-64.

Defendants contend that there were good reasons to offer proprietary mutual

funds, there were 30 other investment vehicles to choose from, and they had used a

fiduciary investment advisor, so it is implausible that the GS Funds were offered for their

benefit.  Doc. 31 at 20-21.  But the availability of other investment options does not

excuse the offering of any imprudent ones.  *Gedek*, 66 F. Supp. 3d at 380 ("'a fiduciary

cannot free himself from his duty to act as a prudent man simply by arguing that other

funds, which individuals may *or may not* elect to combine with a company stock fund,

could theoretically, in combination, create a prudent portfolio.'") (citing *DiFelice v. U.S.

Airways*, 497 F.3d 410, 423 (4th Cir. 2007)) (emphasis in original).  Nor does the

existence of an investment advisor immunize disloyalty.  *Donovan v. Bierwith*, 680 F.2d 263, 272 (2d Cir. 1982); *Intravia v. Nat'l Rural Elec. Coop. Assoc.*, No. 19 Civ. 973, 2020 WL 58276, at *2 (E.D. Va. Jan. 2, 2020).

Accordingly, Defendants' motion to dismiss Count I is denied.

### C.    Prohibited Transactions

Section 1106 was intended to "categorically" bar transactions "likely to injure the pension plan."  *Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (citation omitted). These "per se" prohibitions have been described as a "gloss on the duty of loyalty." *Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007, 1055 (W.D. Wis. 2012); *see also Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 143 n.10 (1985).  As the Supreme Court has said, each prohibition enumerated in § 1106 is aimed at rooting out conflicts of interest and preventing self-dealing.  *Russell*, 473 U.S. at 143 & n.10; *Chesemore,* 886 F. Supp. 2d at 1055.  Here, Plaintiff alleges three violations of § 1106:  (1) that Defendants caused the Plan to engage in sales and exchanges with GSAM and other parties in interest;  (2) that Defendants caused the Plan to make indirect transfers of Plan assets to GSAM and other parties in interest; and (3) that Goldman Sachs received consideration when GSAM and other Goldman Sachs subsidiaries transacted with the Plan.  Doc. 1 at ¶¶ 98, 102.  Defendants deny engaging in prohibited transactions and assert, in the alternative, that they are exempt under DOL regulation PTE 77-3.  Doc. 31 at 21-26.

### i.    § 1106(a) (Count II)

Section 1106(a) lists "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed*, 517 U.S. at 893 (citation omitted).  Plaintiff's allegations fall under two such

categories:  sale or exchange of any property with a party in interest, and transfers to or use by or for the benefit of a party in interest of any plan assets.  29 U.S.C. §§ 1106(a)(1)(A), (D).

### a.      § 1106(a)(1)(A)

A fiduciary is prohibited from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—sale or exchange, or leasing, of any property between the plan and a party in interest."  29 U.S.C. § 1106(a)(1)(A).  To gain relief, a plaintiff must show that a fiduciary caused the plan to engage in the prohibited transaction.  *Lockheed*, 517 U.S. at 888.

Defendants argue that the fee transactions were initiated by Plaintiff's choice to invest in the GS Funds and that the only transaction they caused was the initial choice to offer GS Funds as menu options, which is time barred.  Doc. 31 at 22-23.  Each argument relies on scant authority and is therefore unpersuasive.[18]

Defendants also assert that, for purposes of the sale of GS Fund shares, the GS Funds are not parties in interest.  Doc. 31 at 23.  But that misapprehends Plaintiff's claims, which is that GSAM, a subsidiary of Goldman Sachs, is the party in interest benefitting from exchange of the Plan's shares.  "Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries."  *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530

---

[18]  Neither the regulation upon which Defendants rely for the first argument, nor the cases upon which Defendants rely for the second, bind this Court.  *See* 29 C.F.R. § 2550.404c-1(a)(2) (specifying that "The standards set forth in this section are applicable solely for the purpose of determining whether a plan is an ERISA section 404(c) plan" and "are not intended" to determine other responsibilities under ERISA); *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015) (concluding, contrary to *Tibble v. Edison Int'l*, 639 F. Supp.2d 1074, 1086 (N.D. Cal. 2009), that the duty to monitor can be violated continuously by inaction); *Feinberg v. T. Rowe Price Grp., Inc.*, No. 17 Civ. 427, 2018 WL 3970470, at *11 (D. Md. Aug. 20, 2018) (noting that plaintiff challenged monthly fees as prohibited transactions and not inclusion of funds, therefore declining to follow *David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013) and rejecting dismissal).

U.S. 238, 242 (2000).  ERISA defines, *inter alia*, any person providing services to the plan or an employer of any employees covered by the plan as parties in interest.  29 U.S.C. §1002(14)(B), (C).  GSAM fits both categories.  Doc. 32-1 at 15, 82 (showing GSAM employees are covered by the Plan); *Brotherson v. Putnam Invs., LLC*, 907 F.3d 17, 25 n.7 (1st Cir. 2018).

Thus, Defendants' motion to dismiss Plaintiff's claim under § 1106(a)(1)(A) is denied.

### b.    § 1106(a)(1)(D)

Under § 1106(a)(1)(D), a fiduciary cannot "caus[e] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—transfer to, or use by or for the benefit of a party in interest, of any" plan assets.

Defendants reason that the fees are the GS Funds' assets, not the Plan's.  Doc. 31 at 23-24.  This again misinterprets Plaintiff's position, which is that the payments the Plan makes are unreasonably high and therefore include assets that rightfully belong to the Plan.  Doc. 35 at 23-24.  *Vellali v. Yale*, 308 F. Supp. 3d 673, 690 (D. Conn. 2018) ("payments from mutual funds made at the expense of participants *are* Plan assets and . . . the portion that exceeds a reasonable amount . . . rightfully belongs to the Plan.") (emphasis in original); *Schapker*, 2018 WL 1033277, at *10 (denying dismissal motion where plaintiff urged "the management fees at issue were paid out of the mutual fund assets, not Plan assets"); *Moreno I*, 2016 WL 5957307, at *5 (finding argument that fee payments were not plan assets unpersuasive because "[b]y alleging that Defendants included the proprietary funds for the purpose of increasing the amount of fees paid to [subsidiaries], the Complaint sufficiently alleges that the challenged transactions were

indirect transfers to a party in interest.").  It also discounts representations Defendants

make in their own disclosures that "[i]nvestment management fees charged by managers

of mutual funds are borne by the Plan."  Doc. 32-4 at 49; *Metzler v. Solidarity of Labor*

*Orgs. Health and Welfare Fund*, No. 95 Civ. 7247 (KMW), 1998 WL 477964, at *5

(S.D.N.Y. Aug. 14, 1998).

Defendants further argue that fee collection is not an indirect transfer because

there is no indication Defendants intended it to benefit a party in interest.  Doc. 31 at 24.

But, as we have already determined, GSAM is a party in interest.  *See supra* Part III.C.i.a;

*Moreno I*, 2016 WL 5957307, at *3, 5-6 (upholding claim that offering proprietary

mutual funds caused plan to engage in indirect transfer with subsidiaries via monthly

fees).  And any intent requirement is inconsistent with the "categorical" nature of the §

1106 prohibited transactions.  *Haley Teachers Ins. & Annuity Assoc. of Am.*, 377 F. Supp.

3d 250, 264 (S.D.N.Y. 2019) ("Requiring plaintiffs to demonstrate that fiduciary

transferors and non-fiduciary transferees knew their transaction violated ERISA would

erect a significant barrier to the ability of plaintiffs in such cases to survive a motion to

dismiss or ultimately prevail.").

Thus, Defendants' motion to dismiss Plaintiff's claim under § 1106(a)(1)(D) is

denied.

### ii.      § 1106(b)(3) (Count III)

Under § 1106(b)(3), a fiduciary cannot "receive any consideration for his own

personal account from any party dealing with such plan in connection with a transaction

involving the assets of the plan."  Here, Plaintiff alleges that Goldman Sachs benefitted

from the fees collected by its subsidiaries from the Plan.  Doc. 1 at ¶ 102.

Defendants counter that § 1106(b)(3) is meant to prevent kickbacks, which this cannot be because Goldman Sachs neither chose to invest in the GS Funds nor is enriched from the fees.  Docs. 31 at 25; 38 at 13.  But, as Plaintiff points out, § 1106(b)(3) was meant to prevent any consideration, not just kickbacks.  *Skin Pathology Assocs., Inc. v. Morgan Stanley & Co. Inc.*, 27 F. Supp. 3d 371, 375 (S.D.N.Y. 2014).  Section 1106(b) "protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing."  *Lowen v. Tower Asset Mgmt, Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987).  For this reason, the Second Circuit has held its provisions must "be broadly construed" and its protections applied "even where there is no taint of scandal, no hint of self-dealing, no trace of bad faith."  *Id.* (collecting cases).

In this case, Plaintiff's allegations give rise to the suggestion that Defendants offered the GS Funds and kept offering the GS Funds despite underperformance and higher fees in order to collect those fees through their subsidiaries.  Moreover, by the plain words of the statute, Goldman Sachs' subsidiaries are a "party dealing with" the Plan by collecting the fees from which Goldman Sachs ultimately benefits.  That the Second Circuit has approved "piercing the corporate veil" to hold subsidiary entities liable for violation of  § 1106(b)(3) further suggests that the provision stretches to include fee collection by Goldman Sachs' subsidiaries.  *Lowen*, 829 F.2d at 1213.

Accordingly, Defendants' motion to dismiss Count III is denied.

### iii.    PTE 77-3

Defendants assert that they are exempt from any violations of § 1106 under PTE 77-3, the DOL's exemption for affiliated mutual funds.  Doc. 31 at 25-26; 42 Fed. Reg. 18,734 (Apr. 8, 1977).  PTE 77-3 provides that § 1106 does not apply to the sale of shares

of a proprietary mutual fund by an employee benefit plan.  *Leber v. Citigroup, Inc.,* No. 07 Civ. 9329 (SHS), 2010 WL 935442, at *10 (S.D.N.Y. Mar. 16, 2010) ("*Leber I*") (citing 42 Fed. Reg. at 18,734-35).  There are four conditions to qualify as exempt:

> first, the plan must pay no 'investment management, investment advisory or similar fee' to the mutual fund, although the mutual fund itself may pay such fees to its managers;  second, the plan must not pay 'a redemption fee' when selling its shares;  third, the plan must not pay a sales commission in connection with the sale or acquisition;  and fourth, *all other dealings between the plan and the affiliated fund must be 'on a basis no less favorable to the plan than such dealings are with other shareholders.'*

*Id.* (quoting 42 Fed. Reg. at 18,735) (emphasis added).  As an affirmative defense, Defendants bear the burden of showing PTE 77-3 applies and, because this is a Rule 12(b)(6) motion, its application must be clear from the face of the complaint and any judicially noticed documents.  *Moreno I*, 2016 WL 5957307, at *6.

Plaintiff pleads that the Plan was treated less favorably than other plans because the fiduciaries of other plans collected fee rebates on behalf of those plans while the Plan's fiduciaries did not.  Doc. 1 at ¶¶ 74, 99, 104.  Courts have recognized such arrangements may constitute less favorable treatment blocking exemption under PTE 77-3.  *See, e.g.*, *Brotherston*, 907 F.3d at 30 (vacating and remanding "for the district court to reconsider whether the requirement of PTE 77-3(d) is satisfied in light of revenue sharing payments Putnam makes to other plans"); *Cryer v. Franklin Res., Inc.*, No. 16 Civ. 4265, 2018 WL 6267856, at *2, 5 (N.D. Cal. Nov. 16, 2018) (denying summary judgment where rebates were offered under conditions the plan did not meet and defendants claimed there was no evidence of rebates).

Defendants contend there were no rebates, but cite to no judicially-noticeable or incorporated source for that assertion.  Doc. 31 at 26.  In the alternative, Defendants

30

argue, without authority, that PTE 77-3 does not require funds to treat all intermediaries

alike or recordkeepers to treat all plans the same—a claim that suggests that there *were*

rebates. *Id.* As a result of such vast disagreement between the parties, dismissal at this

stage of the litigation on this basis would be inappropriate. *M&T*, 2018 WL 4334807, at

*10 (rejecting dismissal where "parties disagree considerably about" whether Plan

participants were treated differently than outside investors with rebates); *Wildman I,* 237

F. Supp. 3d at 913 ("compliance with PTE 77–3 is a question of fact that cannot be

resolved at this stage"). Defendants' motion to dismiss Counts II and III on the basis of

PTE 77-3 is therefore denied.

### D.   Monitoring (Count IV)

Defendants argue that Plaintiff's monitoring claim is derivative of his other

claims and otherwise conclusory. Doc. 31 at 26. Because Plaintiff's other ERISA claims

survive Defendants' motion, and because similar allegations have survived dismissal,

Plaintiff's monitoring claim survives as well. Doc. 35 at 26-27; *supra* Part III.B; *Zavala*

*v. Kruse-Western, Inc.*, 398 F. Supp. 3d 731, 747 (E.D. Cal. 2019) (upholding allegation

of failure to investigate); *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 795 (N.D. Tex.

2017) (finding allegations of failing to evaluate investments, failing to monitor

investment selection process, and failure to remove fiduciaries sufficient). Thus,

Defendants' motion to dismiss Count IV is denied.

## IV.     Conclusion

In sum, Defendants' motion to dismiss is denied.  The Court respectfully directs the

Clerk to terminate the motion, Doc. 30.

SO ORDERED.

Dated:     July 9, 2020
           New York, New York

_____
Edgardo Ramos, U.S.D.J.