# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Leonid Falberg, as representative of a
class of similarly situated persons, and
on behalf of The Goldman Sachs 401(k)
Plan,

                    Plaintiff,

                  - against -

The Goldman Sachs Group, Inc., The
Goldman Sachs 401(k) Plan Retirement
Committee, and John Does 1–20,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Case No. 1:19-cv-09910-ER

## DEFENDANTS' MEMORANDUM OF LAW IN
## SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Richard C. Pepperman II
Thomas C. White
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: 212-558-4000
Facsimile: 212-558-3588
peppermanr@sullcrom.com
whitet@sullcrom.com
popovskym@sullcrom.com

*Attorneys for Defendants*

February 28, 2022

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................1

STATEMENT OF FACTS ........................................................................4

    A.    The Plan .........................................................................4

    B.    The Committee's Robust Process for Managing the Plan ......................5

    C.    No Favoritism Toward GSAM Funds .......................................7

    D.    The Committee's Decision to Remove the Five Challenged Funds ......................8

    E.    Plaintiff's Claims .....................................................10

ARGUMENT ..................................................................................12

I.    Plaintiff Cannot Prove a Breach of the Duty of Loyalty ..............................12

II.    Plaintiff Cannot Prove a Breach of the Duty of Prudence ...............................15

    A.    The Committee Employed a Prudent Process.....................................16

    B.    Plaintiff's Second-Guessing Cannot Prove a Breach of the Duty of Prudence.........................................................17

        1.    The Lack of a Formal IPS Does Not Establish a Breach .......................... 18

        2.    Rocaton's Ratings Do Not Establish a Breach ........................................ 20

        3.    Three Funds' Alleged "Underperformance" Does Not Establish a Breach ................................................................ 23

        4.    The Committee's Offering the GSAM Investments in the Form of Mutual Funds Does Not Establish a Breach .............................................. 26

III.    Plaintiff Cannot Prove His Prohibited Transaction Claims ...............................27

IV.    Plaintiff Cannot Prove a Breach of the Duty to Monitor ...................................28

V.    Plaintiff Cannot Prove Performance-Based Losses for Two of the Challenged Funds.........................................................29

CONCLUSION................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................................1

*Bunch* v. *W.R. Grace & Co.*,
555 F.3d 1 (1st Cir. 2009)............................................................................................22

*Chao* v. *Merino*,
452 F.3d 174 (2d Cir. 2006).....................................................................................15, 22

*In re Citigroup ERISA Litig.*,
2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009)..............................................................28

*In re Citigroup ERISA Litig.*,
662 F.3d 128 (2d Cir. 2011)..........................................................................................25

*Cunningham* v. *Cornell Univ.*,
2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019)..........................................................4, 30

*DiFelice* v. *U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ........................................................................................17

*Hughes* v. *Northwestern Univ.*,
142 S. Ct. 737 (2022)..............................................................................3, 16, 17, 25

*Leber* v. *Citigroup, Inc.*,
2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ................................................................28

*Leber* v. *Citigroup 401(k) Plan Inv. Comm.*,
129 F. Supp. 3d 4 (S.D.N.Y. 2015)...............................................................................24

*Leber* v. *Citigroup 401(k) Plan Inv. Comm.*,
323 F.R.D. 145 (S.D.N.Y. 2017) ....................................................................................2

*Liss* v. *Smith*,
991 F. Supp. 278 (S.D.N.Y. 1998).............................................................................18, 19

*Moitoso* v. *FMR LLC*,
451 F. Supp. 3d 189 (D. Mass. 2020) ........................................................................13, 14

*Moreno* v. *Deutsche Bank Ams. Holding Corp.*,
2018 WL 2727880 (S.D.N.Y. June 6, 2018) .............................................................26, 28

*O'Day* v. *Chatila*,
    774 F. App'x 708 (2d Cir. 2019) .......................................................................12

*Patterson* v. *Morgan Stanley*,
    2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ...........................................24, 25, 26

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v.
    *Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) .................................................................15, 16, 24

*Queens Ballpark Co., LLC* v. *Vysk Commc'ns*,
    226 F. Supp. 3d 254 (S.D.N.Y. 2016) ...............................................................12

*Ramos* v. *Banner Health*,
    461 F. Supp. 3d 1067 (D. Colo. 2020) ...............................................................24

*Ret. Sys. of Gov't of V.I.* v. *Blanford*,
    794 F.3d 297 (2d Cir. 2015) .................................................................................1

*Rinehart* v. *Akers*,
    722 F.3d 137 (2d Cir. 2013) ...........................................................................3, 28

*Sacerdote* v. *N.Y. Univ.*,
    9 F.4th 95 (2d Cir. 2021) ...........................................................................19, 29

*In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
    842 F. Supp. 2d 614 (S.D.N.Y. 2012) ...............................................................13

*State St. Bank & Trust Co.* v. *Salovaara*,
    326 F.3d 130 (2d Cir. 2003) ..............................................................................12

*In re SunEdison, Inc. ERISA Litig.*,
    331 F. Supp. 3d 101 (S.D.N.Y. 2018) ..........................................................12, 15

*Taylor* v. *United Tech. Corp.*,
    2009 WL 535779 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525 (2d Cir.
    2009) .............................................................................................................18, 22

*White* v. *Chevron Corp.*,
    2017 WL 2352137 (N.D. Cal. May 31, 2017) .....................................................22

*White* v. *Martin*,
    286 F. Supp. 2d 1029 (D. Minn. 2003) ..........................................................18, 19

**Statutes**

29 U.S.C. § 1104(a)(1)(A) ....................................................................................12

29 U.S.C. § 1104(a)(1)(B) ....................................................................................15

29 U.S.C. § 1108(b)(8) ...............................................................................................27

29 U.S.C. § 1108(c)(3)................................................................................................29

**Other Authorities**

42 Fed. Reg. 18,734 (Apr. 8, 1977) ........................................................................3, 13

Corporate Compliance Series:  ERISA § 4:11 (2015-2016)........................................18

Fed. R. Civ. P. 56(a) ...................................................................................................12

Defendants The Goldman Sachs Group, Inc. ("Goldman Sachs") and The Goldman Sachs 401(k) Plan Retirement Committee (the "Retirement Committee" or "Committee") respectfully submit this memorandum in support of their motion for summary judgment.

## PRELIMINARY STATEMENT

After more than a year of discovery, which included an extensive document production and numerous depositions, there is simply no evidence to support Plaintiff's serious allegations that Defendants "breached their fiduciary duties and engaged in unlawful self-dealing" in their selection of investment options for the Goldman Sachs 401(k) Plan (the "Plan"). (Compl. ¶ 1.) At the motion-to-dismiss stage, the Court was obliged to accept as true Plaintiff's allegations that "Defendants held proprietary funds to a different standard" than non-proprietary funds and that "Defendants maintained the GS Funds as menu options for their own benefit." (ECF No. 43 ("MTD Op.") at 21-22.) At the summary-judgment stage, however, those allegations no longer are entitled to a presumption of truth. Plaintiff instead must identify "specific facts showing that there is a genuine issue for trial." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiff cannot satisfy "the more probing test used at the summary judgment . . . stage of litigation." *Emps.' Ret. Sys. of Gov't of V.I.* v. *Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

*First*, there is no evidence that Defendants breached their duty of loyalty in making five mutual funds managed by Goldman Sachs Asset Management ("GSAM")—the Large Cap Value Fund, Mid Cap Value Fund, High Yield Fund, Core Fixed Income Fund, and Short Duration Government Fund—available as investment options in the Plan. Rather, the evidentiary record uniformly establishes that these GSAM funds were held to the same standard as the dozens of other Plan investment options. At their depositions, Committee members unanimously rejected the suggestion that they held the GSAM funds to a different standard or that their decisions were influenced at all by a desire to benefit Goldman Sachs. Contrary to Plaintiff's assertion, the

Committee regularly *removed* GSAM mutual funds, including the five funds at issue here, as Plan investment options in favor of non-GSAM funds both before and during the class period.  There is simply no evidentiary support for the allegation that Defendants' "decisions were influenced by their desire to drive revenues and profits to Goldman Sachs."  (Compl. ¶ 92.)

*Second*, there is no evidence that Defendants "failed to employ a prudent process."  (*Id.* ¶ 6.)  "The duty of prudence standard focuses on a fiduciary's conduct in arriving at an investment decision, not on its results."  *Leber* v. *Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 157 (S.D.N.Y. 2017) (quotation omitted).  The record demonstrates that the Retirement Committee, which consisted of sophisticated and experienced financial professionals, followed a prudent process.  The Committee (i) hired a full-time employee with years of industry experience to act as "secretary" to the Committee, whose sole job was to assist the Committee with its responsibilities, (ii) retained a respected independent investment advisor to provide the Committee with impartial fiduciary advice regarding the Plan's investment menu, (iii) had access to experienced ERISA counsel, who attended every Committee meeting, (iv) received comprehensive data regarding the performance of each Plan investment option, including detailed monthly and quarterly reports, (v) met regularly to review the Plan's investment options and determine what, if any, actions were appropriate, including the removal and/or replacement of investment options, (vi) received frequent detailed presentations from its independent advisor and from individual fund managers, and (vii) regularly reviewed with its investment advisor the management fees paid by the Plan.

Plaintiff seeks to establish a breach of the duty of prudence by attempting to impose additional requirements on the Committee's already-robust process.  In particular, Plaintiff contends that the Committee should have (i) adopted a formal written Investment Policy Statement (even though ERISA does not require such a document), (ii) assigned greater weight to the general

ratings that the Committee's investment advisor assigned to the GSAM funds (even though those ratings were not recommendations to replace the funds), (iii) removed three of the five at-issue funds as Plan investment options sooner than the Committee did (even though those funds' long-term performance before the class period was strong), and (iv) moved Plan assets from GSAM mutual funds to lower-cost separately managed accounts from GSAM (even though separately managed accounts were not available to the Plan from GSAM). These after-the-fact complaints are no more than nitpicking and are insufficient to establish a breach of the duty of prudence. As the Supreme Court recently stated, "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes* v. *Northwestern Univ.*, 142 S. Ct. 737, 742 (2022).

*Third*, there is no evidence that Defendants engaged in non-exempt prohibited transactions with GSAM. The record instead shows that the Plan's "dealings" with GSAM were "on a basis no less favorable to the plan than such dealings [were] with other" similarly situated plans that invested in GSAM mutual funds. Department of Labor Prohibited Transaction Exemption 77-3 ("PTE 77-3"), 42 Fed. Reg. 18,734 (Apr. 8, 1977). Although Plaintiff contends that Defendants did not collect fee rebates that supposedly were available to retirement plans that invested in GSAM funds, the evidence unambiguously shows that such fee rebates were not available to *any plan*, including the Plan, that invested in any GSAM mutual funds before April 1, 2009.

*Fourth*, there is no evidence that Goldman Sachs breached its duty to monitor the Committee's performance. This claim is entirely derivative of Plaintiff's other defective claims, and thus should be dismissed along with them. *See Rinehart* v. *Akers*, 722 F.3d 137, 154 (2d Cir. 2013). There also is no evidence to support this claim. Notwithstanding that Plaintiff bears the

burden of proof on this issue, Plaintiff's experts simply state that they have seen "no evidence" of effective oversight of the Committee. That is not enough to prove a breach.

*Fifth*, Plaintiff cannot prove that the Plan suffered a loss resulting from the availability of two of the five challenged GSAM funds as investment options, a "necessary element of an ERISA claim." *Cunningham* v. *Cornell Univ.*, 2019 WL 4735876, at *6 (S.D.N.Y. Sept. 27, 2019). Both the Mid Cap Value Fund and the High Yield Fund *outperformed* other investments that Plaintiff's own expert opines would have been prudent substitutes for the GSAM funds at the outset of the class period. Because they outperformed investments that Plaintiff concedes would have been prudent alternatives, the Plan did not suffer a loss as a result of the availability of the Mid Cap Value Fund and High Yield Fund.

## STATEMENT OF FACTS

### A.    The Plan

Goldman Sachs sponsors a defined contribution 401(k) plan for eligible employees. (SOF ¶ 1.) Participants in the Plan are responsible for directing the investments in their accounts. (SOF ¶ 3.) During the class period (October 25, 2013 to June 6, 2017), Plan participants could choose (i) professionally managed "target date" funds based on a target retirement date, or (ii) among the available investment options (at least 35 during the class period) spanning a variety of asset classes, management styles (passive and active), geographies, and risk/return characteristics. (SOF ¶ 4.)

During the class period, less than one third of the Plan's 35 or so different investment options were managed by GSAM, an investment manager with over $1.5 trillion of assets under supervision (as of 2018). (SOF ¶¶ 5-6.) In addition, the five challenged GSAM mutual funds available as investment options under the Plan had a substantial number of investors outside of the Plan: at the beginning of the class period, only 4% of the challenged funds' assets under management came from the Plan. (SOF ¶ 7.) The five GSAM funds also were a small percentage

of the Plan's assets:  only about 12% of the Plan's assets were invested in them between 2013 and 2017.  (SOF ¶ 8.)

### B.    The Committee's Robust Process for Managing the Plan

The Retirement Committee is the named fiduciary under the Plan responsible for selecting and monitoring Plan investment options.  (SOF ¶ 9.)  During the class period, the Committee consisted of 10 to 12 sophisticated financial professionals who held senior positions at Goldman Sachs.  (SOF ¶ 10.)  Plaintiff's "process" expert (Marcia Wagner) described the Committee members as "consummate financial professionals" with a "deep expertise in the markets."  (SOF ¶ 11.)  She also stated that the Committee members' experience "compares favorably" to those of other large plan committees, the "vast majority" of "whose members[] possess[] a limited investment knowledge" and/or expertise.  (SOF ¶ 11.)

Upon joining the Committee, each new member participated in a one-on-one training session with Goldman Sachs' senior ERISA counsel covering a wide range of topics, including fiduciary responsibilities, ERISA's prohibited transaction rules, conflicts of interest, and disclosure obligations.  (SOF ¶¶ 20-21.)  Committee members also received periodic training about their fiduciary responsibilities at Committee meetings, as well as updates on legal and regulatory developments.  (SOF ¶ 24.)

In addition to the extensive resources at Goldman Sachs, the Committee hired an experienced independent investment advisor, Rocaton Investment Advisors LLC ("Rocaton"), as a fiduciary to provide the Committee with impartial investment advice.  (SOF ¶ 27.)  Rocaton provides a wide range of services to retirement plans such as the Plan.  (SOF ¶ 29.)  Here, it provided the Committee with, among other things, (i) detailed information about each of the Plan's investment options, including monthly and quarterly performance reports, (ii) written reports summarizing Rocaton's meetings with investment managers, (iii) Rocaton's commentary on

different investment options and industry trends, and (iv) other information periodically requested by the Committee.  (SOF ¶¶ 44-48.)   The Committee also received detailed analyses of the management fees charged by each of the Plan's investment options, including comparisons of those fees to peer-group averages across different investment vehicle types.  (SOF ¶ 46.)

The Committee met regularly, with meetings at least quarterly and *ad hoc* meetings as needed. (SOF ¶ 49.) Rocaton attended every quarterly meeting and provided Committee members in advance with detailed reports that included a quantitative and qualitative review of each Plan investment option.  (SOF ¶¶ 48, 50.)  These reports gave the Committee information about each option's quarterly, year-to-date, 1-year, 3-year, 5-year, 7-year, and 10-year performance compared to index benchmarks and mutual fund peers.  (SOF ¶ 44.)  Rocaton also provided "a one-page snap shot" for each option that included a product description, total product and Plan assets, fees, a quarterly performance update, portfolio characteristics, and relevant commentary.  (SOF ¶ 45.) Each quarterly meeting then began with Rocaton presenting detailed information to the Committee about Plan performance and fielding questions from Committee members.  (SOF ¶ 51.)

After Rocaton's presentation, the Committee often heard presentations from current or prospective investment managers.  (SOF ¶ 53.)  Plaintiff's expert Ms. Wagner acknowledged that it was "very, very atypical" for a plan committee to have "regular management presentations" and "emphasize[d]" that such presentations are "a very good thing."  (SOF ¶ 55.)  The secretary to the Committee and Rocaton also regularly met with investment managers outside of Committee meetings.  (SOF ¶¶ 57-58.)  As a leading investment advisor, Rocaton held "over a thousand investment manager meetings per year," and the Committee had access to the insights Rocaton and the secretary to the Committee gained from those meetings.  (SOF ¶¶ 43, 48, 58.)

### C.    No Favoritism Toward GSAM Funds

In discharging their fiduciary responsibilities, Retirement Committee members did not favor GSAM-managed funds.  Committee members were specifically trained to "mak[e] decisions in the best interests of the plan participants" and not to "give one particular . . . investment," including the GSAM funds, "preferential treatment." (SOF ¶ 25.)  At their depositions, Committee members uniformly testified that they applied "no different standard for Goldman Sachs funds than for any other fund in the plan." (SOF ¶¶ 59-68.)

That testimony is corroborated by the Committee's actions.  For example, the Committee asked Rocaton in November 2010, almost three years before the class period, to conduct a comprehensive evaluation of the performance of five GSAM funds, including three of the funds at issue here (the Mid Cap Value Fund, High Yield Fund, and Short Duration Government Fund), and, specifically, to compare their performance to those of the funds included on a "Buy" list Rocaton maintained for its clients.  (SOF ¶¶ 69-70.)  With respect to the three challenged funds, the 2010 review showed that "over 3 and 5 year periods," those funds "ha[d] performed above median or [at] median." (SOF ¶ 71.)  While the Committee retained those three funds based on Rocaton's analysis, the Committee removed a GSAM-managed real estate fund in favor of a non-GSAM alternative.  (SOF ¶ 72.)  In December 2011, almost two years before the class period, the Retirement Committee directed Rocaton to expand "last year's report" and evaluate "ALL [of] the GSAM Funds compared to their peer groups." (SOF ¶ 73.)  Following this review, the Committee in January 2012 replaced two additional GSAM funds (the Large Cap Growth Fund and Mid Cap Growth Fund) with funds not managed by GSAM.  (SOF ¶ 74.)

The Committee also carefully considered the fees charged by GSAM as part of its regular review of Plan investment options.  (SOF ¶¶ 45-46, 90.)  Rocaton provided the Committee with detailed comparisons of the fees charged by each fund available in the Plan with those charged by

its peer group.  (SOF ¶ 46.)  Those comparisons show that the challenged GSAM funds' fees were lower than the institutional mutual fund average.  (SOF ¶ 91.)  In 2013, for example, the Large Cap Value Fund charged a fee of 79 basis points, compared to the mutual fund average of 84 basis points.  By 2015, the mutual fund average had risen to 104 basis points, but the fee charged by the Large Cap Value Fund had fallen to 76 basis points.  (SOF ¶ 92.)

### D.    The Committee's Decision to Remove the Five Challenged Funds

As Rocaton's quarterly reports to the Committee show, each of the five challenged GSAM funds outperformed its benchmark in 2012—the year before the start of the class period—and four of the five funds outperformed their benchmarks for multiple years between 2009 and 2012.  (SOF ¶¶ 96-101.)  In particular, the Large Cap Value Fund, Mid Cap Value Fund, and High Yield Fund (the three GSAM funds whose performance is challenged by Plaintiff's expert) each outperformed its benchmark in 2012, delivering returns of 19.64%, 18.54%, and 15.84%, respectively.  (SOF ¶ 101.)

In the monthly Rocaton reports provided to the Committee during the class period, none of the challenged GSAM funds is identified as underperforming on a rolling one-year basis by at least one standard deviation for more than two consecutive months until November 2015, when the Mid Cap Value Fund began showing one standard deviation of underperformance over consecutive months, which rose to two standard deviations in April 2016.  (SOF ¶¶ 106-10.)  The Large Cap Value Fund did not begin showing one standard deviation of underperformance for multiple consecutive months until February 2016, and the High Yield Fund did not begin showing such underperformance until March 2016.  (SOF ¶¶ 108-09.)  The other two challenged funds—the Core Fixed Income Fund and Short Duration Government Fund—were identified on monthly reports as underperforming by one standard deviation only occasionally (and never for more than two consecutive months) between October 2013 and June 2017.  (SOF ¶ 110.)

The Committee acted promptly in response to data showing that three of the GSAM funds had begun underperforming on a more consistent basis in 2016.  The Committee discussed the Mid Cap Value Fund and Large Cap Value Fund at its quarterly meeting on September 29, 2016.[1]  At that meeting, Rocaton presented detailed information about those two funds and fielded questions from the Committee.  (SOF ¶ 119.)  Rocaton's presentation was followed by a presentation from the GSAM managers responsible for the two value funds, and the "Committee asked questions concerning the value funds' investment performance and the team's current outlook, including adjustments made to the portfolios and investment theses, and other relevant matters such as staffing and retention."  (SOF ¶¶ 120-21.)  After the GSAM managers departed, the "Committee and Rocaton engaged in discussion regarding the value funds," and Rocaton was directed to analyze "alternatives that may be available."  (SOF ¶ 122.)

The Committee "set up an *ad hoc* meeting . . . to further address the value funds."  (SOF ¶ 123.)  At that meeting on October 25, 2016, Rocaton presented its "view of the value funds including their performance and teams" and "discussed potential alternatives."  (SOF ¶ 124.)  Rocaton also reviewed the Plan's overall "investment lineup," including all of "the GSAM managed investment options."  (SOF ¶ 125.)  "The Committee asked Rocaton . . . to prepare a presentation focusing on" the Plan's investment lineup and "decided to further review the status" of the two value funds at its next quarterly meeting on December 5, 2016.  (SOF ¶ 126.)

---

[1] The Committee intended to "invit[e] GSAM to review the high yield mutual fund with the Retirement Committee at some point during the first half of 2016."  (SOF ¶ 115.)  Rocaton thus prepared (and Committee members received) an in-depth "High Yield Mutual Fund Review" to facilitate the planned discussion.  (SOF ¶¶ 48, 116.)  After conferring with Rocaton, the Committee decided to defer this discussion until later in the year because concerns about two non-GSAM options demanded immediate attention.  (SOF ¶ 117.)

At that next meeting, Rocaton made a presentation "regarding the 401(k) Plan's investment fund lineup" and "discussed the GSAM actively managed investment options" in the Plan.  (SOF ¶ 127.)  Rocaton's 119-page presentation evaluated each of the challenged funds in detail and compared them to potential replacements.  (SOF ¶ 128.)  Managers of a potential new investment option also made a presentation to the Committee.  (SOF ¶ 129.)  Following these presentations, "the Committee unanimously voted to remove . . . [t]he short duration government, core fixed income, strategic income, mid cap value and large cap value" funds from the Plan.  (SOF ¶ 130.)  This vote was followed by a "discuss[ion] of the GSAM high yield fund and . . . [the] emerging markets equity fund" and a request that the managers of "possible alternative[s]" to those funds "present at the next Committee meeting."  (SOF ¶ 131.)

The next Committee meeting on April 3, 2017 contained similarly detailed presentations concerning the High Yield Fund and Emerging Markets Equity Fund.  (SOF ¶ 132.)  Rocaton provided an overview of potential non-GSAM alternatives and compared both GSAM funds to those alternatives.  (SOF ¶ 133.)  The Committee also listened to presentations by the managers of the alternative funds.  (SOF ¶ 134.)  The Committee thereafter voted unanimously to remove the High Yield Fund and Emerging Markets Equity Fund from the Plan and to add the non-GSAM alternatives as replacements.  (SOF ¶ 135.)  The last of the challenged GSAM funds was removed from the Plan on June 6, 2017, more than two years *before* this action was filed.  (SOF ¶ 136.)

**E.    Plaintiff's Claims**

Plaintiff contends that Defendants breached their fiduciary duties under ERISA by (i) "only reluctantly and belatedly" removing allegedly underperforming GSAM funds as Plan investment options (Compl. ¶ 47), (ii) failing to replace the GSAM mutual funds with lower-cost separately

managed accounts supposedly available from GSAM (*id.* ¶¶ 65-71),[2] and (iii) failing to claim "fee rebates" on behalf of the Plan that supposedly were available to other similarly situated retirement plans that invested in the GSAM funds (*id.* ¶¶ 72-77).  According to the Complaint, Defendants breached their fiduciary duties of loyalty and prudence by "retaining high-cost, poorly performing proprietary mutual funds in the Plan" based on their own "self-interest" and in "disregard for participants." (*Id.* ¶ 47.)  Plaintiffs also allege that the Committee's alleged failure to claim "fee rebates" that supposedly were available to other plans violated ERISA's prohibited transaction restrictions (*id.* ¶¶ 96-105) and that Goldman Sachs breached its duty to monitor the Retirement Committee (*id.* ¶¶ 107-11).

Plaintiff's claims are limited to five specific GSAM funds—the Mid Cap Value Fund, Large Cap Value Fund, High Yield Fund, Core Fixed Income Fund, and Short Duration Government Fund.  The Complaint mentions two additional GSAM funds that also were removed from the Plan in 2017—the Emerging Markets Equity Fund and Strategic Income Fund—only in a footnote, observing that those two funds "had positive 5-year performance records when Defendants removed them." (Compl. at 22 n.4.)  Plaintiff admits "that the Complaint does not explicitly challenge" those two funds (SOF ¶ 2), and the Court limited the certified class to Plan participants whose accounts held one of the five GSAM mutual funds challenged in the Complaint (ECF No. 163 at 25-26).

_____

[2] Although the Complaint alleges that Defendants "failed to obtain lower-cost separate accounts *or collective trusts* in place of proprietary mutual funds" (Compl. ¶ 8 (emphasis added)), GSAM did not offer the relevant strategies through collective investment trusts ("CITs") during the class period. (SOF ¶ 86.)  Indeed, there is no dispute that GSAM "doesn't manage CITs, at least did [not] during this period." (SOF ¶ 87.)  Plaintiff did not advance his CIT allegation in his response to Defendants' letter requesting a pre-motion conference on this motion. (ECF. No. 159.)

## ARGUMENT

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The movant "is first responsible for demonstrating the absence of any genuine issue of material fact." *Queens Ballpark Co., LLC* v. *Vysk Commc'ns*, 226 F. Supp. 3d 254, 257 (S.D.N.Y. 2016). If the movant makes that showing, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.* at 258 (quotation omitted). The non-moving party "must do more than show that there is some metaphysical doubt as to the material facts" and "may not rely on unsupported assertions, conjecture or surmise." *Id.* (quotation omitted). Instead, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Id.* Because the evidence cannot support a decision in Plaintiff's favor, the Court should grant summary judgment for Defendants.

## I.  Plaintiff Cannot Prove a Breach of the Duty of Loyalty.

ERISA's duty of loyalty requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants." 29 U.S.C. § 1104(a)(1)(A). "The Second Circuit has described [this] duty as one requiring a fiduciary to act . . . with an 'eye single to the interests of the participants.'" *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 114 (S.D.N.Y. 2018) (quoting *State St. Bank & Trust Co.* v. *Salovaara*, 326 F.3d 130, 136 (2d Cir. 2003)), *aff'd sub nom*. *O'Day* v. *Chatila*, 774 F. App'x 708 (2d Cir. 2019). Plaintiff alleges that Defendants breached their duty of loyalty because their "decisions were influenced by [a] desire to drive revenues and profits to Goldman Sachs" (Compl. ¶ 92) and that the GSAM funds thus were held to a "different standard" than non-GSAM funds (*id.* ¶ 53). No evidence supports these allegations.

At the outset, Plaintiff's expert Ms. Wagner concedes that Retirement Committee members had no personal financial incentive to include "investment options managed by GSAM" in the

-12-

Plan and that she had no reason to question the "honesty" or "integrity" of any Committee member. (SOF ¶¶ 12-13.)  Plaintiff also cannot cite any evidence (because there is none) that Committee decisions were influenced by a desire to generate fees for or otherwise benefit GSAM.  To the contrary, Committee members uniformly testified that they "evaluated each investment [option] on its merits" and did not apply a "different standard for Goldman Sachs funds than for any other fund in the plan."  (SOF ¶¶ 59-61.)  This testimony was consistent with the fiduciary training each Committee member received to treat the GSAM funds "exactly the same, as equals [to the other] plan options."  (SOF ¶ 26.)  Plaintiff has no explanation for why—if Defendants were motivated by a "desire to drive revenues and profits to Goldman Sachs"—the Committee *removed* multiple GSAM funds from the Plan in favor of non-GSAM alternatives in 2012 (SOF ¶ 74), the year before the start of the class period.

Plaintiff's expert Ms. Wagner opines that offering proprietary investment options like the challenged GSAM funds poses an "inherent" conflict of interest and that more should have been done to minimize the risk that Committee members were influenced by that conflict.  Absent evidence that the Committee's retention of the five GSAM funds between 2013 and 2017 actually was influenced by this supposed conflict, Ms. Wagner's theoretical opinion is insufficient to create a genuine issue of fact.  "It is not enough for a plaintiff to identify a potential conflict of interest from the defendant's investment in its own proprietary funds."  *Moitoso* v. *FMR LLC*, 451 F. Supp. 3d 189, 204 (D. Mass. 2020).  Indeed, the Department of Labor expressly exempts from ERISA's "prohibited transaction rules" making available in a plan mutual funds managed by an affiliate of the plan's sponsor if certain conditions are met (as they are here).  *See* 42 Fed. Reg. 18734.

Moreover, "in the ERISA context, 'a conflict of interest alone is not a *per se* breach'" of the duty of loyalty.  *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp.

2d 614, 649 (S.D.N.Y. 2012) (citation omitted).  Even Ms. Wagner agrees that "the mere fact that a fiduciary had an adverse interest does not by itself state a claim for relief, or ERISA would not have permitted corporate officers [of the plan sponsor] to be fiduciaries." (Ex. 68 (Marcia Wagner, *Duty of Loyalty*, 401(k) Advisor (Sept. 2018)).)  As this Court previously recognized, a plaintiff must show that "the defendant acted *for the purpose of* providing benefits to itself or someone else." (MTD Op. at 23.)  Plaintiff cannot show that here.

Even assuming that there was some theoretical risk that the Committee's decisions could be influenced by a potential conflict, the Committee took appropriate steps to address that risk. *See Moitoso*, 451 F. Supp. 3d at 204 (ERISA requires "court[s] [to] consider[] the totality of circumstances" when "making [a conflict of interest] inquiry").  In addition to the fiduciary training each Committee member received, the Committee also had the benefit of impartial advice from an independent advisor (Rocaton) that had no economic interest in Goldman Sachs or the GSAM funds.  (SOF ¶¶ 27-28.)  Furthermore, the Committee's co-chair during most of the class period (█████████████) had no affiliation with Goldman Sachs after "█████████████" when he left the firm.  (SOF ¶ 19.)

In his class-certification brief, Plaintiff cited two emails as evidence that Goldman Sachs employees "on multiple occasions" ███████████████████████████ (ECF No. 83 at 5.)  In the first email, ███████████████████████████████████ ████████████████████████████████████████ (SOF ¶ 63.)  ████████████ testified that he did not remember "having a conversation with [the employee] about the manager selection process" and that he could not "recall anyone else at Goldman Sachs ever requesting that [he] add a certain manager or inquiring about the process for adding managers to the plan." (SOF ¶ 64.)  In the second email, █████████████████████

-14-



(SOF ¶ 65.)

(SOF ¶ 66.)   In response,

(SOF ¶ 67.)            testified that this

"was the kind of process that was used, whether it was a Goldman Sachs inquiry for a manager or

a non-Goldman Sachs inquiry."  (SOF ¶ 68.)  These two unremarkable emails (out of Goldman

Sachs' voluminous document production) hardly constitute evidence that Committee members

failed to "act loyally to plan participants" or that they were "swayed by their separate

responsibilities to the corporation." *In re SunEdison*, 331 F. Supp. 3d at 114.  Nor are these emails

evidence that the Committee followed a different process for GSAM than it did for other fund

managers.

## II.     Plaintiff Cannot Prove a Breach of the Duty of Prudence.

To prevail on his duty-of-prudence claim, Plaintiff must prove that the Retirement

Committee did not "act in a prudent manner 'under the circumstances then prevailing.'" *Pension

Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt.

Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) ("*PBGC*") (quoting 29 U.S.C. § 1104(a)(1)(B)).  As the

Second Circuit held, the duty of prudence "focus[es] on a fiduciary's conduct in arriving at an

investment decision, not on its results."  *Id*.  Merely showing that "another approach" to plan

investments "seems preferable" is insufficient to establish a breach.  *Chao* v. *Merino*, 452 F.3d

174, 182 (2d Cir. 2006).  "Courts must also be mindful to judge a fiduciary's actions based upon

information available to the fiduciary at the time of each investment decision and not from the

vantage point of hindsight."  (MTD Op. at 17 (quotation omitted).)  The Committee here satisfied

these standards, and Plaintiff's *ex-post* criticisms and second-guessing do not create a triable issue of fact. *See Hughes*, 142 S. Ct. at 742 ("At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.").

**A.      The Committee Employed a Prudent Process.**

The Retirement Committee used "appropriate methods to investigate and determine the merits of" all of the Plan investment options, including the challenged GSAM funds. *PBGC*, 712 F.3d at 716.  The Committee:

- Consisted of "financial professionals" with a "deep expertise in the markets," which was atypical among large 401(k) plan committees (SOF ¶ 11);

- Received extensive fiduciary training from experienced ERISA counsel at Goldman Sachs, a best practice followed by "only a minority of plan sponsors" (SOF ¶¶ 22-23);

- Was assisted by a dedicated professional staff that included a full-time, highly qualified Committee "secretary" (a Columbia MBA and Chartered Financial Analyst with extensive industry experience) and experienced and highly qualified ERISA counsel at Goldman Sachs (SOF ¶ 15);

- Retained Rocaton as an independent fiduciary investment advisor, whose work was described by Plaintiff's expert as "impressive" (SOF ¶ 30);

- Received and reviewed monthly reports on the performance of each of the Plan's over 35 investment options that were "developed by Rocaton per the [C]ommittee's request" and that exceeded the amount of information Rocaton provided to its other clients (SOF ¶ 47);

- Received and reviewed detailed quarterly reports from Rocaton in advance of each quarterly meeting that included an array of qualitative and quantitative information about each investment option (SOF ¶¶ 43-48);

- Met at least quarterly and held frequent *ad hoc* meetings on an as-needed basis (SOF ¶ 49);

- Heard presentations from investment managers at Committee meetings, which was "very, very atypical" and gave Committee members "unique" access to information (SOF ¶¶ 53-56); and

- Regularly reviewed all management fees paid by the Plan (SOF ¶¶ 45-46, 90).

Apart from its ordinary-course review of all of the Plan investment options, the Committee also scrutinized the GSAM-managed funds in particular by:

- Asking Rocaton to conduct multiple GSAM-specific reviews that "evaluated the performance of . . . GSAM funds relative to the performance of their peer groups as well as non-proprietary alternatives that received 'Buy' ratings from Rocaton" (SOF ¶¶ 69-74);

- Interviewing GSAM investment managers at multiple Committee meetings (SOF ¶¶ 76, 120); and

- Removing GSAM funds from the Plan lineup both before and during the class period (SOF ¶¶ 72, 74, 130, 135).

In sum, the Committee "engage[d] in a reasoned, prudent decisionmaking process, using appropriate methods to investigate the merits of retaining Company [f]unds as . . . investment option[s]." *DiFelice* v. *U.S. Airways, Inc.*, 497 F.3d 410, 421 (4th Cir. 2007) (quotation omitted). The record is replete with evidence of the Committee's "thorough investigation" of all of the Plan's investment options, including the five challenged GSAM funds. *Id.*

## B.  Plaintiff's Second-Guessing Cannot Prove a Breach of the Duty of Prudence.

Plaintiff advances four criticisms of the Committee's selection of Plan investment options: the Committee (i) did not adopt a formal written Investment Policy Statement ("IPS"), (ii) did not assign sufficient weight to Rocaton's ratings of the challenged funds, (iii) retained three GSAM funds that allegedly "underperformed" before January 1, 2014, and (iv) did not use lower-cost separately managed accounts that supposedly were available from GSAM.  None of these criticisms of the Committee's robust process shows that the Committee operated outside "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742.  Instead, they are exactly the type of second-guessing in which courts should not engage.

### 1.    The Lack of a Formal IPS Does Not Establish a Breach.

An IPS "is a written document outlining the process for a plan's investment-related decision making" that can include "a plan's goals and objectives, . . . strategic vision for plan investment," or "a framework for participant education."  Corporate Compliance Series:  ERISA § 4:11 (2015-2016) (describing "advantages and drawbacks in adopting such a statement"). Plaintiff's expert Ms. Wagner criticizes the Committee for not adopting a formal written IPS, but that does not establish a breach of the duty of prudence and, in view of the record of the Committee's robust process and careful decision making, amounts entirely to form over substance.

It is undisputed that ERISA does not require an IPS.  In *Taylor* v. *United Technologies Corp.*, 2009 WL 535779 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525 (2d Cir. 2009), the plaintiff's expert faulted the plan sponsor "for failing to create a written Investment Policy Statement," but the court held that "ERISA does not require a fiduciary . . . to create such a document." *Id.* at *10; *see also*, *e.g.*, *White* v. *Martin*, 286 F. Supp. 2d 1029, 1040 (D. Minn. 2003) ("White's arguments fail because a statement of investment policy is not required under ERISA; it is merely one way of fulfilling fiduciary obligations.").  Likewise, the Department of Labor has never taken the position that an IPS is required to satisfy a fiduciary's duties.  (SOF ¶¶ 144-45.)

Plaintiff's reliance here on *Liss* v. *Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998), is misplaced. (ECF No. 159 at 2.)  *Liss* recognized that "ERISA does not contain a specific requirement that a written investment policy be maintained by the trustees," 991 F. Supp. at 296, and the absence of a written policy alone was not dispositive in that case.  Instead, it was just one factor "coupled with the other acts and omissions . . . [that] constituted a breach of fiduciary duty." *Id*.  The *Liss* court also was careful to limit its ruling to "the circumstances [t]here," *id*., which could not have been more different from those here.  Unlike this case, "*Liss* involved large-scale 'gross mismanagement, if not worse,' in the Teamsters union, including embezzlement, kick-backs,

skimmed profits, and conflicts of interest."  *White*, 286 F. Supp. 2d at 1040.  The *Liss* court even noted that "[t]he record certainly establishes the possibility (if not the probability) that punitive damages [would be] appropriate" against a defendant for "wanton dishonesty as to imply criminal indifference to civil obligations."  991 F. Supp. at 308 n.32 (quotation omitted).  Plaintiff's own expert, Ms. Wagner, has called *Liss* "[a]n outlier to th[e] general rule" that "ERISA does not impose a fiduciary duty to create an IPS."  (Ex. 67 (Marcia Wagner, *Investment Policy Statement*, 401(k) Advisor, (Apr. 2019)).)

Although Ms. Wagner asserts that it is typical for large plans to adopt an IPS, she conducted no analysis to support that assertion.  (SOF ¶ 148.)  She also previously testified that a defined contribution plan sponsored by Verizon had a prudent process even though it "didn't have an IPS" (SOF ¶ 146.  At most, Plaintiff can point to Ms. Wagner's opinion that having an IPS is a "best practice."  (SOF ¶ 147.)  But "the duty of prudence does not mandate a 'best practice' and only requires a prudent process."  (Ex. 69 (Rebuttal Expert Report of Marcia Wagner, *Sacerdote* v. *New York Univ.*, 1:16-cv-06284 (ECF No. 233-6)) ¶ 5; SOF ¶ 147.)

There plainly was a prudent process here, and no evidence even remotely suggests that the adoption of an IPS would have caused the Committee to act any differently.  Ms. Wagner opines that the absence of a formal IPS or "watch list" meant that the Committee lacked "tangible guidance" or "clear direction regarding its monitoring duties."  (Ex. 60 (Expert Rpt. of Marcia Wagner) ¶ 11.)  But the evidence shows that the Committee closely monitored all of the Plan's investment options, including the GSAM funds, and acted promptly to remove the challenged GSAM funds from the Plan when three of them began to exhibit underperformance over multiple quarters in 2016.  (SOF ¶¶ 106-10, 118-36.)  In these circumstances, a formal IPS or "watch list" would not have added anything over and above what the Committee already was doing.  As another

of Plaintiff's experts (William Fender) recognized, "any opinion" on whether an IPS might have improved Plan performance would be "hindsight or hypothetical." (SOF ¶ 149.)

       **2.**       **Rocaton's Ratings Do Not Establish a Breach.**

Plaintiff argues that the Committee breached the duty of prudence by not removing five GSAM funds from the Plan that Rocaton rated as "not broadly recommended." According to Plaintiff's expert Mr. Fender, "'not broadly recommended' means a fund is average (or worse) within its peer group." (SOF ¶ 33.) In relying on this rating by Rocaton, Plaintiff incorrectly suggests that it was tantamount to a recommendation by Rocaton to remove the funds, and Plaintiff also ignores the role the Rocaton's ratings actually played in the Committee's evaluation of Plan investment options.

Rocaton assigned one of five ratings to the mutual funds it covered: "buy," "hold," "not broadly recommended," "sell," and "under consideration." (SOF ¶ 31.) These ratings were not client specific—they were not advice tailored to any particular client—but rather were made available to Rocaton's clients generally. (SOF ¶ 32.) The "not broadly recommended" rating meant that the fund was "not typically included by Rocaton in searches for new mandates, but may be suitable for some clients based on their specific objectives." (SOF ¶ 34.)

In its class-certification decision, the Court suggested that Rocaton may have assigned the High Yield Fund, Large Cap Value Fund, and Mid Cap Value Fund a "not broadly recommended" rating following the presentations by those funds' "management teams to the Retirement Committee in 2011 and 2012." (ECF No. 163 at 4.) In fact, Rocaton rated those three funds "not broadly recommended" before those presentations. Rocaton's presentation to the Committee at its April 2011 meeting at which the High Yield Fund's managers presented stated that the fund was rated "not broadly recommended." (SOF ¶¶ 75-78.) Rocaton explained that "the strategy does not earn [Rocaton's] highest endorsement due [to] the meaningful turnover of the portfolio

-20-

management team and an investment approach that is somewhat evolving from what it was historically." (SOF ¶ 77.) The Large Cap Value Fund and Mid Cap Value Fund also were rated "not broadly recommended" by Rocaton before the managers of those two funds presented to the Committee in October 2012. (SOF ¶ 78; ECF No. 83 at 6.) Those Rocaton ratings of the GSAM funds thus had nothing to do with the Plan or those managers' presentations to the Committee.

Rocaton's Anne Buehl—the Plan's long-time consultant—explained that a "not broadly recommended" rating was "*not* a recommendation by Rocaton to remove a fund as an investment option." (SOF ¶ 35.) Rocaton's "sell" rating served that purpose, and none of the challenged GSAM funds ever was rated "sell" by Rocaton. (SOF ¶¶ 35, 79.) According to Ms. Buehl, many of Rocaton's clients held investments with "not broadly recommended" ratings in their retirement plans, and Rocaton believed it was entirely appropriate for retirement committees to make such funds available as investment options. (SOF ¶¶ 36-37.)

There is no support for Plaintiff's suggestion that the Retirement Committee "ignored" Rocaton's ratings. To the contrary, the record shows that Committee members asked Rocaton questions about its ratings and discussed them at Committee meetings. (SOF ¶ 52.) The Committee even asked Rocaton to provide a "rationale" for "why the 10 managers" of funds in the Plan, including the challenged GSAM funds, "that [we]re not 'buy' rated have an alternate rating." (SOF ¶ 82.) In addition, the five GSAM funds were not unique among the Plan's investment options in not having a "buy" or "hold" rating from Rocaton. During the class period, at least four non-GSAM funds included in the Plan's investment lineup also were rated "not broadly recommended" by Rocaton. (SOF ¶ 83.) The Committee even ███████████ ████████████████████████████████████████████████ (SOF ¶¶ 84-85.) After receiving input from Rocaton and hearing a presentation from the investment managers,

the Committee ███████████████████████████████████████.  (SOF

¶ 85.)  In short, there is no basis to suggest that the Committee, in considering Rocaton's ratings,

held the GSAM funds to a different standard.

Nor is there any support for the notion that the Committee should have used the Rocaton

ratings as the sole basis for the Committee's decisions rather than considering them together with

an array of other information, including Rocaton's specific advice to the Committee about the

Plan's investment options.  Committee members testified that they considered Rocaton's ratings

alongside all of the other information Rocaton provided.  (SOF ¶¶ 43, 80-81.)  As Committee

members explained, Rocaton ratings were "consider[ed]" as "one of a number of [factors]," and

while these ratings were "of value," their importance "was also dependent on" the circumstances.

(SOF ¶ 80.)  According to ███████ Rocaton's "ratings were only a small part of the information

that we provided to the Committee about the Plan's investment options."  (SOF ¶ 43.)  The

Committee also considered "performance data, commentary from managers and from Rocaton,

and the Committee members' own knowledge of capital markets and market indicators (which was

extensive)."  (SOF ¶ 81.)

The duty of prudence "does not require a fiduciary to take 'any particular course.'"  *Taylor*,

2009 WL 535779, at *10 (quoting *Chao*, 452 F.3d at 182).  That Plaintiff or his experts may have

assigned more weight to Rocaton's ratings than the Committee did does not establish a breach of

the duty of prudence.  *See Bunch* v. *W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (fiduciaries

should consider "totality of the circumstances" rather than "emphasizing one factor"); *White* v.

*Chevron Corp.*, 2017 WL 2352137, at *11 (N.D. Cal. May 31, 2017) ("fiduciaries have latitude to

value investment features").

-22-

### 3.    Three Funds' Alleged "Underperformance" Does Not Establish a Breach.

Plaintiff contends that three of the challenged funds (the Large Cap Value Fund, Mid Cap Value Fund, and High Yield Fund) "underperformed" benchmark indices and peer universe medians in the years before the start of the class period.  According to Plaintiff's expert Mr. Fender, the Committee should have "scrutinized carefully" those three funds and removed them from the Plan "by January 1, 2014, if not earlier."  (SOF ¶ 104.)

Plaintiff's allegation of underperformance is driven largely by the three funds' performance in 2011, when each underperformed its benchmark index.  (SOF ¶ 99.)  The Mid Cap Value Fund and High Yield Fund also underperformed their benchmarks in 2009, and the Large Cap Value Fund and High Yield Fund underperformed their benchmarks in 2010.[3]  (SOF ¶¶ 97-98.)  Rather than sitting idly by, the Committee responded to this information by directing Rocaton to evaluate the GSAM-managed funds in the Plan in November 2010 (evaluation of the Mid Cap Value Fund and High Yield Fund) and again in December 2011 (evaluation of all GSAM funds), including by comparing them to non-GSAM alternatives rated "buy" by Rocaton.  (SOF ¶¶ 69-74.)  Although these reviews resulted in the removal of three GSAM funds from the Plan, the Committee elected to retain the five challenged funds based on their long-run performance.  (SOF ¶¶ 72, 74.)  Following the Committee's informed decision in December 2011, the five challenged GSAM funds maintained as Plan options all *outperformed* their benchmarks in 2012.  (SOF ¶ 100.)  That year, the Large Cap Value Fund, Mid Cap Value Fund, and High Yield Fund had impressive returns of 19.64%, 18.54%, and 15.84%, respectively.  (SOF ¶ 101.)

---

[3] In 2009, the Mid Cap Value Fund and High Yield Fund had returns of 33.24% and 50.78%, respectively.  (SOF ¶ 97.)  In 2010, the Large Cap Value Fund and High Yield Fund had returns of 12.59% and 13.71%, respectively.  (SOF ¶ 98.)

The law is clear that "the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers . . . . Clearly, no court has ever suggested the existence of such a duty." *Patterson* v. *Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019).  "Although courts in this district have recognized that allegations of consistent, ten-year underperformance may support a duty of prudence claim, the underperformance must be substantial."  *Id*. at *10 (citation omitted).  The funds' long-term performance must make them "'so plainly risky' as to render the investments in them imprudent." *Leber* v. *Citigroup 401(k) Plan Inv. Comm.*, 129 F. Supp. 3d 4, 14 (S.D.N.Y. 2015) (quoting *PBGC*, 712 F.3d at 719).  In considering the performance of plan investment options, courts have recognized that fiduciaries are free to make decisions by "evaluating fund performance over longer time periods," even "over an entire market cycle . . . of ten to fifteen years."  *Ramos* v. *Banner Health*, 461 F. Supp. 3d 1067, 1096 (D. Colo. 2020).

Here, the three challenged funds' "long-run (ten-year) historical returns . . . , as of [the] proposed removal date of January 1, 2014, were generally consistent with, or better than, those of their mutual fund peers (both on an absolute and a risk-adjusted basis)."  (SOF ¶ 102.)  Over the ten-year period before January 1, 2014, the Mid Cap Value Fund, High Yield Fund, and Large Cap Value Fund ranked in the top 28th, 47th, and 57th percentile, respectively, of their mutual fund peers.  (SOF ¶ 103.)  During the first three years of the class period (2013-2015), both Morningstar and Lipper also rated these three GSAM funds as average or above average.  (SOF ¶ 111.)  The Committee thus had ample reason to maintain each as an investment option before 2016.

When these funds began to exhibit underperformance over multiple quarters in 2016, the Committee took prompt action.  The Committee met with the value fund managers at a quarterly meeting in September 2016, convened an *ad hoc* meeting to discuss the funds further in

October 2016, requested additional analysis from Rocaton after the *ad hoc* meeting, and ultimately voted in December 2016 to remove the Large Cap Value Fund and Mid Cap Value Fund from the Plan and voted in April 2017 to remove the High Yield Fund.  (SOF ¶¶ 118-36.)  There is no evidence that the Committee's response was so "belated[]" (Compl. ¶ 47) that it exceeded its wide discretion.  *See Hughes*, 142 S. Ct. at 742 ("[C]ourts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.").  Although Plaintiff contends with the benefit of hindsight that the Committee should have acted sooner, such second-guessing cannot establish a breach of the duty of prudence.  *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011).

Plaintiff's expert Mr. Fender asserts that the Committee should not "have been satisfied with . . . average" performance.  (SOF ¶ 105.)  But it was not a breach of the duty of prudence to make available as Plan investment options mutual funds that had average performance during some time periods.  To support a duty of prudence claim, "the underperformance must be substantial."  *Patterson*, 2019 WL 4934834, at *10.  "[T]he mere fact that [a fund] did not do as well as other options does not give rise to the inference that Defendants' decision to retain that investment offering was imprudent."  *Id*. at *11.  If the law were otherwise, "Plan sponsors would be duty-bound to merely follow the industry rankings for the past year's results, even though past performance is no guarantee of future success."  *Id*.

Plaintiff's suggestion that the Committee should have quickly changed the Plan's investment lineup in January 2014 based on average performance over the preceding years runs afoul of another reality:  the significant transaction costs associated with making frequent changes to the menu of a defined contribution plan.  Those costs are one of the reasons why the Committee elected to remove all (as opposed to only some) of the GSAM mutual funds as Plan investment

options in 2017.  (SOF ¶¶ 140-42.)  As Defendants' expert Eileen Kamerick explains, "changes to a plan's investment lineup" should "be approached with care" because they are "disruptive to participants and may cause disengagement and confusion."  (SOF ¶ 138.)  Even Plaintiff's expert Ms. Wagner agrees that, once an option has been made available to Plan participants, it is entitled to some "deference."  (SOF ¶ 139.)  For all of these reasons, Plaintiff's allegation that three GSAM funds underperformed in certain years before the class period cannot support a duty of prudence claim.

### 4.    The Committee's Offering the GSAM Investments in the Form of Mutual Funds Does Not Establish a Breach.

Plaintiff argues that the Retirement Committee acted imprudently by not moving the Plan assets invested in the GSAM mutual funds to lower-cost separately managed accounts supposedly available from GSAM.  But this option was not available to the Committee because the Plan could not pay GSAM management fees for separately managed accounts under ERISA's prohibited transaction rules.  Employee benefit plans like the Plan are permitted to offer mutual funds managed by an affiliate under a specific exemption to ERISA's prohibited transaction restrictions that applies only to mutual funds.  *Moreno* v. *Deutsche Bank Ams. Holding Corp.*, 2018 WL 2727880, at *5 (S.D.N.Y. June 6, 2018) ("PTE 77-3 creates a 'Class Exemption Involving Mutual Funds,' which, under certain conditions, 'exempt[s] from the prohibited transaction restrictions the acquisition and sale of shares of a registered open-end investment company (mutual fund) . . . .'") (quoting PTE 77-3).  There is no comparable exemption for separately managed accounts.  *See Patterson*, 2019 WL 4934834, at *9 ("[T]he Court is not aware of an exemption which permits fiduciaries to invest plan assets in single-client 'separate accounts' in which the fiduciary has an interest or receives fees.").  As a result, the Plan could make the challenged funds' strategies available to Plan participants through separately managed accounts only if GSAM was

willing to forgo any management fees paid by the Plan.  (SOF ¶ 88.)  Because GSAM was not

willing to do so, that option was unavailable to the Committee.  (SOF ¶ 89.)[4]

### III.    Plaintiff Cannot Prove His Prohibited Transaction Claims.

Plaintiff alleges that the Committee's failure to collect fee rebates on behalf of the Plan

that supposedly were available to other plans that invested in GSAM mutual funds resulted in a

non-exempt "prohibited transaction" under ERISA.  (Compl. ¶ 99; *see also id*. ¶ 104 ("the Plan

was treated less favorably than other shareholders in the [GSAM] funds"); ECF No. 159 at 2

("other plans received fee rebates from GSAM mutual funds that the Plan did not").  Based on the

flawed premise that these fee rebates were available to other similarly situated plans, Plaintiff

contends that the Committee cannot rely on the Department of Labor's class exemption that allows

ERISA plans like the Plan here to invest in affiliated mutual funds, provided that they are offered

"on a basis no less favorable to the plan than such dealings [were] with other shareholders" of the

mutual funds.  PTE 77-3(d).  There is no record evidence, however, supporting Plaintiff's claim

of disparate treatment.  In fact, the evidence shows the opposite.

Plaintiff's contention that the Plan and other plans were entitled to fee rebates is premised

on GSAM's shareholder services agreement with Hewitt Associates, which provided

recordkeeping services to many retirement plans, including the Plan here.  (SOF ¶ 93.)  Pursuant

to that agreement, GSAM made revenue-sharing payments to Hewitt Associates.  (SOF ¶ 93.)  The

GSAM-Hewitt Associates agreement, however, expressly "exclude[d] the assets . . . of Customers

who have opened accounts with the Funds prior to April 1, 2009."  (SOF ¶ 93.)  As a result of this

---

[4] Plaintiff's expert Ms. Wagner suggests that ERISA Section 408(b)(8) provides a statutory exemption that would have permitted the Committee to utilize separately managed accounts from GSAM.  (Ex. 64 (Wagner Tr.) at 340:18-342:14.)  That section applies, however, only to "a common or collective trust fund or pooled investment fund," *not* to a separately managed account. 29 U.S.C. § 1108(b)(8).

express exclusion, Hewitt Associates was not eligible to receive revenue-sharing payments from GSAM for *any* plan that invested in any GSAM mutual funds before April 1, 2009.  (SOF ¶¶ 93-95.)  Because the Plan invested in GSAM mutual funds before April 1, 2009, Hewitt Associates was ineligible to receive any revenue-sharing payments from GSAM based on the Plan's investments in GSAM mutual funds.  (SOF ¶¶ 93-95.)  Nor could Hewitt Associates receive revenue-sharing payments in respect of any other plan that invested in GSAM funds before that date.  (SOF ¶ 95.)  The Plan thus satisfied PTE 77-3(d)'s requirements:  the GSAM mutual funds were offered "on the terms generally available" to other similarly situated investors.  *Leber* v. *Citigroup, Inc.*, 2010 WL 935442, at *9 (S.D.N.Y. Mar. 16, 2010).  Plaintiff's prohibited transaction claims thus should be dismissed.  *See Moreno*, 2018 WL 2727880, at *5-6.

## IV.  Plaintiff Cannot Prove a Breach of the Duty to Monitor.

Plaintiff's claim that Goldman Sachs breached its duty to monitor Plan fiduciaries is predicated on his allegation that the Committee breached its fiduciary duties.  *See In re Citigroup ERISA Litig.*, 2009 WL 2762708, at *26 (S.D.N.Y. Aug. 31, 2009).  Because this claim is entirely "derivative of Plaintiff['s] other claims," it fails for the same reasons.  *See Rinehart*, 722 F.3d at 154 ("Plaintiffs cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA.").

There is also no evidence to support this claim.  Improperly shifting the burden of proof to Defendants, Plaintiff's experts simply note that they have seen "no evidence" of effective oversight of the Committee.  There is no suggestion, however, that the Retirement Committee's members were unqualified or failed to perform their duties or that particular Committee members should have been removed.  To the contrary, Plaintiff's expert Marcia Wagner described the Committee members as "highly regarded and famous, frankly."  (SOF ¶ 14.)  Although Ms. Wagner suggests that Goldman Sachs' "Management Committee should have considered appointing independent

Retirement Committee members who were not employees of Goldman Sachs or its affiliates" (SOF ¶ 18), such a committee would have been highly unusual.  Ms. Wagner could not think of a single company that included non-employees on its retirement committee because its retirement plan made proprietary mutual funds available as investment options.  (SOF ¶ 18.)  There also is no requirement under ERISA to appoint non-employees to a retirement committee.  *See* 29 U.S.C. § 1108(c)(3).

## V.  Plaintiff Cannot Prove Performance-Based Losses for Two of the Challenged Funds.

Even if Plaintiff could prove a breach of fiduciary duty, he cannot show that the Plan suffered a performance-based loss based on its investments in two of the challenged funds—the Mid Cap Value Fund and High Yield Fund.  "Loss is measured in this context by 'a comparison of what the Plan actually earned on the . . . investment with what the Plan would have earned had the funds been available for other Plan purposes.  If the latter amount is greater than the former, the loss is the difference between the two." *Sacerdote* v. *N.Y. Univ.*, 9 F.4th 95, 112 (2d Cir. 2021) (quotation omitted).

Plaintiff contends that the Plan suffered a loss by failing to replace the challenged GSAM funds in October 2013 with better-performing prudent alternatives.  In identifying these prudent alternatives, Plaintiff's expert Mr. Fender pointed to two lists maintained by Rocaton:

> Rocaton's "Buy List" represents the managers and strategies that Rocaton believes, based on its evaluation, to have the greatest prospects for success.  A smaller subset, those on the High Conviction Buy List, are presumably the strategies that Rocaton has identified as the best of the best . . . .

(SOF ¶ 40.)  Rocaton's High Conviction Buy List "typically consisted of three-to-six investment options per investment strategy."  (SOF ¶ 39.)  Mr. Fender testified that a "prudent action on the part of the retirement committee fiduciaries" would have been to replace the challenged GSAM funds in October 2013 with funds identified by Rocaton on its High Conviction Buy List.  (SOF

¶ 41.)  According to Mr. Fender, any of the three-to-six funds in each asset class included on that list—the best of the best—would have been prudent alternatives in October 2013.  (SOF ¶ 42.)

As Defendants' expert Dr. Kristen Willard demonstrates, over the course of the class period, the Mid Cap Value Fund and High Yield Fund both *outperformed* multiple funds in the same asset class on Rocaton's High Conviction Buy List at the start of the class period:  the Mid Cap Value Fund outperformed two of the five listed funds, and the High Yield Fund outperformed two of the four listed funds.  (SOF ¶¶ 112-14.)  Dr. Willard thus concludes that "Plan participants incurred no economic losses from the inclusion of the . . . Mid Cap Value Fund [and High Yield Fund] in the Plan . . . relative to the funds that Mr. Fender claims should have been considered for the plan at the beginning of th[e class] period."  (Ex. 62 (Expert Rpt. of Kristen Willard) ¶ 84.)  Accepting Mr. Fender's view that the Plan would not have suffered a loss if the Retirement Committee in October 2013 had selected *any* of the funds on the High Conviction Buy List as replacements for the GSAM mutual funds, the Plan also could not have suffered a performance-based loss because of the retention of two GSAM mutual funds that actually outperformed two of those admittedly prudent alternatives.  The Court therefore should grant summary judgment in Defendants' favor on Plaintiff's claims based on the performance of the Mid Cap Value Fund and High Yield Fund.  *See Cunningham*, 2019 WL 4735876, at *5 ("[B]ecause plaintiffs have not come forward with evidence that any breach resulted in loss, summary judgment will be granted [in defendants' favor].").

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment and dismiss Plaintiff's claims in their entirety with prejudice.

-30-

Dated:  New York, New York
        February 28, 2022

/s/ *Richard C. Pepperman II*

Richard C. Pepperman II
Thomas C. White
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:  212-558-4000
Facsimile:  212-558-3588
peppermanr@sullcrom.com
whitet@sullcrom.com
popovskym@sullcrom.com

*Attorneys for Defendants*