### IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                :

Leonid Falberg, as representative of a
class of similarly situated persons, and
on behalf of The Goldman Sachs 401(k)
Plan,

         Plaintiff,        :    Civil Case No. 1:19-cv-09910-ER

       - against -

The Goldman Sachs Group, Inc., The
Goldman Sachs 401(k) Plan Retirement
Committee, and John Does 1–20,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Richard C. Pepperman II
Thomas C. White
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: 212-558-4000
Facsimile: 212-558-3588
peppermanr@sullcrom.com
whitet@sullcrom.com
popovskym@sullcrom.com

*Attorneys for Defendants*

April 25, 2022

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................3

    A.    Plaintiff's Allegations ...........................................................................................3

    B.    Plaintiff's Three Methodologies for Calculating Performance-Based
        Losses ....................................................................................................................4

        1.    The Prospectus Benchmark Scenario............................................................ 4

        2.    The Goldman Sachs Mapping Scenario........................................................ 4

        3.    The High Conviction Buy List Scenario....................................................... 5

    C.    Plaintiff's Other Damages Methodologies................................................................6

    D.    Dr. Kristen Willard's Rebuttal Report .....................................................................6

    E.    Dr. Russell Wermers' Expert Report ....................................................................10

ARGUMENT .......................................................................................................................10

I.    Plaintiff's Motion for Partial Summary Judgment Is Premature Before the Court
    Determines the Existence and Scope of Any Liability .......................................................11

II.    Plaintiff Has Not Satisfied His Burden of Proving a Loss to the Plan ............................12

    A.    The Prospectus Benchmark Scenario Is Insufficient to Show a Loss...................13

    B.    The Goldman Sachs Mapping Scenario Is Insufficient to Show a Loss...............16

    C.    The High Conviction Buy List Scenario Is Insufficient to Show a Loss..............18

    D.    The Separate Account Scenario Is Insufficient to Show a Loss ...........................20

    E.    The Revenue Sharing Scenario Is Insufficient to Show a Loss ............................21

III.    If the Court Ever Reaches the Issue, Defendants Have Created Disputed Factual
    Questions on Loss Causation ...............................................................................................21

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amerada Hess Corp.* v. *Yuma Shipping Corp.*,
 1985 WL 458 (S.D.N.Y. Mar. 27, 1985) ...............................................................12

*Bernard* v. *BNY Mellon, N.A.*,
 2022 WL 376999 (W.D. Pa. Feb. 7, 2022) .............................................................15

*Brotherston* v. *Putnam Invs., LLC*,
 907 F.3d 17 (1st Cir. 2018)...................................................................11, 15, 18

*Browe* v. *CTC Corp.*,
 15 F.4th 175 (2d Cir. 2021) ...................................................................11, 17, 19

*Dardaganis* v. *Grace Capital, Inc.*,
 889 F.2d 1237 (2d Cir. 1989)..................................................................11, 21, 22

*Davis* v. *Salesforce.com, Inc.*,
 2021 WL 1428259 (N.D. Cal. Apr. 15, 2021), *rev'd and remanded on other
 grounds*, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) ..............................................14

*Donovan* v. *Bierwirth*,
 754 F.2d 1049 (2d Cir. 1985)....................................................................1, 11, 12

*Enos* v. *Adidas Am., Inc.*,
 2021 WL 5622121 (D. Or. Aug. 26, 2021)..............................................................14

*Fuller* v. *SunTrust Banks, Inc.*,
 2019 WL 5448206 (N.D. Ga. Oct. 3, 2019) ............................................................18

*Gilbert* v. *EMG Advisors, Inc.*,
 1999 WL 160382 (9th Cir. Mar. 17, 1999)..............................................................16

*Henry* v. *Champlain Enters., Inc.*,
 445 F.3d 610 (2d Cir. 2006).................................................................................20

*Kendall* v. *Pharm. Prod. Dev., LLC*,
 2021 WL 1231415 (E.D.N.C. Mar. 31, 2021) ........................................................14

*Leister* v. *Dovetail, Inc.*,
 546 F.3d 875 (7th Cir. 2008) ...............................................................................18

*Lovely H.* v. *Eggleston*,
 2012 WL 4459463 (S.D.N.Y. Sept. 19, 2012).........................................................12

*Martin* v. *Feilen*,
  965 F.2d 660 (8th Cir. 1992) ...................................................................11

*McDonald* v. *Provident Indem. Life Ins. Co.*,
  60 F.3d 234 (5th Cir. 1995) ...................................................................11

*Meyer* v. *Berkshire Life Insurance Co.*,
  250 F. Supp. 2d 544 (D. Md. 2003) ........................................................16

*Moitoso* v. *FMR LLC*,
  451 F. Supp. 3d 189 (D. Mass. 2020) .....................................................12

*Patterson* v. *Morgan Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ............................................24

*Ramos* v. *Banner Health*,
  461 F. Supp. 3d 1067 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) .....................23, 24

*Sacerdote* v. *New York Univ.*,
  9 F.4th 95 (2d Cir. 2021) ............................................................ *passim*

*Seawell* v. *Brown*,
  2010 WL 11561287 (S.D. Ohio Sept. 9, 2010) ........................................20

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation*,
  842 F. Supp. 2d 614 (S.D.N.Y. 2012)......................................................15

*Tatum* v. *RJR Pension Inv. Comm.*,
  761 F.3d 346 (4th Cir. 2014) ...........................................................11, 22

*Trammell* v. *Keane*,
  338 F.3d 155 (2d Cir. 2003)....................................................................11

*Trs. of Upstate N.Y. Eng'rs Pension Fund* v. *Ivy Asset Mgmt.*,
  843 F.3d 561 (2d Cir. 2016)......................................................................1

*Wildman* v. *Am. Century Servs., LLC*,
  362 F. Supp. 3d 685 (W.D. Mo. 2019) ....................................................15

## Rules

Fed. R. Civ. P. 56(a) ...............................................................................10

## Other Authorities

Restatement (Third) of Trusts § 100, cmt. b(1) ...........................................12

## PRELIMINARY STATEMENT

Plaintiff's motion for partial summary judgment on the issues of loss and loss causation attempts to bypass his burden to *prove* liability and instead asks the Court simply to *assume* that Defendants are liable for the entirety of the purported breaches of fiduciary duties and prohibited transactions alleged in the Complaint.  The issues of loss and loss causation cannot be decided, however, without first knowing the scope of the violation that allegedly caused the loss.  As the Second Circuit has held, questions of loss and loss causation arise only after "a breach of fiduciary duty has been established." *Donovan* v. *Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985).  Plaintiff cites no precedent for his request for partial summary judgment on the issues of loss and loss causation based on an *assumed* breach of fiduciary duty.  This Court should decline to be the first to enter what would be, at most, an advisory opinion based on hypothetical violations of ERISA.

Even if this motion is not premature (and thus improper), Plaintiff's request for partial summary judgment still should be denied on the record here.  This factual record is set forth in detail in Defendants' accompanying Rule 56.1 statement of additional material facts.  Insofar as Plaintiff is able to establish some breach of fiduciary duty at trial, Plaintiff still "bear[s] the burden of proving a loss" to the Plan caused by that breach, *Sacerdote* v. *New York Univ.*, 9 F.4th 95, 113 (2d Cir. 2021), *i.e.*, that "but for the breach, the [Plan] would have earned . . . more than it actually earned," *Trs. of Upstate N.Y. Eng'rs Pension Fund* v. *Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016).  To clear this hurdle, Plaintiff must provide a model that shows a loss to the Plan by comparing "plausible" alternative investments to the five challenged mutual funds managed by Goldman Sachs Asset Management ("GSAM") in the but-for world.  *Donavan*, 754 F.2d at 1056.  At the very least, Plaintiff's loss models and the assumptions underlying them raise vigorously disputed factual questions that foreclose summary judgment.

In an effort to show a loss based on the GSAM funds' performance, Plaintiff relies on three fatally flawed models.  Defendants already have moved to exclude two of them—the "Goldman Sachs Mapping Scenario" and the "High Conviction Buy List Scenario"—on the grounds that there is no expert support for the comparator funds used in them and both are infected with hindsight bias  (ECF No. 171.)  Even if that motion is denied, the disputed factual questions it raises will need to be resolved at trial.  Plaintiff's third model—the "Prospectus Benchmark Scenario"—also is flawed because it compares the returns of the *actively managed* GSAM mutual funds to the returns of *passively managed* index funds, which are fundamentally different.  It also is not plausible that the Retirement Committee would have replaced the actively managed GSAM mutual funds with passively managed index funds at the beginning of the class period in the but-for world:  the Plan already offered multiple index funds as investment options, and the Committee ultimately replaced the GSAM mutual funds with actively managed options in 2017.  Nor has Plaintiff established a loss arising from his allegations that the Committee purportedly violated ERISA by offering the GSAM funds as mutual funds rather than as separate accounts and by failing to secure revenue sharing supposedly available from GSAM.  The separate-account comparators posited by Plaintiff did not exist during the class period, and there is no basis to assume that GSAM could or would have created those hypothetical separate accounts for the Plan.  There also is no basis for Plaintiff's assumption that hypothetical revenue-sharing payments by GSAM to the Plan's recordkeeper would not have reduced the payments Goldman Sachs, as the Plan sponsor, otherwise made to the recordkeeper, resulting in no loss to the Plan.  These disputed factual issues preclude any determination that the comparator funds used by Plaintiff to show Plan losses are proper as a matter of law

On loss causation, Plaintiff attempts to rely on burden shifting under ERISA without proving the liability needed to shift the burden.  Plaintiff asserts that once he establishes liability and a loss to the Plan, "the burden under ERISA shifts to the defendants to disprove any portion of potential damages by showing that the loss was not caused by the breach of fiduciary duty." *Sacerdote*, 9 F.4th at 113.  Plaintiff stresses that "this is a deliberately heavy burden" for defendants found to have breached their fiduciary duties.  (Pl.'s Mem. 14.)  But Defendants here have not been found to be "breaching fiduciaries," and Plaintiff does not move for summary judgment on that ground.  (*Id*. at 13.)  Yet, even assuming that this burden-shifting approach applies where the plaintiff has proven neither liability nor a loss, Defendants have put forward more than sufficient evidence to raise genuine disputes of material fact concerning whether a prudent fiduciary would have taken the same approach that the Retirement Committee took here:  monitor the performance of the GSAM funds during the class period and ultimately remove them from the Plan in 2017.  That factual question will be vigorously contested at trial.

## BACKGROUND

### A.    Plaintiff's Allegations

Plaintiff alleges that Defendants breached their fiduciary duties under ERISA by making five actively managed GSAM mutual funds available as investment options in the Plan during the class period.  These are the (i) Mid Cap Value Fund, (ii) Large Cap Value Fund, (iii) High Yield Fund, (iv) Core Fixed Income Fund, and (v) Short Duration Government Fund.  (Compl. ¶¶ 48, 88-95.)  According to Plaintiff, Defendants violated their duties of loyalty and prudence by making the GSAM mutual funds available as investment options because "[t]here were multiple superior alternatives to these proprietary funds in the marketplace, which Defendants could have readily identified had they conducted a prudent investigation."  (*Id.* ¶ 57.)  Plaintiff also asserts that Defendants breached their fiduciary duties by offering the GSAM funds to Plan participants in the

form of mutual funds rather than lower-cost separate accounts.  (*Id.* ¶¶ 65-71.)  Plaintiff further alleges that Defendants engaged in prohibited transactions under ERISA "by failing to collect available fee rebates" from GSAM.  (*Id.* ¶ 99.)

### B.   Plaintiff's Three Methodologies for Calculating Performance-Based Losses

Plaintiff retained Dr. Brian Becker to "calculate damages" by "compar[ing] the performance of the [GSAM funds] to alternative investments that Goldman Sachs could have offered." (Ex. 1 (Becker Rpt.) at 9.)  At the direction of Plaintiff's counsel, Dr. Becker offers three methodologies for calculating Plan losses based on the purported underperformance of the GSAM funds:  (i) the Prospectus Benchmark Scenario, (ii) the Goldman Sachs Mapping Scenario, and (iii) the High Conviction Buy List Scenario.  (*Id.* at 18-23; Ex. 2 (Becker Rebuttal Rpt.) at 15-24; Ex. 3 (Becker Supp. Rpt.) at 7 & Fig. 1.)

#### 1.   The Prospectus Benchmark Scenario

Under the Prospectus Benchmark Scenario, Dr. Becker compares the returns of the actively managed GSAM mutual funds with "the returns of actual or hypothetical index funds that track the At-Issue Funds' benchmark indexes or similar indexes." (Ex. 1 (Becker Rpt.) at 18.)  As comparators for this scenario, Plaintiff's counsel "identified seven funds consisting of five investable index funds . . . and two non-investable indexes," all passively managed benchmark indexes.  (*Id.* at 20-21; *see also* ECF No. 179-63 (Willard Rpt.) ¶ 41.)

#### 2.   The Goldman Sachs Mapping Scenario

Under the Goldman Sachs Mapping Scenario, Dr. Becker compares the performance of the GSAM mutual funds with the investment options that the Retirement Committee ultimately selected to replace the GSAM mutual funds at the end of the class period.  (Ex. 1 (Becker Rpt.) at 21-23 & Fig. 7.)  Dr. Becker performed no independent analysis to determine whether the comparator funds used in this scenario are appropriate comparators for purposes of calculating

damages, but rather used them simply because they were "identified by plaintiff's counsel." (ECF No. 171 at 5; *see* Ex. 4 (Becker Tr.) at 63:18-65:6.)   Defendants have moved to exclude Dr. Becker's Goldman Sachs Mapping Scenario because there is no expert support for the comparator funds used in this scenario. (ECF No. 171.)

### 3. The High Conviction Buy List Scenario

Under the High Conviction Buy List Scenario, Dr. Becker compares the performance of the challenged GSAM mutual funds with certain mutual funds on a list maintained by Rocaton Investment Advisors, LLC ("Rocaton"), the Committee's independent investment advisor during the class period. (Ex. 2 (Becker Rebuttal Rpt.) at 15.) In his expert initial report, Plaintiff's expert William Fender opined that Rocaton's High Conviction Buy List consisted of a very small subset of "strategies that Rocaton . . . identified as the best of the best." (ECF No. 179-59 (Fender Rpt.) at 33.) Whereas Rocaton's "Buy" list included "approximately 275-300 managers" (*id.*), the High Conviction Buy List "typically consisted of [only] three-to-six investment options per investment strategy." (ECF No. 179-8 (Buehl Decl. II) ¶ 13.)

To calculate damages using the High Conviction Buy List Scenario, Dr. Becker compares the GSAM funds' performance over the class period with the performance of "the highest-returning investment and median-returning investment" on Rocaton's High Conviction Buy List "as of the third quarter of 2013." (Pl.'s Mem. 11.) Dr. Becker does not offer any opinion that the highest-performing and median-performing funds on the High Conviction Buy List are appropriate comparators for purposes of calculating damages in this case (Ex. 4 (Becker Tr.) at 194:8-17), but rather uses them based simply on the instructions of Plaintiff's counsel (*id.* at 188:9-13 ("In terms of the logic as to why it was chosen as the highest or the median or another number in there, I will leave that to others.  That wasn't really my decision.").  Defendants also have moved to exclude this scenario because there is no expert support for the comparator funds used in it. (ECF No. 171.)

### C.      Plaintiff's Other Damages Methodologies

Dr. Becker also offers two methodologies that purport to measure losses associated with Plaintiff's allegations that Defendants failed (i) to switch to lower-cost separate accounts supposedly offered by GSAM, and (ii) to secure revenue sharing supposedly available from GSAM.  (Ex. 1 (Becker Rpt.) at 23-30.)  For the former, Plaintiff's counsel asked Dr. Becker to assume that GSAM could (and would) have developed separate accounts that "followed the same strategy and held the same underlying securities as their corresponding At-Issue Funds."  (*Id.* at 47.)  To calculate damages, Dr. Becker thus uses the "actual" returns of the challenged GSAM mutual funds as the returns for these hypothetical separate accounts and simply adjusts those returns to account for the difference in expenses between the GSAM mutual funds and different separate accounts actually offered by GSAM.  (*Id.*)  For the latter, Plaintiff's counsel instructed Dr. Becker simply to increase the returns of the challenged GSAM mutual funds by "10 basis points to account for the 10 basis point rebate Plaintiff alleges should have been issued" to the Plan.  (*Id.* at 29.)

### D.      Dr. Kristen Willard's Rebuttal Report

In response to Dr. Becker's various damages methodologies, Defendants offered a rebuttal report from Dr. Kristen Willard.  As Dr. Willard explains, "[d]amages calculations, as a matter of general economic principle, should determine whether, and to what extent, a plaintiff suffered economic harm caused by the alleged misconduct."  (ECF No. 179-63 (Willard Rpt.) ¶ 55.) "Specifically, a credible damages calculation must first measure the economic state of the plaintiff in the but-for world, and then compute the difference between that but-for world and the actual world that can be attributed *solely* to the alleged misconduct."  (*Id.*)  Dr. Willard further opines that damages experts must "base their opinions regarding but-for decisions . . . only on information available to the relevant decision makers at the time the alleged breach would have been cured,"

and she stresses that "hindsight bias" must be avoided.  (*Id*. ¶ 57.)  Applying those basic principles, Dr. Willard identifies multiple fundamental flaws in each of Dr. Becker's methodologies.

<u>Prospectus Benchmark Scenario</u>.  In response to Dr. Becker's Prospectus Benchmark Scenario, Dr. Willard opines that "passively-managed index funds are not realistic or reasonable alternatives for actively-managed funds in a damages estimate because the two types of funds are fundamentally different products."  (*Id*. ¶ 65.)  Dr. Willard explains that passively managed index funds are "constrained by design to purchase all or a representative sample of the components of a specified index," whereas actively managed funds have "discretion to adjust exposure to different sectors or securities within the fund's investment mandate."  (*Id*. ¶¶ 66, 67.)  Dr. Willard also opines that there is no basis for Dr. Becker's assumption "that the Retirement Committee would have 'replaced' the actively-managed At-Issue Funds with the passively-managed Prospectus Benchmark Comparators" at the beginning of the class period in the but-for world.  (*Id*. ¶ 70.)  The evidence instead strongly suggests otherwise.  "[W]hen deciding to remove each At-Issue Fund, the Retirement Committee chose to map Plan assets in each and every At-Issue Fund to an actively-managed alternative investment."  (*Id*. ¶ 71.)  "This shows that the Retirement Committee was committed to making available actively-managed funds alongside index funds in the Plan" and renders "unrealistic" Dr. Becker's assumption that the Committee would have abandoned that commitment in the but-for world.  (*Id*.)

<u>Goldman Sachs Mapping Scenario</u>.  Dr. Willard explains that Dr. Becker's Goldman Sachs Mapping Scenario "depends critically on *ex-post* information that was unknowable at the beginning of the" class period.  (*Id.* ¶ 79.)  In particular, "Dr. Becker assumes that Plan fiduciaries would have 'replaced' the At-Issue Funds at the beginning of [the class period] with the same funds that they ultimately chose . . . more than three years later, based on information that

accumulated between 2013 and 2017." (*Id*.)  Dr. Willard notes that the Retirement Committee's decisions in 2016 and 2017 to replace the GSAM funds with particular funds "were made based, in part, on the historical performance of Dr. Becker's Mapping Comparators *as of those dates*." (*Id*. ¶ 80.)  Because "historical performance information (as of December 2016 and April 2017) was not available to Plan fiduciaries" at the beginning of the class period, Dr. Willard concludes that "using the Mapping Comparators as alternatives embeds hindsight bias into Dr. Becker's damages methodology." (*Id*.)

High Conviction Buy List Scenario.  Because Dr. Becker did not offer his High Conviction Buy List Scenario until his rebuttal report (Ex. 2 (Becker Rebuttal Rpt.) at 15-24), Dr. Willard did not have an opportunity to address that scenario in her report, yet she did discuss Rocaton's High Conviction Buy List in her report.  Based on the opinion offered by another of Plaintiff's experts, William Fender, that the Retirement Committee "should have considered the funds on Rocaton's 'High Conviction Buy List' as alternatives" to the GSAM funds at the beginning of the class period, Dr. Willard observes that "an unbiased damages methodology should attribute no damages to any of the . . . funds included on that list."  (ECF No. 179-63 (Willard Rpt.) ¶¶ 82-83.) Dr. Willard then points out that "the annualized total returns of the Goldman Sachs Mid Cap Value Fund—the At-Issue fund that makes up over 75% of Dr. Becker's performance-based damages (before prejudgment interest)—over the [class period were] within the range of annualized total returns of the mid-cap value funds included on Rocaton's 'High Conviction Buy List' as of Q3 2013." (*Id*. ¶84.)  Indeed, the Mid Cap Value Fund *outperformed* two of the five funds on that list during the class period.  (*Id*. Ex. 5 at 2.)  "This means that Plan participants incurred no economic losses from the inclusion of the Goldman Sachs Mid Cap Value Fund in the Plan over the [class period] relative to the funds that Mr. Fender claims should have been considered for the Plan at

the beginning of that period." (*Id.*)  This same reasoning also applies to the GSAM High Yield Fund, which *outperformed* two of the four funds on Rocaton's High Conviction Buy List during the class period.  (ECF No. 179-63 (Willard Rpt.) Ex. 5 at 3.)

Separate Account Scenario.  Dr. Willard opines that Dr. Becker's damages calculation based on the purported availability of separate accounts from GSAM "is unfounded and unreliable." (*Id.* ¶ 97.)  As Dr. Willard explains, "the hypothetical [separate account comparators] that Dr. Becker uses to calculate damages" under this damages theory "are not actual GSAM funds available during the [class period]." (*Id.* ¶ 93.)  "Rather, based on instructions from Plaintiff's counsel, Dr. Becker simply assumes that GSAM could have created [separate accounts] that replicate the underlying investment strategies of the At-Issue Funds, and then Plan fiduciaries would have made these hypothetical [separate accounts] available in the Plan and charged participants the expenses that Dr. Becker estimates." (*Id.*)  According to Dr. Willard, these assumptions are "speculative" and "inconsistent with deposition testimony in this matter." (*Id.* ¶¶ 93, 97.)

Revenue Sharing Scenario.  Dr. Willard notes that Dr. Becker's damages theory based on potential revenue sharing from GSAM ignores that "Goldman Sachs subsidized the Plan's administrative and recordkeeping fees throughout the [class period], covering 100% of those costs for active employees." (*Id.* ¶ 103.)  As a result, if "GSAM were to pay hypothetical revenue sharing to the Plan's recordkeeper, and the recordkeeper made such payments available to offset its Plan recordkeeping fee, Goldman Sachs, as the Plan sponsor, may choose to use the revenue sharing amount to reduce the payments it would otherwise make to the recordkeeper as the Plan sponsor, thereby resulting in no damages from a lack of revenue sharing payments to Plan

participants." (*Id.*)  In his rebuttal report, Dr. Becker "offer[ed] no opinion on such criticisms," acknowledging that they raise disputed factual questions.  (Ex. 2 (Becker Rebuttal Rpt.) at 8.)

### E.    Dr. Russell Wermers' Expert Report

Defendants also offered an expert report from Dr. Russell Wermers, who "analyze[d] the reasonableness of including each [GSAM fund] in the Plan's investment lineup" during the class period.  (ECF No. 179-62 (Wermers Rpt.) ¶ 9.)  Dr. Wermers opines that "[w]hen evaluating the economic reasonableness of an investment option, one must consider the information available at the time of the decision to add (or retain) an option, rather than using hindsight acquired after-the-fact." (*Id.* ¶ 13.)  According to Dr. Wermers, an "economically reasonable" investment option is an investment that would "be expected to provide an attractive combination of risk and return" given "the goals of the fund" based on "a holistic consideration of a wide range of quantitative and qualitative factors, as well as expenses." (*Id.* ¶¶ 41, 42.)  Based on Dr. Wermers' "professional experience and the totality of [his] analyses, it is [his] opinion that it was economically reasonable to make each of the [GSAM] funds available as an investment option for Plan participants during the [class period]." (*Id.* ¶ 13.)  Dr. Wermers demonstrates, among other things, that four of the five challenged GSAM funds "had historical returns that were generally consistent with, or better than, the returns of [their] mutual fund peers before the removal of the fund[s]" and that the fifth GSAM fund had returns "generally consistent" with its mutual fund peers.  (*Id.* ¶¶ 66, 84, 96, 107, 117, 126.)  Like Dr. Willard, Dr. Wermers opines that Dr. Becker's selection of comparator funds for his Goldman Sachs Mapping Scenario "is based on hindsight bias acquired after-the-fact." (*Id.* ¶ 155.)

## ARGUMENT

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a). "When ruling on a motion for summary judgment, a court is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." *Trammell* v. *Keane*, 338 F.3d 155, 161 (2d Cir. 2003). Applying that standard here, genuine disputes of material fact abound on the issues of loss and loss causation. Defendants describe the relevant factual record in detail in their accompanying Rule 56.1 statement of additional material facts. Plaintiff's motion for partial summary judgment therefore should be denied in its entirety.

**I.    Plaintiff's Motion for Partial Summary Judgment Is Premature Because the Court Has Not Determined the Existence or Scope of Any Liability.**

As a threshold matter, Plaintiff cannot move for partial summary judgment on the issues of loss and loss causation before there is a finding on the existence or scope of Defendants' liability under any of Plaintiff's claims. Given that ERISA "speaks in terms of 'losses . . . resulting from [a] breach,'" a proper loss analysis cannot begin until "a breach of fiduciary duty has been established." *Donovan*, 754 F.2d at 1055. Plaintiff fails to identify *any* case granting partial summary judgment for a plaintiff on the issues of loss or loss causation based on *assumed* violations of ERISA. Plaintiff instead relies on cases in which the trial court already had decided the defendant's liability, either at trial or on summary judgment.[1] Unlike in those cases, Plaintiff does not seek summary judgment on the central issue of "whether Defendants breached their duties of loyalty and prudence." (Pl.'s Mem. 1.)

---

[1] *See* Pl.'s Mem. 13-15 (citing *Browe* v. *CTC Corp.*, 15 F.4th 175, 183, 199 (2d Cir. 2021) (appeal of judgment from bench trial); *Sacerdote*, 9 F.4th at 101 (same); *Brotherston* v. *Putnam Invs., LLC*, 907 F.3d 17, 24 (1st Cir. 2018) (same); *Tatum* v. *RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014) (same); *McDonald* v. *Provident Indem. Life Ins. Co.*, 60 F.3d 234, 235 (5th Cir. 1995) (same); *Martin* v. *Feilen*, 965 F.2d 660, 671 (8th Cir. 1992) (same); *Donovan*, 754 F.2d at 1051 (same); *Dardaganis* v. *Grace Capital, Inc.*, 889 F.2d 1237, 1243 (2d Cir. 1989) (appeal of summary judgment in plaintiff's favor on liability).

The law does not support Plaintiff's gambit.  "It is axiomatic that summary judgment as to damages can only follow a determination that damages are in fact owed (*i.e.*, that the defendant is actually liable for damages)."  *Lovely H.* v. *Eggleston*, 2012 WL 4459463, at *2 (S.D.N.Y. Sept. 19, 2012) (denying plaintiff's motion for partial summary judgment).  Indeed, "[i]t is difficult to imagine how the Court could rule on damages . . . without first determining the liability issue." *Amerada Hess Corp.* v. *Yuma Shipping Corp.*, 1985 WL 458, at *4 (S.D.N.Y. Mar. 27, 1985).  "In the absence of such a finding, any such determination could only amount to an inappropriate advisory opinion."  *Lovely H*, 2012 WL 4459463, at *2; *see also Moitoso* v. *FMR LLC*, 451 F. Supp. 3d 189, 210 (D. Mass. 2020) (declining to "determine whether any loss has occurred" because that determination would be "premature" before a finding on liability); Restatement (Third) of Trusts § 100, cmt. b(1) (determination of loss depends on "nature of the breach").

Because the Court cannot resolve questions of loss or loss causation now, the Court should deny Plaintiff's motion for partial summary judgment as premature.

## II.    Plaintiff Has Not Satisfied His Burden of Proving a Loss to the Plan.

Under ERISA, "[l]oss is measured . . . by 'a comparison of what the [P]lan actually earned on the . . . investment with what the [P]lan would have earned had the funds been available for other Plan purposes.  If the latter amount is greater than the former, the loss is the difference between the two.'"  *Sacerdote*, 9 F.4th at 112 (quoting *Donovan*, 754 F.2d at 1056).  "In determining what the Plan would have earned had the funds been available for other Plan purposes," courts look to "other funds being invested during the same period in proper transactions."  *Donovan*, 754 F.2d at 1056.  To be an appropriate comparator fund, any "alternative investment strategies" must be a "plausible" substitute for the challenged fund in the but-for world given the specific facts of the case.  *Id.*

Plaintiff relies on Dr. Becker's Prospectus Benchmark, Goldman Sachs Mapping, and High Conviction Buy List Scenarios to establish the loss allegedly incurred by the Plan as a result of the Committee's purportedly improper retention of the GSAM funds during the class period.  (Pl.'s Mem. 3.)  Plaintiff further relies on Dr. Becker's separate-account and revenue-sharing scenarios to show losses purportedly resulting from the Committee's alleged failure to reduce expenses associated with the GSAM funds.  (*Id*. at 4.)  None of these damages scenarios satisfies Plaintiff's burden on the issue of loss as a matter of law.  At the very least, Dr. Willard's rebuttal report— which spans more than 60 pages—creates genuine disputes of material facts that preclude summary judgment.

## A.    The Prospectus Benchmark Scenario Is Insufficient to Show a Loss.

The Prospectus Benchmark Scenario fails to demonstrate any loss to the Plan because it relies on inapt comparisons between the challenged actively managed GSAM mutual funds and passively managed index funds selected by Plaintiff's counsel.[2]  As Dr. Willard explains, this scenario confuses two distinct concepts:  "(1) evaluating an investment manager's performance relative to an objective and observable benchmark, and (2) computing damages from an allegedly imprudent investment selection."  (ECF No. 179-63 (Willard Rpt.) ¶ 60.)  "[T]he task of a damages expert is to determine what would have reasonably occurred in the absence of the alleged misconduct" in the but-for world.  (*Id*. ¶ 64.)  Dr. Willard observes that "Dr. Becker makes no attempt to justify his assumption that Defendants [in the but-for world] would have mapped the

---

[2] Plaintiff notes that "Defendants do not challenge this method for calculating loss in their *Daubert* motion directed to Dr. Becker."  (Pl.'s Mem. 9.)  That is because another of Plaintiff's experts, William Fender, opined that the index funds used as comparators in the Prospectus Benchmark Scenario are "reasonable comparator[s]," thus creating a disputed factual question.  (ECF No. 179-59 (Fender Rpt.) at 56.)  Because Mr. Fender declined to offer the same opinion for the funds used in the Goldman Sachs Mapping and High Conviction Buy List Scenarios, Defendants have moved to exclude those two scenarios as lacking evidentiary support.  (ECF No. 171.)

Plan assets invested in the actively-managed At-Issue Funds at the start of the [class period] into the passive alternatives selected by Plaintiff's counsel." (*Id.* ¶ 59.)

Dr. Becker's unsupported assumption "stands in stark contrast to the actual . . . decisions that the committee made in 2017. Specifically, when deciding to remove each At-Issue Fund, the Retirement Committee chose to map Plan assets in each and every At-Issue Fund to an actively-managed alternative investment." (*Id.* ¶ 71.) Dr. Willard stresses that this evidence "shows that the Retirement Committee was committed to making available actively-managed funds alongside [the] index funds [already included] in the Plan." (*Id.*) Dr. Willard concludes that "it is unrealistic to imagine . . . that the Retirement Committee would [have] abandon[ed] this commitment" in the but-for world. (*Id.*)

Dr. Willard further opines that "passively-managed index funds are not realistic or reasonable alternatives for actively-managed funds in a damages estimate because the two types of funds are fundamentally different." (*Id.* ¶ 65.) Consistent with that opinion, courts have recognized that "passively managed funds are not meaningful benchmarks for actively managed funds given their essential differences." *Davis* v. *Salesforce.com, Inc.*, 2021 WL 1428259, at *5 (N.D. Cal. Apr. 15, 2021), *rev'd and remanded on other grounds*, 2022 WL 1055557, at *2 n.1 (9th Cir. Apr. 8, 2022) ("We agree with the district court that plaintiffs have not plausibly alleged that defendants breached the duty of prudence by failing to adequately consider passively managed mutual fund alternatives to the actively managed funds offered by the plan."); *see Enos* v. *Adidas Am., Inc.*, 2021 WL 5622121, at *7 (D. Or. Aug. 26, 2021) (describing "significant" differences between "passively managed funds" and "actively managed fund[s]"); *Kendall* v. *Pharm. Prod. Dev., LLC*, 2021 WL 1231415, at *9 (E.D.N.C. Mar. 31, 2021) ("Comparing actively-and

passively-managed funds is like '[c]omparing apples and oranges' and cannot create a meaningful benchmark.").

In determining whether a comparison of actively managed mutual funds with passive benchmarks can establish a "prima facie case of loss" to a plan, courts consider the plan's "investment strategy" and other facts unique to the case. *Wildman* v. *Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 710 (W.D. Mo. 2019). For example, in *Bernard* v. *BNY Mellon, N.A.*, 2022 WL 376999, at *10 (W.D. Pa. Feb. 7, 2022), the court excluded a damages model that used passive indexes as comparators on the ground that the plaintiffs there "have not shown to a sufficient degree that the comparator funds used by [the plaintiffs' expert] were adequate comparators." Here, Dr. Becker provides no support for his use of passively managed index funds as comparators in this scenario; he instead admits that those comparator funds were provided to him by Plaintiff's counsel. (Ex. 1 (Becker Rpt.) at 20 ("COUNSEL has identified these Prospectus Benchmark Index Funds . . . .").)

In view of Dr. Willard's opinions, the question of whether Dr. Becker's Prospectus Benchmark Scenario demonstrates a loss to the Plan is a disputed factual question that cannot be resolved through summary judgment. Plaintiff does not cite any case holding that passively managed index funds are appropriate comparators for actively managed mutual funds *as a matter of law*. (*See* Pl.'s Mem. 8-9.) In *Brotherston*, "the district court [had] ruled, as a matter of law," following trial that the benchmark funds or indexes used as comparators by the plaintiffs were "insufficient to make out a prima facie case of loss." 907 F.3d at 33. On appeal, the First Circuit reversed, holding that the issues of whether the plaintiffs "picked suitable benchmarks" and whether the selected "comparators were . . . plausible" are "questions of fact" that cannot be resolved as a matter of law. *Id.* at 34. In *In re State Street Bank & Trust Co. Fixed Income Funds*

*Investment Litigation*, 842 F. Supp. 2d 614, 617, 658-59 (S.D.N.Y. 2012), the court found—following a seven-day bench trial at which "[a] significant amount of the testimony and evidence . . . focused on the meaning of the term 'enhanced index fund'"—that "benchmark indices" did not properly measure damages, but that "enhanced index funds . . . provide[d] an approximate calculation" in that case.[3]  None of these cases provides support for Plaintiff's contention that his Prospectus Benchmark Scenario establishes a loss to the Plan as a matter of law.

### B.   The Goldman Sachs Mapping Scenario Is Insufficient to Show a Loss.

Dr. Becker's Goldman Sachs Mapping Scenario fares even worse—which is why Defendants have moved to exclude it.  (ECF No. 171.)  The comparator funds used in this scenario were selected by Plaintiff's counsel with the benefit of hindsight based on how they performed between 2013 and 2017, information that the Committee did not have at the start of the class period in October 2013.  (*See* ECF No. 179-63 (Willard Rpt.) ¶¶ 79-80.)  As Dr. Willard explains, "damages experts should base their determination of how to replace allegedly imprudent investment options using information that was knowable at the time when the alleged misconduct occurred."  (*Id.* ¶ 86.)  Yet "Dr. Becker's damages calculation in his Goldman Sachs Mapping Scenario depends critically on *ex-post* information that was unknowable at the beginning of the [class period]."  (*Id.* ¶ 79.)  Dr. Wermers also opines that Dr. Becker's selection of comparator funds for this scenario "is based on hindsight bias acquired after-the-fact."  (ECF No. 179-62 (Wermers Rpt.) ¶ 155.)

---

[3] Plaintiff's other cited cases are also inapposite.  (Pl.'s Mem. 9 n.7.)  In *Gilbert* v. *EMG Advisors, Inc.*, 1999 WL 160382, at *3 (9th Cir. Mar. 17, 1999), the court permitted the "use of a benchmark . . . to adjust the total damages figure" award in a case involving a failure to investigate certain complex derivative securities.  That case did not address whether passively managed index funds can be used to assess loss arising from the retention of actively managed mutual funds.  In *Meyer* v. *Berkshire Life Insurance Co.*, 250 F. Supp. 2d 544, 573-74 (D. Md. 2003), the court, after a six-day bench trial, calculated damages using a mix of funds based on the "testimony and evidence" presented at trial.

Although Plaintiff asserts that this scenario "is particularly compelling . . . because the replacement funds were selected and deemed prudent by Defendants themselves" (Pl.'s Mem. 10), Plaintiff ignores that the Retirement Committee selected the replacement funds in December 2016 and April 2017 *based on information that had accumulated between 2013 and 2017*, which would not have been available to the Committee at the beginning of the class period (ECF No. 179-63 (Willard Rpt.) ¶¶ 79-80; ECF No. 179-62 (Wermers Rpt.) ¶ 155). Any calculation of damages based on information that the Committee could not possibly have known at the beginning of the class period violates a "key principle of a proper damages methodology." (ECF No. 179-63 (Willard Rpt.) ¶ 86; *see also* ECF No. 179-62 (Wermers Rpt.) ¶ 155; ECF No. 179-59 (Fender Rpt.) at 44.) Even Dr. Becker does not deny that the comparator funds used in his Goldman Sachs Mapping Scenario were the product of "hindsight bias." (Ex. 4 (Becker Tr.) at 96:7-97:17.)

Plaintiff also contends that this damages scenario is consistent with the Second Circuit's statement that courts "should presume that funds would have been treated like other funds being invested during the same period in proper transactions." (Pl.'s Mem. 10 (quoting *Browe*, 15 4th 199).) But *Browe* does not authorize an expert to select comparator funds for purposes of calculating loss with the benefit of hindsight based on information that was unavailable to the fiduciary at the time of the challenged decision. In *Browe*, the Second Circuit affirmed a trial verdict finding that fiduciaries of a small deferred compensation plan misappropriated hundreds of thousands of dollars from the plan "to pay business operating expenses." 15 4th at 187-88. The Second Circuit held that the district court should "return the participants to the position that they would have occupied but for the breach," including compensation for "unrealized gains resulting from the breach." *Id.* at 199. The Second Circuit did not endorse, however, the use of loss models based on comparator funds that were selected with knowledge of how they performed during the

class period, which "would yield a windfall, given the uncertainty of investments." *Leister* v. *Dovetail, Inc.*, 546 F.3d 875, 881 (7th Cir. 2008).

Notwithstanding Plaintiff's assertion that this methodology is "consistent with applicable law," Plaintiff cites no authority suggesting that the Goldman Sachs Mapping Scenario's comparators are appropriate *as a matter of law*. (Pl.'s Mem. 10.)  As previously noted, the First Circuit in *Brotherston* held that whether the plaintiffs' expert had selected "suitable benchmarks" is a "question of fact" that cannot be resolved as a matter of law.  907 F.3d at 34 & n.14.  In *Fuller* v. *SunTrust Banks, Inc.*, 2019 WL 5448206, at *28 (N.D. Ga. Oct. 3, 2019), the court also agreed that "the determination of the appropriateness of the comparator funds used is a question for trial, not summary judgment," and thus held that "a genuine issue of fact exists as to whether the Plan suffered loss."  At a minimum, whether Plaintiff's Goldman Sachs Mapping Scenario establishes a loss to the Plan raises disputed factual questions, as described by Dr. Willard and Dr. Wermers, that preclude summary judgment.

### C.     The High Conviction Buy List Scenario Is Insufficient to Show a Loss.

Dr. Becker's High Conviction Buy List Scenario also is infected by hindsight bias and thus cannot establish a loss to the Plan.  Defendants' *Daubert* motion seeks to exclude this scenario as well.  (ECF No. 171.)  The "High Conviction Buy List Scenario compares the returns of each Challenged GSAM fund to the returns of both the highest-returning investment and median-returning investment on Rocaton's High Conviction Buy List as of the third quarter of 2013." (Pl.'s Mem. 11.)  There can be no dispute, however, that the Retirement Committee could not have known in October 2013 which funds included on Rocaton's High Conviction Buy List at that time would have the "highest annualized returns" or "median returns" from "October 2013 to April 2017 or June 2017" when the GSAM funds were removed from the Plan.  (Ex. 2 (Becker Rebuttal Rpt.) at 15.)  Even Dr. Becker agreed with the common-sense notion that the Committee

could not have known in October 2013 which funds on Rocaton's High Conviction Buy List would have the highest and median returns over the next three and one-half years.  (Ex. 4 (Becker Tr.) at 188:25-189:14 ("[T]hey certainly couldn't know the future at that time.  There is no question about that."); *id*. at 192:2-13 ("[The Retirement Committee] would not [have] known of those returns in October of 2013, that's correct.").)  When asked "[i]s it your opinion that the funds with the highest and median returns are better comparators for purposes of calculating damages than other funds on Rocaton's high-conviction buy list," Dr. Becker responded:  "I don't have an opinion on that, no."  (*Id.* at 194:8-17.)

Dr. Willard determined that two of the three challenged GSAM funds that generate the highest performance-based damages under Dr. Becker's methodologies—the Mid Cap Value Fund and the High Yield Fund—over the class period *outperformed* multiple funds included on Rocaton's High Conviction Buy at the start of the class period.[4]  (ECF No. 179-63 (Willard Rpt.) ¶¶ 83-84 & Ex. 5.)  Dr. Willard thus concludes "that Plan participants incurred *no economic losses* from the inclusion of [those two funds] in the Plan . . . relative to the funds that Mr. Fender claims should have been considered for the Plan at the beginning of that period."  (*Id.* ¶ 84 (emphasis added).)  Dr. Becker offers no explanation for why the highest- and median-performing funds on Rocaton's High Conviction Buy List are superior comparators to any of the other funds on the list at that time.  He instead testified, "I don't have an opinion on that, no."  (Ex. 4 (Becker Tr.) at 194:8-17.)

Citing *Browe*, Plaintiff incorrectly argues that "the Second Circuit has expressly endorsed this type of approach."  (Pl.'s Mem. 11 (quoting *Browe*, 15 F.4th at 199).)  The language quoted

---

[4] The Mid Cap Value Fund outperformed two of the five funds on the High Conviction Buy List at the start of the class period, and the High Yield fund outperformed two of the four listed funds. (ECF No. 179-63 (Willard Rpt.) Ex. 5 at 2-3.)

by Plaintiff does not mean that ERISA plaintiffs can collect windfall damages by proposing a loss model that selects comparator funds based on how they performed during the class period.  *See supra* at 17-18.  "The aim of ERISA is to make the plaintiffs whole, but not give them a windfall." *Henry* v. *Champlain Enters., Inc.*, 445 F.3d 610, 624 (2d Cir. 2006) (internal quotation omitted). "It does not take an expert to look at the data supplied to [him], identify the best performing fund managers, and determine the average rates of return for those fund managers in hindsight." *Seawell* v. *Brown*, 2010 WL 11561287, at *8 (S.D. Ohio Sept. 9, 2010).  At a minimum, these are disputed factual questions.

      **D.**      **The Separate Account Scenario Is Insufficient to Show a Loss.**

Plaintiff asserts that "Goldman Sachs offered separate accounts in the same or similar strategies as . . . each of the Challenged GSAM mutual funds" and that "[t]hese separate account vehicles are the comparators that Dr. Becker used for purposes of his separate accounts models." (Pl.'s Mem. 12.)  That is incorrect.  As Dr. Willard explains, "the hypothetical [separate account comparators] that Dr. Becker uses to calculate damages" under this damages theory "are not actual GSAM funds available during the [class period]."  (ECF No. 179-63 (Willard Rpt.) ¶ 93.)  "Rather, based on instructions from Plaintiff's counsel, Dr. Becker simply *assumes* that GSAM could have created [separate accounts] that replicate the underlying investment strategies of the At-Issue Funds, and then Plan fiduciaries would have made these hypothetical [separate accounts] available in the Plan and charged participants the expenses that Dr. Becker estimates."  (*Id.* (emphasis added).)  Those assumptions, however, "are inconsistent with deposition testimony in this matter" and are "unfounded and unreliable."  (*Id.* ¶¶ 93, 97.)  Although Plaintiff notes that "Defendants do not challenge" this methodology "in their *Daubert* motion" (Pl.'s Mem. 12), Dr. Willard devotes a section of her rebuttal report to identifying this methodology's flaws (ECF No. 179-63 (Willard Rpt.) ¶¶ 93-100), which creates genuine disputes of material facts.

E.      **The Revenue Sharing Scenario Is Insufficient to Show a Loss.**

Plaintiff contends that GSAM "offered fee rebates in the form of revenue sharing to some other plans in connection with each of the Challenged GSAM funds" and that "[t]hese fee rebates . . . formed the basis for Dr. Becker's calculation of losses in his fee rebates model."  (Pl.'s Mem. 12.)  Again, Dr. Willard devotes a section of her rebuttal report to this methodology's flaws. (ECF No. 179-63 (Willard Rpt.) ¶¶ 101-03.)   Dr. Willard notes that Dr. Becker ignores that "Goldman Sachs subsidized the Plan's administrative and recordkeeping fees throughout the [class period], covering 100% of those costs for active employees."  (*Id*. ¶ 103.)  As a result, if "GSAM were to pay hypothetical revenue sharing to the Plan's recordkeeper, and the recordkeeper made such payments available to offset its Plan recordkeeping fee, Goldman Sachs, as the Plan sponsor, may choose to use the revenue sharing amount to reduce the payments it would otherwise make to the recordkeeper as the Plan sponsor, thereby resulting in no damages from a lack of revenue sharing payments to Plan participants."  (*Id*.)  Dr. Becker "offer[s] no opinion" on Dr. Willard's criticisms of this methodology (Ex. 2 (Becker Rebuttal Rpt.) at 8), which create disputed factual questions for trial.

III.    **If the Court Ever Reaches the Issue, Defendants Have Created Disputed Factual Questions on Loss Causation.**

Relying on Dr. Becker's various damages methodologies, Plaintiff asserts that he has "shown a loss to the Plan," which shifts "the burden . . . to the defendants to disprove any portion of potential damages by showing that the loss was not caused by the breach of fiduciary duty." (Pl.'s Mem. 12-13 (quoting *Sacerdote*, 9 F.4th at 113).)  Plaintiff emphasizes that "[t]his burden is a heavy one" after a breach of trust has been established because "'uncertainties in fixing damages will be resolved against the wrongdoer.'"  (*Id*. at 13 (quoting *Dardaganis*, 889 F.2d at 1244).)  To meet this "deliberately heavy burden," a fiduciary that has been proven to have

breached his or her duties must show that a prudent fiduciary "'would have'" made the same

decision. (*Id*. at 14 (quoting *Sacerdote*, 9 F.4th at 112).) Until Plaintiff "has proved" a breach of

fiduciary duty "and a prima facie loss," however, there is no basis to engage in burden shifting and

impose a "heavy" burden on Defendants. *Tatum*, 761 F.3d at 364. No "breach of trust" has been

established here, and Plaintiff has not shown any Defendant to be a "wrongdoer." *Dardaganis*,

889 F.2d at 1244. This Court thus need not reach the question of loss causation.

Even if Plaintiff could avail himself of burden shifting, Defendants have shown that "a

hypothetical prudent fiduciary would have made the same decision anyway." *Tatum*, 761 F.3d at

363 (internal quotation omitted). Plaintiff does not challenge the Committee's initial *selection* of

the GSAM funds as investment options, which "occurred over a decade before the Class Period

began." (ECF No. 198 at 14 n.15.) As a result, the relevant question is whether a prudent fiduciary

would have retained the challenged GSAM mutual funds in the Plan until at least December 2016

and April 2017, when the Committee decided to remove them. At a minimum, that question raises

disputed factual issues that must be resolved at trial.

Defendants have submitted extensive expert evidence demonstrating that a prudent

fiduciary would have retained the GSAM funds in the Plan at least until the Committee voted to

remove them. Dr. Russell Wermers offers over 40 pages of detailed analysis describing the

quantitative and qualitative factors that made each GSAM fund an economically reasonable

investment option for the Plan during the class period based on his review of each fund's structure,

management team, and investment strategy. (ECF No. 179-62 (Wermers Rpt.) ¶¶ 13, 48-120.)

Although Plaintiff takes issue with his use of the phrase "economically reasonable" investment

options (Pl.'s Mem. 15),[5] Dr. Wermers explains that, "for a plan option within a given investment style, there is a range of economically reasonable investment approaches that can be expected to provide an attractive combination of risk and return given the option's investment objective, *i.e.*, the fund's goals."  (ECF No. 179-62 (Wermers Rpt.) ¶ 41.)  As a result, "evaluating the economic reasonableness of an investment option requires a holistic consideration of a wide range of quantitative and qualitative factors, as well as expenses."  (*Id*. ¶ 42.)  Dr. Wermers demonstrates that four of the five GSAM funds "had historical returns that were generally consistent with, or better than, the returns of [their] mutual fund peers before the removal of the fund[s]" (*id.* ¶¶ 66, 84, 107, 126) and that the fifth fund had returns "that were generally consistent with the returns of its mutual fund peers" (*id.* ¶ 117).  Dr. Wermers also examines the long-term performance of the three supposedly underperforming challenged funds and demonstrates that, despite isolated years of underperformance, those funds' "long-run (ten-year) historical returns" also were "generally consistent with, or better than," those of their peers.  (*Id.* ¶ 13.)  "Based on [his] professional experience and the totality of [his] analysis, it is [Dr. Wermers'] opinion that it was economically reasonable to make each of the Challenged Funds available as an investment option for Plan participants during the [class period]."  (*Id*.)

Dr. Wermers' opinions provide more than sufficient evidence to create genuine disputes of fact over whether a prudent fiduciary would have retained the challenged GSAM funds in the Plan lineup at least until the Retirement Committee voted to remove them.  When deciding whether to

---

[5] Plaintiff appears to fault Dr. Wermers for not offering opinions that would constitute pure legal conclusions, such as whether a particular investment option was "prudent."  (Pl.'s Mem. 15 (Dr. Wermers' opinion "does not comport with Defendants' burden of proof under . . . Second Circuit law").)  Dr. Wermers' analysis is clearly admissible (Plaintiff has not moved to exclude it) and will provide ample assistance to the Court.  *See Ramos* v. *Banner Health*, 461 F. Supp. 3d 1067, 1129-30 (D. Colo. 2020) (applying similar expert analysis by Dr. Wermers), *aff'd*, 1 F.4th 769 (10th Cir. 2021).

remove an existing investment option, a prudent fiduciary should consider its long-run performance rather than short-term gains and losses. *See Ramos*, 461 F. Supp. 3d at 1129 (crediting Dr. Wermers' testimony that funds "were reasonable investment options, particularly over the longer timeframe, when compared to their peers and respective benchmark indexes"). "Put simply, the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers.  If that were the case, Plan sponsors would be duty-bound to merely follow the industry rankings for the past year's results, even though past performance is no guarantee of future success." *Patterson* v. *Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019).  As Defendants' expert Eileen Kamerick explains, "changes to a plan's investment line-up" should "be approached with care" because they are "disruptive to participants and may cause disengagement and confusion."  (ECF No. 179-60 (Kamerick Rpt.) ¶ 110.)

Plaintiff contends that Dr. Willard's critiques of Dr. Becker's loss models "are theoretical and do not come close to meeting Defendants' burden" because she "offers no opinion on whether a prudent and loyal fiduciary would have retained the Challenged GSAM Funds." (Pl.'s Mem. 15.) But that was not Dr. Willard's role:  she "was asked to evaluate whether the damages methodologies proposed by Dr. Becker are reliable estimates of any economic harm that may have derived from Defendants' alleged" violations of ERISA.  (ECF No. 179-63 (Willard Rpt.) ¶ 11.) In addition to evaluating Dr. Becker's methodologies, Dr. Willard offers an alternative framework for assessing damages based on Rocaton's High Conviction Buy List.  "Given Mr. Fender's view that the Retirement Committee should have considered the funds on Rocaton's 'High Conviction Buy List' as alternatives" to the GSAM funds at the beginning of the class period, Dr. Willard presents a "damages methodology" that "attribute[s] no damages" to GSAM funds that

outperformed any of the funds included on that Rocaton list in their respective asset categories. (*Id*. ¶¶ 83-84 & Ex. 5; *see* ECF No. 179-63 (Willard Tr.) at 85:11-17 (describing calculations performed related to those high conviction buy funds).)  She opines that "Plan participants incurred no economic losses from the inclusion" of any GSAM fund such as the Mid Cap Value Fund and High Yield Fund that outperformed any of the funds on Rocaton's High Conviction Buy List, which "Mr. Fender claims should have been considered for the Plan at the beginning of that period."  (ECF No. 179-63 (Willard Rpt.) ¶ 84.)  It is thus not accurate that Defendants "failed to present an alternative methodology for calculating loss" and have "forfeited [their] right to challenge whether the Plan suffered a loss or the amount of damages that should be awarded." (Pl.'s Mem. 15-16.)

In light of the ample evidence raising genuine issues of material fact about whether a prudent fiduciary would have made the same decisions as the Retirement Committee, summary judgment on the question of loss causation would be inappropriate.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for partial summary judgment in its entirety.

Dated:  New York, New York
        April 25, 2022

/s/ *Richard C. Pepperman II*

Richard C. Pepperman II
Thomas C. White
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:  212-558-4000
Facsimile:  212-558-3588
peppermanr@sullcrom.com
whitet@sullcrom.com
popovskym@sullcrom.com

*Attorneys for Defendants*

-26-